In re: **METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

This document relates to:

Columbia Board of Education v. Amerada Hess Corp., et al.,

Our Lady of the Rosary Chapel v. Amerada Hess Corp., et al.,

American Distilling and Manufacturing Co., Inc. v. Amerada Hess Corp., et al.,

Town of East Hampton v. Amerada Hess Corp., et al.,

United Water Connecticut, Inc. v. Amerada Hess Corp.,

Escambia County Utilities Authority v. Amerada Hess Corp.,

Village of Island Lake v. Amerada Hess Corp., et al.,

City of Rockport v. Amerada Hess Corp., et al.,

City of Mishawaka v. Amerada Hess Corp., et al.,

City of South Bend v. Amerada Hess Corp., et al.,

North Newton School Corp. v. Amerada Hess Corp., et al.,

Town of Campbellsburg v. Amerada Hess Corp., et al.,

City of Galva, et al. v. Amerada Hess Corp., et al.,

City of Park City v. Alon USA Energy, Inc., et al.,

City of Dodge City v. Alon USA Energy, Inc., et al.,

Chisholm Creek Utility Authority v. Alon USA Energy, Inc., et al.,

City of Bel Aire v. Alon USA
Energy, Inc., et al.,

City of Marksville v. Alon USA
Energy, Inc., et al.,

Town of Rayville v. Alon USA
Energy, Inc., et al.,

Town of Duxbury, et al. v. Amerada
Hess Corp., et al.,

City of Dover v. Amerada
Hess Corp., et al.,

City of Portsmouth v. Amerada
Hess Corp., et al.,

New Jersey American Water Co.,
Inc., et al. v. Amerada Hess
Corp., et al.,

Basso, et al. v. Sunoco, Inc., et al.,

Carle Place Water District
v. Agip, Inc., et al.,

City of New York v. Amerada
Hess Corp., et al.,

County of Nassau v. Amerada
Hess Corp., et al.,

County of Suffolk, et al. v. Amerada
Hess Corp., et al.,

Franklin Square Water District v.
Amerada Hess Corp., et al.,

Hicksville Water District v. Amerada
Hess Corp., et al.,

Incorporated Village of Mineola,
et al. v. Agip, Inc., et al.,

Incorporated Village of Sands Point
v. Amerada Hess Corp., et al.,

Long Island Water Corp. v. Amerada
Hess Corp., et al.,

Port Washington Water District v.
Amerada Hess Corp., et al.,

Roslyn Water District v. Amerada

Hess Corp., et al.,

Tonneson, et al., v. Exxon
Mobile Corp., et al.,

Town of East Hampton
v. Agip, Inc., et al.,

Town of Southampton v.
Agip, Inc., et al.,

Town of Wappinger v. Amerada
Hess Corp., et al.,

United Water New York, Inc. v.
Amerada Hess Corp., et al.,

Village of Hempstead v.
Agip, Inc., et al.,

Village of Pawling v. Amerada
Hess Corp., et al.,

Water Authority of Great Neck North
v. Amerada Hess Corp., et al.,

Water Authority of Western Naussau
County v. Amerada Hess Corp.,
et al.,

West Hempstead Water District
v. Agip, Inc., et al.,

Westbury Water District
v. Agip, Inc., et al.,

Northampton, Bucks County Municipal
Authority v. Amerada Hess Corp.,
et al.,

Craftsbury Fire District #2 v. Amerada
Hess Corp., et al.,

Town of Hartland v. Amerada
Hess Corp., et al.,

Buchanan County School Board v.
Amerada Hess Corp., et al.,

Patrick County School Board v.
Amerada Hess Corp., et al.,

Town of Matoaka v. Amerada
Hess Corp., et al.,

Nos. MDL 1358(SAS), M21–88, 04 Civ.

1716, 04 Civ.1718–1722, 04 Civ.2053, 04 Civ.1724, 04 Civ.2055–2057, 04 Civ.4990, 04 Civ.1723, 04 Civ.2059–2062, 04 Civ. 3412, 04 Civ.3413, 04 Civ.1725, 04 Civ. 2067, 04 Civ.2066, 04 Civ.1726, 03 Civ. 9050, 03 Civ.10053, 04 Civ.3417, 03 Civ. 9543, 04 Civ.5424, 04 Civ.5423, 04 Civ. 5421, 03 Civ.10051, 04 Civ.3416, 04 Civ. 2068, 04 Civ.3415, 04 Civ.5422, 03 Civ. 8248, 03 Civ.10056, 03 Civ.10054, 04 Civ. 2388, 04 Civ.2389, 03 Civ.10055, 04 Civ. 2390, 04 Civ.1727, 03 Civ.9544, 03 Civ. 10052, 03 Civ.10057, 04 Civ.6993, 04 Civ. 3419, 04 Civ.2072, 04 Civ.3418, 04 Civ. 2070, 04 Civ.3420.

United States District Court,
S.D. New York.

April 20, 2005.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery LLP, New York, NY, for Defendants.

Robert Gordon, Stanley N. Alpert, C. Sanders McNew, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### Table of Contents

I. INTRODUCTION ...................................................................361

II. FACTUAL ALLEGATIONS ...........................................364

III. LEGAL STANDARD ...................................................367
 A. Rule 12(b)(6) ....................................................367
 B. Rule 8 .................................................................367
 C. Rule 9(b) ...........................................................368
 D. Prediction of State Law ...................................369

IV. THEORIES OF COLLECTIVE LIABILITY ..............370
 A. Concurrent Wrongdoing ...................................371
 B. Concert of Action Liability...............................372
 C. Alternative Liability ........................................373
 D. Enterprise Liability .........................................373
 E. Market Share Liability ....................................374
 F. "Commingled Product" Market Share Liability ..................377

V. CONNECTICUT.......................................................379
 A. Collective Liability ..........................................379
 B. Connecticut Products Liability Act..................383
 C. Connecticut Unfair Trade Practices Act .........385
 D. Fraud .................................................................386

VI. FLORIDA..................................................................388
 A. Collective Liability ..........................................388
 B. Trespass ............................................................389
 C. Civil Conspiracy...............................................390

VII. ILLINOIS ...............................................................391
 A. Collective Liability ..........................................391
 B. Illinois Water Pollutant Discharge Act ..........393

VIII. INDIANA.................................................................394
 A. Collective Liability ..........................................394
 B. Indiana Environmental Legal Action ..............397
 C. Downstream Handlers ......................................397

IX. IOWA.........................................................................398
 A. Collective Liability ..........................................398
 B. Trespass ............................................................400
 C. Fraud .................................................................401

X. KANSAS ....................................................................402

 A. Collective Liability ..................................................403

XI. LOUISIANA ....................................................405
 A. Collective Liability ........................................405
 B. Louisiana Products Liability Act ........................408

XII. MASSACHUSETTS .............................................409
 A. Collective Liability ........................................409
 B. Trespass ....................................................411
 C. Massachusetts Oil and Hazardous Material Release Prevention and
 Response Act ..........................................412

XIII. NEW HAMPSHIRE..........................................413
 A. Collective Liability ........................................413
 B. Nuisance ....................................................416
 C. Trespass ....................................................417
 D. Oil Discharge Statute ......................................418
 E. New Hampshire Consumer Protection Act ..............419

XIV. NEW JERSEY .................................................420
 A. Collective Liability ........................................420
 B. Private Nuisance ..........................................422
 C. New Jersey Spill Compensation and Control Act ........423

XV. NEW YORK.....................................................424
 A. Collective Liability ........................................425
 B. Trespass ....................................................426
 C. New York Oil Spill Prevention, Control, and Compensation Act...........427
 D. Negligence Per Se .........................................429
 E. Infliction of Emotional Distress ..........................429

XVI. PENNSYLVANIA .............................................433
 A. Collective Liability ........................................433
 B. Trespass ....................................................437

XVII. VERMONT, VIRGINIA, and WEST VIRGINIA ..........................438
 A. Collective Liability ........................................439
 B. Trespass ....................................................440

XVIII. CONCLUSION ...............................................441

## I. INTRODUCTION

In this consolidated multi-district litigation, plaintiffs seek relief from defendants' alleged contamination, or threatened contamination, of groundwater with the gasoline additive methyl tertiary butyl ether ("MTBE"). The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opinions is assumed.[1] Defendants now move,

---

1. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan.18, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21–88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan.6, 2005); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21–88, MDL 1358(SAS), 2004 WL 2454053 (S.D.N.Y. Nov.3, 2004); *In re Methyl Tertiary Butyl* *Ether Prods. Liab. Litig.*, No. M21–88, MDL 1358(SAS), 2004 WL 2360136 (S.D.N.Y. Oct.19, 2004); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 341 F.Supp.2d 386 (S.D.N.Y.2004); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 341 F.Supp.2d 351 (S.D.N.Y.2004); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 342 F.Supp.2d 147 (S.D.N.Y.2004); *In re Methyl Tertiary Butyl*

pursuant to Federal Rule of Civil Procedure 12(b)(6), for the complete dismissal of all the complaints filed in fifteen states: Connecticut, Florida, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Vermont, Virginia, and West Virginia.

While raising many issues, defendants' motions to dismiss focus in particular on the problem of product identification. Defendants argue that the complaints from all fifteen states must be dismissed because plaintiffs have failed to identify which defendant's MTBE-containing gasoline proximately caused their harm. In each of the relevant jurisdictions, plaintiffs must establish which product was responsible for causing their injuries in order to be granted relief.[2] If plaintiffs cannot do so, their cases cannot survive unless they

can proceed on a theory of collective liability. Plaintiffs concede that they cannot identify the offending product due to its fungible nature, as well as the commingling of many suppliers' petroleum products during transportation and distribution. Thus, the primary question addressed in this decision is whether plaintiffs may proceed on their state law claims based on theories of collective liability.

▬ An important point must be highlighted at the outset, which raises the delicate consideration of the dual sovereignty of the federal and state courts. In the absence of a definitive ruling by the highest court of a particular state, this Court is called upon to predict what that court would decide if presented with the issue of collective liability.[3] This is the duty of a federal court when faced with an undecided issue of state law.[4] States have

---

*Ether Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y.2002); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 00 Civ. 1898(SAS), 2002 WL 32361003 (S.D.N.Y. May 23, 2002); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 174 F.Supp.2d 4 (S.D.N.Y. 2001); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, MDL 1358, 2001 WL 1042051 (S.D.N.Y. Sept.7, 2001); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F.Supp.2d 593 (S.D.N.Y.2001) (*"MTBE I"*).

**2.** *See* La.Rev.Stat. § 9:2800.54(A); *Sharp v. Wyatt, Inc.*, No. 28 64 15, 1992 WL 91718, at *7 (Conn.Super.Ct. Apr.8, 1992), *rev'd on other grounds*, 31 Conn.App. 824, 627 A.2d 1347, 1352 (1993); *Conley v. Boyle Drug Co.*, 477 So.2d 600, 602 (Fla.Ct.App.1985), *rev'd on other grounds*, 570 So.2d 275 (Fla.1990); *Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 328 (1990); *Fulk v. Allied Signal, Inc.*, 755 N.E.2d 1198, 1203 (Ind.Ct.App.2001); *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 70 (Iowa 1986); *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 661 P.2d 348, 357 (1983); *Payton v. Abbott Labs.*, 386 Mass. 540, 437 N.E.2d 171, 188 (1982); *Hancock v. R.A. Earnhardt Textile Mach. Div., Inc.*, 139 N.H. 356, 357, 653 A.2d 558 (1995); *Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710,

716 (1993); *Healey v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596, 601, 640 N.Y.S.2d 860, 663 N.E.2d 901 (1996); *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50, 52 (1988); *Bean v. Asbestos Corp. Ltd.*, No. 95–52, 1998 WL 972122, at *33 (Va. Cir. Ct. Feb.26, 1998); *Gilman v. Towmotor Corp.*, 160 Vt. 116, 119, 621 A.2d 1260 (1992); *Tolley v. Carboline Co.*, No. 31751, 2005 WL 636791 (Mar.18, 2005).

**3.** *See infra* Part III.D.

**4.** The Court has no choice but to apply and predict state law in this case. "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.... There is no federal general common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In limited circumstances, however, the Supreme Court has recognized the need to formulate federal common law. "These instances are few and restricted, and fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop substantive law." *Texas Indus., Inc. v. Radcliff Materials,*

the primary responsibility to construe their own laws.[5] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The great innovation of this design was that "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other"—"a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its

own set of mutual rights and obligations to the people who· sustain it and are governed by it." [6]

Therefore, some federal courts—especially in diversity cases—have exercised great restraint in ruling on novel issues of state law.[7] While not adopting the Seventh Circuit's refusal to "speculat[e] about trends" in state law, the Second Circuit has stated that the role of the federal court is to "construe and apply state law as [it] believe[s] the state's highest court would, not to adopt innovative theories that may distort established state law." [8] Courts have

---

*Inc.,* 451 U.S. 630, 640, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (quotation marks and citations omitted). "[A]bsent some congressional authorization to formulate substantive rules of decision,. federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Id.* at 641, 101 S.Ct. 2061. Furthermore, "a federal court may fashion federal common-law rules only upon a specific showing that the use of state law will create a significant conflict with, or threat to, some federal policy or interest." *Atherton v. FDIC,* 519 U.S. 213, 214, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). *Accord O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Wallis v. Pan Am. Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). None of these circumstances exist here.

**5.** *See Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) ("[T]he State's highest court is the best authority on its own law."); *Erie,* 304 U.S. at 79, 58 S.Ct. 817 ("The authority and only authority is the State, and if that be so, the voice adopted by the State as its own (whether it be of its Legislature or of its Supreme Court) should utter the last word.").

**6.** *Printz v. United States,* 521 U.S. 898, 920, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838, 115 S.Ct.˙1842, 131 L.Ed.2d 881 (1995)).

**7.** *See, e.g., Birchler v. Gehl Co.,* 88 F.3d 518, 521 (7th Cir.1996) ("We avoid speculation about trends in diversity cases: our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court.") (quotation marks and citation omitted); *Pearson v. John Hancock Mut. Life Ins. Co.,* 979 F.2d 254, 259 (1st Cir.1992) (court's reticence not unfair to the plaintiff because plaintiff "deliberately chose to bring this action in federal court when the state ·courts were equally available to him. A litigant who seeks out a federal forum when a state-court forum is equally available to him cannot justifiably complain if the federal court manifests great caution in blazing new state-law trails."); *Villegas v. Princeton Farms, Inc.,* 893 F.2d 919, 925 (7th Cir.1990) (abuse of discretion to vacate judgment so that plaintiff could refile in state court because the plaintiff "attempted to prove his novel theory in federal court, instead of giving the Illinois courts the first opportunity to address this issue"); *Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987) ("In the context of pendent state law claims, we have already indicated our unwillingness to speculate on any trends in state law ... [O]ur policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court.").

**8.** *City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1153 (2d Cir.1989). *See also National Union Fire Ins. Co. of Pittsburgh v. The Stroh Companies, Inc.,* 265 F.3d 97, 106 (2d Cir.2001) (acknowledging a reluctance, "in the absence of clear guidance from

noted that such caution is especially appropriate where plaintiffs choose to bring an action in federal court.[9]

Here, plaintiffs did not bring these actions in federal court in the hope of obtaining a broader interpretation of state law than they might reasonably expect to obtain from the state. All of these actions were originally brought in state court but removed to federal court over plaintiffs' vigorous objections. Thus, plaintiffs sought to have a state court interpret state law and should not be prejudiced by a removal they opposed.

■ When a defendant removes a case from state to federal court, a liberal construction of state law protects the principle of dual sovereignty by protecting a party who sought to obtain a resolution of state law claims from state courts. If this Court were to adopt a more restrictive reading of state law than the highest courts of the relevant states would be likely to adopt, the parties would be treated differently than they would be in a state court—a result directly contrary to the fundamental

goals of *Erie*, namely the "discouragement of forum-shopping and avoidance of inequitable administration of laws."[10] Therefore, while a court may not adopt "innovative theories" without support in state law, or "distort" existing state law, when a case is removed to federal court, the plaintiff is entitled to the same treatment it would receive in state court—no more, and no less.

## II. FACTUAL ALLEGATIONS

A thorough recitation of plaintiffs' fact allegations is warranted because these motions will be decided on the pleadings. Although the complaints are not identical, they allege essentially the same facts.[11] Plaintiffs are generally cities, municipal corporations, and public and private water providers.[12] Defendants engaged in one or more phases of the petroleum business, including the design, manufacture, and distribution of gasoline containing MTBE.[13]

MTBE is chemical compound produced from methanol and isobutylene, a byproduct of the gasoline refining process. It is

state courts" to adopt an "innovative theory," but noting in dicta that it might be appropriate for the federal court to make a "short leap from [] formulations" present in existing state law to predict that the state's highest court would adopt the novel theory).

9. *See, e.g., Shaw,* 810 F.2d at 150 ("This policy applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court.").

10. *Hanna v. Plumer,* 380 U.S. 460, 468, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Moreover, the independence and sovereignty of the states is ill-served by a policy which gives parties a strong incentive to remove cases to federal court to escape foreseeable adverse developments in state law, thus systematically depriving state courts of the opportunity to address such novel issues. *See Paul v. Watchtower Bible & Tract Soc.,* 819 F.2d 875, 879 (9th Cir.1987) (declining to adopt a policy of restraint in interpreting state law, in part because "a policy by the federal courts never

to advance beyond existing state court precedent would vest in defendants the power to bar the successful adjudication of plaintiffs' claims in cases with novel issues; defendants could ensure a decision in their favor simply by removing the case to federal court. Congress, in providing for removal, certainly did not intend to provide such a weapon to defendants.").

11. These allegations are taken from the Fifth Amended Complaint of American Distilling and Mfg. Co., Inc. ("Am. Distilling Compl."). The following recitation is a summary of the allegations and is not a finding of facts.

12. The *Tonneson* and *Basso* plaintiffs are citizens of New York who use or possess property that draws water from allegedly contaminated wells.

13. *See* Am. Distilling Compl. ¶ 10.

highly soluble in water and does not readily biodegrade. Because of its high solubility, MTBE races through the underground water supply, eventually contaminating wells and underground aquifers. MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline. Even in very small quantities, MTBE imparts a foul taste and odor to water and renders it unusable and unfit for human consumption. MTBE is carcinogenic in animals and may be carcinogenic in humans, as well.[14]

Once it is released into the environment, MTBE lacks a "chemical signature" that would enable identification of the refinery or company that manufactured that particular batch of gasoline. The process of manufacturing and distributing petroleum products involves complex arrangements whereby defendants trade, barter or otherwise exchange product for delivery throughout parts of the country. MTBE-containing gasoline from various refiners is commingled during its transmission via pipeline from refineries to distribution centers.[15]

Sometime after 1979, defendants began adding the oxygenate MTBE to gasoline in order to boost octane levels in higher grades of gasoline. Defendants claimed that MTBE helped fuel burn more efficiently to reduce air pollution. Although the Clean Air Act of 1990 required defendants to use oxygenates, there were many possible alternatives. Defendants chose MTBE so as to profit from a gasoline refining waste byproduct. Ironically, MTBE does not deliver defendants' promise of cleaner air, as it does little to reduce ozone air pollution and smog, and combustion of MTBE-containing gasoline in car

engines actually increases exhaust emissions of toxic chemicals. MTBE that is discharged into the air contaminates groundwater through the return of rainfall.[16]

Defendants were aware that mixing MTBE with gasoline would result in massive groundwater contamination. They knew that there was a national crisis involving gasoline leaking from multiple sources, such as underground storage tanks, and that gasoline enters the soil from gas stations due to consumer and jobber overfills. Defendants studied and shared information with each other. For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry (including defendants), formed a Toxicology Committee, which repeatedly discussed MTBE's propensity to contaminate groundwater. Although the Committee acknowledged the need for certain toxicological information, no ingestion studies on the effects of MTBE were ever performed.[17] Defendants had specific knowledge of instances of MTBE groundwater contamination during the 1980s and 1990s in Rockaway, N.J., Jacksonville, Md., Liberty, N.Y., and East Patchogue, N.Y.[18] Defendants were also aware of a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water Contaminant" by Peter Garrett and Marcel Morceau, which recommended that MTBE be banned as a gasoline additive or at least be stored in double-contained facilities. Defendants banned together and tried unsuccessfully to change the authors' conclusions. Defendants' internal documents demonstrate

14. *See id.* ¶¶ 87–88, 98–103.

15. *See id.* ¶¶ 191–193.

16. *See id.* ¶¶ 91–97.

17. *See id.* ¶¶ 106–140.

18. *See id.* ¶¶ 116–123.

their awareness of MTBE contamination of groundwater.[19]

Despite knowledge of MTBE's ill effects, defendants conspired to mislead plaintiffs, the EPA, downstream handlers, and the public about the hazards of adding MTBE to gasoline. Beginning in the early 1980s, defendants formed various task forces and committees under the auspices of trade organizations, such as the API, Oxygenated Fuels Association ("OFA"), and MTBE Committee, to convince the public and regulators of the desirability of increasing concentrations of MTBE in gasoline and to conceal the risk of MTBE contamination.[20]

In furtherance of this conspiracy, defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act during the late 1980s. Among other things, they provided joint comments through the MTBE Committee that "sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data." [21] The Committee made other such comments that downplayed MTBE's risk to groundwater.[22]

In addition, defendants misled Congress into broadening the market for MTBE by including oxygenate requirements in the Reformulated Gasoline ("RFG") Program adopted in the 1990 amendments to the Clean Air Act. The idea for the RFG program was developed and promoted by the petroleum industry—not by the EPA or federal government. Through the amendments, Congress mandated the use of RFG containing at least 2% oxygen by weight in those areas of the country with the worst ozone and smog problems. In 1992, the EPA initiated the Oxygenated Fuels Program, which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas during the fall and winter months.[23]

Finally, defendants perpetuated their conspiracy by misleading plaintiffs and the public about the hazards of gasoline containing MTBE. By way of example, during a public presentation, an agent of the MTBE Committee represented that MTBE spills had been effectively dealt with. The API responded to an article critical of MTBE by claiming that there was no basis to question its continued use. And the OFA published and distributed a pamphlet indicating that contamination was rare. The OFA pamphlets even suggested that MTBE in groundwater provided a public health service by acting as an early indicator of gasoline contamination, thereby triggering cleanup and remediation. According to plaintiffs, had plaintiffs and the public been warned of the hazards of MTBE, they would have sought and demanded alternative oxygenates.[24]

After the creation of the RFG Program, defendants dramatically increased their use of MTBE. MTBE is now the second most frequently detected chemical in groundwater in the United States.[25] Because MTBE-containing gasoline is a fungible product, plaintiffs are pursuing their claims against defendants jointly and severally under applicable theories of collec-

---

19. *See id.* ¶¶ 132–140, 146.

20. *See id.* ¶ 141.

21. *Id.* ¶ 151.

22. *See id.* ¶¶ 142–157

23. *See id.* ¶¶ 158–162.

24. *See id.* ¶¶ 165–172.

25. *See id.* ¶¶ 173–178, 186.

tive liability.[26]

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' "[27] At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' "[28]

■ The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[29] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[30] Although the plaintiff's allegations are taken as true,

the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[31]

### B. Rule 8

■ It is now well-established that a plaintiff need not "set out in detail the facts upon which [it] bases [its] claim,"[32] nor allege a prima facie case.[33] Pursuant to Rule 8, "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' "[34] The issue is not whether a plaintiff has alleged certain facts, but whether the facts asserted give the defendant fair notice of the claim and the basis for such claim.[35] Fair notice is " 'that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial.' "[36] This notice pleading standard "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues

---

**26.** *See id.* ¶ 194.

**27.** *Weixel v. Board of Educ. of N.Y.*, 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (alterations omitted)).

**28.** *Phelps v. Kapnolas*, 308 F.3d 180, 184–85 (2d Cir.2002) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998)). *Accord In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 322–24 (S.D.N.Y.2003).

**29.** *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir.2004) (quotation marks and citation omitted).

**30.** *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

**31.** *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,*

*L.L.P.*, 322 F.3d 147, 158 (2d Cir.2003); *Stamelman v. Fleishman–Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *2 (S.D.N.Y. July 31, 2003).

**32.** *Conley*, 355 U.S. at 47, 78 S.Ct. 99, 2 L.Ed.2d 80.

**33.** *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514–15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *see also Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir.2004) (legal theories, specific authority, and detailed evidence *"are not* requirements imposed by Rule 8").

**34.** *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992 (quoting Fed.R.Civ.P. 8(a)(2)).

**35.** *See id.*

**36.** *Wynder*, 360 F.3d at 79 (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir.1995)).

and to dispose of unmeritorious claims."[37] "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."[38] Accordingly, a claim can only be dismissed if " 'no relief could be granted under *any* set of facts that could be proved consistent with the allegations.' "[39]

An understanding of Rule 8's notice pleading standard is essential because the case law must be considered in this light.[40] Many of the states relevant to these motions are fact pleading jurisdictions, and therefore require plaintiffs to plead more in their complaints than merely providing notice.[41] To the extent these cases (or *MTBE I*[42]) suggest that every element of a claim must be alleged, they are inconsistent with the controlling pleading standards governing this case.[43]

### C. Rule 9(b)

When a plaintiff alleges fraud, on the other hand, the defendant must be given more than notice of the claim. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."[44] The objectives of the Rule are (1) to provide a defendant with fair notice of the plaintiff's claim to enable preparation of a defense; (2) to protect a defendant from harm to its reputation or goodwill; and (3) to reduce the number of strike suits.[45] Rule 9(b)

37. *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992. *Accord Conley,* 355 U.S. at 48, 78 S.Ct. 99, 2 L.Ed.2d 80 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

38. *Swierkiewicz,* 534 U.S. at 514, 122 S.Ct. 992.

39. *Id.* at 513, 122 S.Ct. 992 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)) (emphasis added).

40. Prior to *Swierkiewicz,* some federal courts held plaintiffs to an unduly high standard of pleading.

41. *See Connecticut Water Co. v. Town of Thomaston,* No. CV 940535590S, 1997 WL 255101 (Conn.Super.Ct. Apr.24, 1997) (fact pleading); *Continental Baking Co. v. Vincent,* 634 So.2d 242, 244 (Fla.Ct.App.1994) (same); *Levin v. King,* 271 Ill.App.3d 728, 208 Ill.Dec. 186, 648 N.E.2d 1108, 1113 (1995) (same); *Robertson v. West Carroll Ambulance Serv. Dist.,* 892 So.2d 772, 777–78 (La.App. 2 Cir. 2005) (same); *Youndt v. First Nat'l Bank of*

*Port Allegany,* 868 A.2d 539, 544–45 (Pa.Super.2005) (same).

42. This Court's decision in *MTBE I,* which addressed collective liability in California, New York, Illinois, and Florida, was issued prior to *Swierkiewicz.*

43. Rule 8 applies to removed state law claims, as well as to state law claims originally filed in federal court. *See Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 214–15 (2d Cir.2003) (removed to federal court); *Siegelman v. Cunard White Star,* 221 F.2d 189, 196 (2d Cir.1955) (same); *Phillips & Benjamin Co. v. Ratner,* 206 F.2d 372, 376 (2d Cir.1953) (same); *cf. Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 512 (2d Cir.2005) (action alleging state law claims originally filed in federal court). Applying the Rule 8 pleading standard to both removed and originally filed actions ensures consistency in the application of procedural rules by federal courts. If a defendant does not want Rule 8 to govern on a motion to dismiss, it should not remove to federal court.

44. Fed.R.Civ.P. 9(b).

45. *See IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993); *Di-*

must be read in conjunction with Rule 8's requirement of a "short and plain statement" of the claim.[46]

A fraud claim should specify the who, what, when, where, and how of the alleged fraud.[47] "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of [its] alleged participation in the fraud."[48] Although scienter may be averred generally, the plaintiff must allege facts that give rise to a strong inference of fraudulent intent.[49] "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both a motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[50]

An exception to Rule 9(b) is that fraud allegations may be based upon information and belief as to facts peculiarly within the opposing party's knowledge.[51] However, "the allegations must be accompanied by a

statement of the facts upon which the belief is based."[52]

## D. Prediction of State Law

" 'Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve uncertainty or ambiguity.' "[53] In making a prediction of state law, federal courts "look to the state's decisional law, as well as to its constitution and statutes."[54] The "fullest weight" is accorded to the pronouncements of the state's highest court, while "proper regard" is given to the relevant rulings of the state's lower courts.[55] A court may consider cases from other jurisdictions on the same or analogous issues.[56] If the state has not passed on the question but the federal appeals court in the circuit where the state is located "has essayed its own prediction of the course of state law . . ., the federal courts of other circuits should defer to that holding."[57] However, a court is not bound by the relevant circuit court's decision if it is

Vittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987).

**46.** See DiVittorio, 822 F.2d at 1247.

**47.** See id.; Polar Int'l Brokerage Corp. v. Reeve, 108 F.Supp.2d 225, 236 (S.D.N.Y. 2000).

**48.** DiVittorio, 822 F.2d at 1247. Accord Polar, 108 F.Supp.2d at 237 ("It is well-settled that where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of its alleged participation in the fraud. The requirements of Rule 9(b) are not satisfied by a complaint in which defendants are clumped together in vague allegations.").

**49.** See Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir.1994).

**50.** Id. Accord Wexner v. First Manhattan Co., 902 F.2d 169, 173 (2d Cir.1990) (dismissing fraud claim because allegations did not pro-

vide a factual basis from which an inference of fraud could be drawn).

**51.** See DiVittorio, 822 F.2d at 1247.

**52.** Id.

**53.** Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 199 (2d Cir.2003) (quoting Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir.1994)). Accord McCarthy v. Olin Corp., 119 F.3d 148, 153 (2d Cir.1997) (same).

**54.** Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 297 (2d Cir.2000).

**55.** Travelers, 14 F.3d at 119.

**56.** See Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 78 (2d Cir.1999).

**57.** Factors Etc., Inc. v. Pro Arts, Inc., 652 F.2d 278, 283 (2d Cir.1981).

persuaded that the holding ha[s] been superceded by a later pronouncement from state legislative or judicial sources, or that prior state court decisions had been inadvertently overlooked by the pertinent court of appeals ... [,] the pertinent court of appeals [ ] disregarded clear signals emanating from the state's highest court pointing toward a different rule ... [or the sitting court] can point to a clear basis in [state] law for predicting that the [state] courts, when confronted with a case such as [the one before it], would conclude that the [circuit court's] prediction was incorrect.[58]

In making the required predictions, a court must carefully consider any state constitutions, statutes or judicial decisions, as well as the law from other states, and any Restatements of the law.[59] When considering judicial decisions, those with facts most analogous to the issues presented to the court have the most persuasive authority. If after reaching these predictions, a state's highest court issues a ruling contrary to those predictions, a defendant may always renew a motion to dismiss based on the decision of the state's highest court.

## IV. THEORIES OF COLLECTIVE LI-ABILITY

Defendants contend that because none of the fifteen states recognize the theories of concert of action, alternative, enterprise, or market share liability, plaintiffs will not be able to sustain their burden of proving causation. Plaintiffs respond that Rule 8 does not require them to plead theories of causation, but in any event, each state would adopt collective liability theories in the MTBE context. Plaintiffs add that in addition to the theories named by defendants, certain states might also apply the joint and several liability principle of concurrent negligence. Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim. The issue is whether plaintiffs can prove any set of facts that would entitle them to relief.[60]

Plaintiffs argue in the alternative that if the Court rejects all theories of collective liability, their claims should still not be dismissed because they may, following discovery, be able to prove causation through traditional proof of product identification. Defendants object to that argument on the ground that plaintiffs are bound by the admissions in their complaints that product identification is impossible. According to defendants, because these fifteen states do not recognize collective liability theories, plaintiffs have pled themselves out of court. The arguments made by both plaintiffs and defendants are devoid of merit.

*First*, plaintiffs' claims cannot survive these motions to dismiss based on the mere possibility of plaintiffs identifying the manufacturer of the offending product during discovery. To accept this argument would be akin to granting pre-action

**58.** *Id.*

**59.** *See Travelers*, 14 F.3d at 119 (resources to be considered include "the statutory language, pertinent legislative history, the statutory scheme set in historical context, how the statute can be woven into the state law with the least distortion of the total fabric, state decisional law, federal cases which construe the state statute, scholarly works and any other reliable data tending to indicate how the [state's highest court] would resolve the [issue]").

**60.** *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir.1999) ("Rule 8(a)(2) specifies the conditions of the formal adequacy of a pleading. It does not specify the conditions of its substantive adequacy, that is, its legal merit.").

discovery to plaintiffs, which would impose onerous burdens on defendants and would encourage strike suits against participants in certain industries. It is not fair to require more than two hundred companies to defend against these MTBE claims if plaintiffs cannot name the actual tortfeasors, and the fifteen states do not relieve plaintiffs of that burden.

■ *Second,* plaintiffs' statements of impossibility are not judicial admissions because they pertain to facts peculiarly in the knowledge and control of defendants. While "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding," [61] judicial admissions generally pertain to matters that a party is uniquely positioned to know and concede, as opposed to facts uniquely known or controlled by an adverse party.[62] Trial judges are given broad discretion to relieve the parties from the consequences of judicial admissions in the appropriate circumstances.[63]

Plaintiffs assert that they cannot identify the wrongdoer based on the fungible nature of the MTBE-containing gasoline. However, if plaintiffs' claims survive based on theories of collective liability, then discovery will proceed. During that discovery, evidence might reveal that the offending product can be traced to a specific tortfeasor through the sales and distribution records of defendants. It would be unfair to treat plaintiffs' assertions as binding when defendants are in a better position to know who manufactured the injury-causing product, but have little incentive to provide that information. Plaintiffs' statements were based on an incomplete understanding of the relevant facts— many of which may surface in the course of discovery. If plaintiffs are able to discover which defendants caused their injuries, they will not be permitted to proceed on a theory of collective liability, but must pursue the actual wrongdoers and dismiss the remaining defendants. Accordingly, plaintiffs are not precluded from proving their case through individualized proof of product identification if they eventually discover whose products caused their harm.

### A. Concurrent Wrongdoing

■ Ordinarily, "[w]hen two causes combine to produce injuries, one is not relieved from liability because [it] is responsible for only one of them. The negligence of two or more persons may concur, and each be liable." [64] For liability to attach, defendants' tortious conduct need not be simultaneous in time, but must combine to produce plaintiff's indivisible injury.[65] This concept of concurrent wrongdoing evolved to relieve plaintiffs of the burden of establishing several liability in cases

**61.** *Bellefonte Re Insurance Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir.1985).

**62.** *See Banks v. Yokemick,* 214 F.Supp.2d 401, 406 (S.D.N.Y.2002).

**63.** *See United States v. Belculfine,* 527 F.2d 941, 944 (1st Cir.1975) (citing Wigmore on Evidence ¶ 2590); *Coral v. Gonse,* 330 F.2d 997, 998 n. 1 (4th Cir.1964); *Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.,* 87 F.Supp.2d 394, 406 (D.N.J.2000).

**64.** *Albert v. Lee Circle, Inc.,* 162 Conn. 124, 128, 291 A.2d 735 (1971). *Accord Ravo v. Rogatnick,* 70 N.Y.2d 305, 312, 520 N.Y.S.2d 533, 514 N.E.2d 1104 (1987) (finding joint and several liability appropriate where the evidence established that plaintiff's brain damage was a single indivisible injury and the defendants failed to submit any evidence upon which a finder of fact could base an apportionment of damages).

**65.** *See McGraw v. Weeks,* 326 Ark. 285, 288, 930 S.W.2d 365 (1996); *Ravo,* 70 N.Y.2d at 311, 520 N.Y.S.2d 533, 514 N.E.2d 1104.

where more than one defendant proximately caused the harm.[66] One court has explained:

> Historically, several liability was employed in situations where the plaintiff's injury was divisible according to the causal contributions of multiple defendants. This use of several liability imposed a burden of proof on plaintiff to demonstrate the portion of the injury caused by each defendant. Thus, factual causation was the basis for determining the several-liability portion of the plaintiff's injuries for which each defendant was liable. Nevertheless, in cases in which proof was unavailable or difficult to obtain, many courts adopted joint and several liability to relieve the plaintiff of the difficulties of proof.[67]

The burden of proving apportionment is shifted to the defendants because of the "injustice of allowing a proved wrongdoer who has in fact caused the harm to the plaintiff to escape liability merely because the harm which [it] has inflicted has combined with similar harm inflicted by other wrongdoers."[68] Cases applying the rule of concurrent wrongdoing typically involve a small number of tortfeasors, such that the imposition of joint and several liability does not cause disproportionate hardship to the defendants.[69]

## B. Concert of Action Liability

 The theory of concert of action is a principle of vicarious liability. One party is responsible for the acts of another if it

(a) does a tortious act in concert with the other or pursuant to a common design with [it], or

(b) knows that the other's conduct constitutes a breach of a duty and gives substantial assistance or encouragement so to conduct [itself], or

(c) gives substantial assistance to the other in accomplishing a tortious result and [its] own conduct, separately considered, constitutes a breach of duty to the third person.[70]

The term "conspiracy" is often used where the wrongful acts were done pursuant to an express common plan or design to cooperate in tortious conduct.[71] In order for liability to attach, however, express agreement among the actors is not required. A mere tacit understanding is sufficient. The classic example of concerted action is a drag race, in which one driver is the cause-in-fact of the accident, but the other

---

**66.** Although this principle has been called "concurrent negligence," I use the broader term of "concurrent wrongdoing" to encompass cases in which multiple defendants may have acted intentionally or recklessly. Where the culpability level of defendants is high, it presents an even more compelling argument for the application of joint and several liability than does merely negligent conduct.

**67.** *City of Tulsa v. Tyson Foods, Inc.*, 258 F.Supp.2d 1263, 1300 (N.D.Okla.2003) (quoting Restatement (Third) of Torts: Apportionment of Liability § 11 cmt. b (2000)).

**68.** Restatement (Second) of Torts § 433B(2) cmt. d (1965).

**69.** *See, e.g., City of Tulsa v. Tyson Foods, Inc.*, 258 F.Supp.2d 1263, 1300 (N.D.Okla.2003) (action against seven defendants for pollution of lake); *McGraw*, 326 Ark. at 288, 930 S.W.2d 365 (damage to cotton crop from application of herbicide to nearby field by three defendants); *Ravo*, 70 N.Y.2d at 313, 520 N.Y.S.2d 533, 514 N.E.2d 1104 (brain damage negligently inflicted by obstetrician and pediatrician); *Union Texas Petroleum Corp. v. Jackson*, 909 P.2d 131, 150 (Okla.App.1995) (saltwater contamination of aquifer by two petroleum companies); Restatement (Second) of Torts § 433B(2) cmt. e (observing that typical cases applying concurrent negligence principles involve two or three tortfeasors).

**70.** Restatement (Second) of Torts § 876 (1979).

**71.** *See id.* cmt. b.

driver is also jointly liable for the injury.[72] Although the concert of action theory was not developed to ease a plaintiff's traditional burden of proving causation, it may have that effect.[73]

## C. Alternative Liability

 Alternative liability, as adopted in *Summers v. Tice*,[74] provides that the burden of identification is shifted to the defendants where each defendant acted tortiously toward the plaintiff, one of the defendants caused the injury, but there is uncertainty as to which one.[75] Once the burden has shifted, each defendant may prove that it did not cause the plaintiff's harm, but failure to do so renders each jointly and severally liable. The basic difference between concert of action and alternative liability is that the former is a true joint tort, as all defendants acted together to produce the injury, while the latter involves independent acts by two or more tortfeasors.[76]

In *Summers*, the plaintiff sustained injury to his eye when two hunters negligently fired shots in his direction. Although the plaintiff could not determine which defendant's conduct had caused the injury, the trial court held both defendants liable. On appeal, the defendants argued that they were not joint tortfeasors because they had not acted in concert. The California Supreme Court disagreed and upheld the judgment. It reasoned that both defendants were negligent toward the plaintiff and "brought about a situation where the negligence of one of them injured the plaintiff, hence, it should rest with them each to absolve himself if he can."[77]

The doctrine of alternative liability is now embodied in Section 433B(3) of the Restatement (Second) of Torts. It notes that the policy underlying the shifting burden is "the injustice of permitting proved wrongdoers ... to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them caused the harm."[78] Typically, alternative liability has been applied in cases where defendants' conduct was simultaneous in time, was of the same character, and created the same risk of harm, and where all potential tortfeasors were joined as defendants.[79]

## D. Enterprise Liability

 The concept of enterprise, or industry-wide liability, originated in *Hall v. E.I. Du Pont De Nemours & Co.*[80] In Hall, thirteen children who were injured in separate blasting cap accidents, brought suit

---

72. *See id.* cmt. a, illus. 2. *See, e.g., Saisa v. Lilja,* 76 F.2d 380 (1st Cir.1935); *Bierczynski v. Rogers,* 239 A.2d 218 (Del.1968); *Nelson v. Nason,* 343 Mass. 220, 177 N.E.2d 887 (1961).

73. *See, e.g., Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164, 176 (1984) (finding concert of action liability applicable in DES litigation).

74. 33 Cal.2d 80, 199 P.2d 1 (1948).

75. *See id.* at 4.

76. *See Martin v. Abbott Labs.,* 102 Wash.2d 581, 689 P.2d 368, 378 (1984) (citing *Abel,* 418 Mich. 311, 343 N.W.2d 164).

77. *Summers,* 199 P.2d at 4.

78. Restatement (Second) of Torts § 433B(3) cmt. f.

79. *See id.* cmt. h. *But see Abel,* 343 N.W.2d at 172 (holding that DES plaintiffs could rely on alternative liability even though contested issue over whether plaintiffs had sued all potential tortfeasors and where alleged tortious activity occurred over period of twenty years).

80. 345 F.Supp. 353 (E.D.N.Y.1972).

against six manufacturers, comprising virtually the entire blasting cap industry of the United States. Plaintiffs alleged that defendants' failure to place warnings on individual blasting caps created an unreasonable risk of harm. They further asserted that defendants knew of the high incidence of injury to children and consciously agreed not to place warnings on the caps. Defendants moved to dismiss on the ground that the complaint did not identify the specific manufacturer that caused a particular injury.

The court held that "Plaintiffs' allegations of joint knowledge and action raise[d] issues of fact and law sufficient to defeat dismissal." [81] The court focused on three issues: (1) defendants' joint control of the risk; (2) the assignment of costs to those most able to reduce them; and (3) providing a remedy to innocent plaintiffs.[82] It reasoned that plaintiffs alleged that defendants had adhered to an industry-wide safety standard, that defendants had delegated safety functions to a trade association, and that defendants had explicitly cooperated in the manufacture and design of the blasting caps. It would be reasonable to relax the burden of proving proximate cause if the plaintiffs eventually demonstrated "defendants' joint awareness of the risks at issue in this case and their joint capacity to reduce or affect those risks." [83] The court emphasized, however, that its ruling was applicable to industries composed of a small number of actors and that it might be unreasonable if applied to a decentralized industry consisting of numerous producers.[84]

## E. Market Share Liability

The above theories proved to be inadequate in cases where plaintiffs alleged injuries resulting from their *in utero* exposure to the drug diethylstilbestrol (DES). DES is a synthetic estrogen hormone that was marketed to women as a miscarriage preventative from 1947 to 1971. In 1971, a link was discovered between fetal exposure to DES and the development many years later of adenocarcinoma of the vagina. Over two hundred manufacturers produced DES. Because of the long latency period and generic nature of the drug, many plaintiffs were unable to identify the precise manufacturer of the DES ingested by their mothers during pregnancy. In *Sindell v. Abbott Laboratories*,[85] the California Supreme Court fashioned its own theory of collective liability to accommodate the needs of DES plaintiffs.

The *Sindell* plaintiffs brought a class action against eleven drug manufacturers, alleging that defendants were jointly liable because they had acted in concert to produce, market, and promote DES as a safe and effective drug for preventing miscarriages. The trial court dismissed the claims due to the plaintiffs' inability to identify which defendants had manufactured the DES responsible for their injuries. In reversing the decision, the California Supreme Court first declined to apply any of the then-existing theories of collective liability. The court found alternative liability to be inapplicable because all potential tortfeasors had not been joined.[86] Concert of action was not available because plaintiffs had merely alleged defendants' parallel action, rather than a

81. *Id.* at 386.

82. *See id.* at 371.

83. *Id.* at 378.

84. *See id.*

85. 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980).

86. *See id.* at 139, 607 P.2d at 931.

tacit understanding or a common plan.[87] Finally, enterprise liability was unsuitable due to the large number of DES manufacturers and defendants' lack of joint control over the risk of harm.[88] The court recognized that in a "contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer."[89] Thus, rather than rigidly applying traditional tort principles, the court expanded alternative liability to encompass what is now known as market share liability.

Under market share liability, the burden of identification shifts to the defendants if the plaintiff establishes a prima facie case on every element of the claim except for identification of the actual tortfeasor or tortfeasors, and that the plaintiff has joined manufacturers representing a "substantial share" of the DES market.[90] Once these things are established, each defendant is severally liable for the portion of the judgment that represented its share of the market at the time of the injury, unless it proves that it could not have made the DES that caused the plaintiff's harm.[91]

In short, market share liability encompasses the defendants' burden in disproving causation and the apportionment of damages among defendants.

The *Sindell* court based its decision on two policy considerations: (1) "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury";[92] and (2) holding manufacturers liable would create an incentive to produce safer products.[93] The court thought it reasonable, under the circumstances, to measure the likelihood that any one of the defendants supplied the offending product by each defendant's share of the DES market. Furthermore, by apportioning liability according to market share, "each manufacturer's liability for an injury would be approximately equivalent to the damage caused by the DES it manufactured."[94]

Following *Sindell*, five states adopted some form of market share liability: Wisconsin,[95] Washington,[96] New York,[97] and Florida[98] in DES cases, and Hawaii in a case involving a blood product needed by hemophiliacs.[99] Although each court modified *Sindell*'s formulation of market share

---

87. *See id.* at 141, 607 P.2d at 933.

88. *See id.* at 143, 607 P.2d at 935.

89. *Id.* at 144, 607 P.2d at 936.

90. *Id.* at 144–45, 607 P.2d at 936–37.

91. In *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988), the California Supreme Court clarified its intention to hold defendants severally, instead of jointly and severally, liable because joint liability would "frustrate *Sindell*'s goal of achieving a balance between the interest of DES plaintiffs and manufacturers of the drug." *Id.* at 428, 751 P.2d at 487.

92. *Sindell*, 163 Cal.Rptr. at 144, 607 P.2d at 936.

93. *See id.*

94. *Id.* at 145, 607 P.2d at 937.

95. *See Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984) ("risk contribution" theory of market share liability).

96. *See Martin*, 102 Wash.2d 581, 689 P.2d 368 ("market share alternate liability" theory).

97. *See Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989) (national market).

98. *See Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla.1990) (due diligence requirement).

99. *See Smith v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717 (1991).

liability, they all agreed that an innocent plaintiff should not be left without a remedy where each of the defendants acted tortiously; in that situation, it is reasonable to shift the burden of identification to the defendants.[100] In addition, each court held that liability is several, rather than joint and several, and is limited to the market share of each defendant, so that each defendant's liability would approximate the harm caused by that defendant's product.[101]

The majority of the remaining states have not addressed market share liability, but the ones that have done so have declined to apply it in cases involving non-fungible goods.[102] With respect to toxic substances, a draft of the Restatement (Third) of Torts explains:

> When market-share liability is limited to fungible products that pose equivalent risks to users who have no reasonable means to prove which manufacturer provided the product that caused plaintiff's harm, it has an exceedingly limited reach.... Only products that cause harm after a lengthy latency period between exposure and development of harm are likely to create the systemic proof problems that market-share liability addresses. Many toxic substances, including asbestos products, do not pose

equivalent risks to all exposed to the products.[103]

Hence, market share liability is uniquely suited to fungible product cases because such products (1) create the problem of non-identification in the first place, and (2) pose equal risks of harm to those exposed to the product.

Furthermore, the Restatement (Third) of Torts indicates:

> In deciding whether to adopt a rule of [market share] liability, courts have considered the following factors: (1) the generic nature of the product; (2) the long latency period of the harm; (3) the inability of plaintiffs to discover which defendant's product caused plaintiff's harm, even after exhaustive discovery; (4) the clarity of the causal connection between the defective product and harm suffered by plaintiffs; (5) the absence of other medical or environmental factors that could have caused or materially contributed to the harm; and (6) the availability of sufficient 'market share' data to support a reasonable apportionment of liability.[104]

At the very least, factors 1, 3, and 4 apply here. MTBE-containing gasoline is a fungible product because all brands are interchangeable, and because different concen-

---

**100.** *See Conley,* 570 So.2d at 283; *Smith,* 823 P.2d at 728; *Hymowitz,* 73 N.Y.2d at 507, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *Martin,* 689 P.2d at 381–82; *Collins,* 342 N.W.2d at 50.

**101.** *See Conley,* 570 So.2d at 287; *Smith,* 823 P.2d at 729; *Hymowitz,* 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *Martin,* 689 P.2d at 383; *Collins,* 342 N.W.2d at 51.

**102.** *See* Restatement (Third) of Torts: Liability for Physical Harm § 28 cmt. *o* (Proposed Final Draft No. 1, 2005).

**103.** With respect to toxic substances, a draft of the Restatement (Third) of Torts explains: When market-share liability is limited to fungible products that pse equivalent risks

to users who have no reasonable means to prove which manufacturer provided the product that caused plaintiff's harm, it has an exceedingly limited reach.... Only products that cause harm after a lengthy latency period between exposure and development of harm are likely to create the systemic proof problems that market-share liability addressed. Many toxic substances, including asbestos products, do not pose equivalent risks to all exposed to the products.

**104.** Restatement (Third) of Torts: Products Liability § 15 cmt. c (1998).

trations of MTBE in different batches of gasoline do not affect its ability to contaminate groundwater.[105] As such, it is inherently difficult to identify the refiner that caused plaintiffs' injuries, and indeed, may be even more difficult than in DES cases because DES pills could be distinguished by appearance (*e.g.,* color, shape, or size of the pills).[106] MTBE-containing gasoline is an indiscrete liquid commodity that mixes with other products during transport, and might not vary in appearance from batch to batch. According to plaintiffs, when it is released into the environment, it lacks even a chemical signature that would enable identification. Furthermore, because plaintiffs allege injury (*i.e.,* contamination) from *any* amount of MTBE, defendants' products present equivalent risks of harm to all plaintiffs, regardless of the concentration of MTBE in the gasoline. Factor 2 cuts against application of market share theory because MTBE does not have a long latency period of harm. Plaintiffs allege that "MTBE races through underground water, spreading faster and further than other chemical components contained in gasoline ... soon contaminating wells...."[107] Factors 5 and 6 are neutral because it is not possible at the pleading stage to determine whether other environmental factors could have caused or materially contributed to the harm, or whether there is sufficient market share data to support a reasonable apportionment of liability.

Although cognizant of the Court's obligation to apply state substantive law, I note that MTBE contamination presents as compelling a circumstance for the application of market share liability as does DES. At this early juncture, the balance of equities weighs in favor of applying market share liability. Although none of the factors are dispositive, great weight should be given to factor 1 because, as previously discussed, the fungible nature of goods creates the necessity for using the market share theory and ensures fairness in apportioning liability. Innocent water providers—and ultimately innocent water users—should not be denied relief from the contamination of their water supply if defendants breached a duty to avoid an unreasonable risk of harm from their products.

## F. "Commingled Product" Market Share Liability

The review of the various theories of collective liability set forth above reveals that from time to time courts have fashioned new approaches in order to permit plaintiffs to pursue a recovery when the facts and circumstances of their actions raised unforeseen barriers to relief. Those courts made a policy decision that in balancing the rights of all parties, it would be inappropriate to foreclose plaintiffs entirely from seeking relief merely because their actions did not fit the parameters of existing liability theories. These MTBE cases suggest the need for one more theory, which can be viewed as a modification of market share liability, incorporating elements of concurrent wrongdoing.

To that end, I shall now describe what I call the "commingled product theory" of market share liability. When a plaintiff can prove that certain gaseous or

**105.** Indeed, defendants have repeatedly represented that petroleum products are mixed during transportation and that gasoline may be provided by any refiner whose product is in the chain of supply. *See* Transcript of April 22, 2004, hearing at 35–38.

**106.** *See Conley,* 570 So.2d at 285 (noting that some DES plaintiffs had been able to identify the manufacturer of the injury-causing DES).

**107.** Am. Distilling Compl. ¶ 99.

liquid products (*e.g.*, gasoline, liquid propane, alcohol) of many suppliers were present in a completely commingled or blended state at the time and place that the risk of harm occurred, and the commingled product caused a single indivisible injury, then each of the products should be deemed to have caused the harm. By way of illustration, assume that the petroleum products of ten refiners are commingled in an underground storage tank. These ten products are completely fungible and blended, combined or commingled into a single batch. Each refiner supplied ten percent of the total volume of product in the tank. If twenty percent of the petroleum in the tank leaks into the ground, it is not reasonable to assume that the harm resulting from this leak was caused by the products of only two refiners (each supplying ten percent), and to require plaintiffs to prove which two proximately caused the harm. Because the petroleum products were commingled to form a new mixture, each of the ten refiners contributed to the injury in proportion to the amount of product that each supplied. Under this theory, each refiner actually caused the injury. Thus, if a defendant's indistinct product was present in the area of contamination and was commingled with the products of other suppliers, all of the suppliers can be held liable for any harm arising from an incident of contamination.

Under such a theory, defendants would be severally liable because joint and several liability is unjust where "there [are] so large a number of actors, each of whom contribute[d] a relatively small and insignificant part of the total harm, that the application of the rule [of joint and several liability] may cause disproportionate hardship to defendants." [108] Damages should be apportioned by proof of a defendant's share of the market at the time a risk of harm was created to a class of potential victims. Finally, a defendant must be able to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the new commingled or blended product.

For this theory to apply, plaintiffs must identify only those defendants whom they believe contributed to the commingled product that caused their injury. Because the conceptual basis is different than traditional market share theory—*i.e.*, that defendants' products were actually present and contributed to the injury—a plaintiff cannot just name all or substantially all of the participants in a particular market and expect defendants to exculpate themselves. Plaintiffs must conduct some investigation so that they can make a good faith identification of the defendants whom they believe caused their injury. It is unnecessary for plaintiffs to name all potential tortfeasors because they should be able to recover damages from any defendant that contributed to the harm, even if a defendant was not responsible for all of it. However, plaintiffs have an incentive to name all potential tortfeasors to maximize recovery as defendants would only be liable for their share of the damages. So long as plaintiffs allege that defendants marketed and sold MTBE-containing gasoline in the relevant zone of injury and defendants products were in a completely commingled state, defendants potentially contributed to plaintiffs' indivisible injury.

This modification of market share liability is based on two features distinguishable from those instances in which market share liability has been applied. *First,* because the gaseous or liquid blended product is a new commodity created by commingling the products of various sup-

---

**108.** Restatement (Second) of Torts § 433B(2) cmt. e.

pliers, the product of each supplier is *known* to be present. It is also known that the commingled product caused the harm. What is *not known* is what percentage of each supplier's goods is present in the blended product that caused the harm. In the traditional market share case, whether a defendant's product caused the harm is unknown, but because of the difficulties of proof, all manufacturers present in the market must bear a share of the liability. Since this "commingled product theory" applies to a specific set of products, it provides some assurance that all defendants found to be liable would have actually caused a plaintiff's losses. Under concert of action, alternative, enterprise, and market share liability theories, one or more of the defendants may *not* in fact have caused the harm, but they are held liable either because of their own generally tortious conduct (not toward the particular plaintiff), or their inability to exculpate themselves. *Second,* the harm caused by this commingled product need not have a long latency period prior to the discovery of the harm. While the harm may occur immediately upon contamination, this has no effect on the victim's ability to identify the actual tortfeasor.

Because most of the states have not definitively passed on theories of collective liability, this Court must predict how the highest court of each state would resolve the issue in the context of MTBE contamination. I have carefully considered all state statutes and decisions, laws from other states, and the Restatement of Torts. I found those cases involving the commingling of fungible products to be the most persuasive, for these purposes, because they are most analogous to the present situation. Conversely, cases in which courts considered collective liability in the context of non-fungible goods were given less weight.

## V. CONNECTICUT

The Connecticut Plaintiffs [109] assert the following claims: causes of action under (1) the Connecticut Products Liability Act ("CPLA"); [110] (2) the Connecticut Unfair Trade Practices Act ("CUTPA"); [111] (3) the Connecticut Environmental Protection Act ("CEPA") for declaratory and equitable relief against unreasonable pollution; [112] (4) CEPA for damages based on unreasonable pollution; [113] and (5) public nuisance; (6) private nuisance; (7) civil trespass; (8) fraud; and (9) civil conspiracy. [114]

### A. Collective Liability

In order for plaintiffs' claims to be cognizable, Connecticut would have to recognize some form of collective liability. The Connecticut Supreme Court has not yet considered the viability of such theories. However, its affirmance of the appellate court's decision in *Sharp v. Wyatt, Inc.,* [115] foreshadows the adoption of a hybrid theory of market share liability and concurrent wrongdoing.

In *Sharp,* the administrators of three estates brought a wrongful death action against the decedents' employer, a whole-

---

**109.** American Distilling and Manufacturing Co., Inc., Columbia Board of Education, Our Lady of the Rosary Chapel, Town of East Hampton, and United Water CT, Inc.

**110.** Conn. Gen.Stat. §§ 52–572m *et seq.*

**111.** *Id.* § 42–110a *et seq.*

**112.** *Id.* § 22a–16 *et seq.*

**113.** *Id.* § 22a–452 *et seq.*

**114.** *See* Am. Distilling Compl. ¶¶ 195–250. In this and subsequent Parts of this opinion, I shall cite to only one representative complaint for each of the states.

**115.** 230 Conn. 12, 644 A.2d 871 (1994).

sale distributor of petroleum products, and six oil suppliers, based on the decedents' asphyxiation in the employer's underground storage vault. Decedents were employed by the retail petroleum company Norbert E. Mitchell Co. ("Mitchell Fuel"). As part of its underground storage facilities, Mitchell Fuel maintained seven tanks; five contained number two fuel oil, one contained kerosene, and one contained diesel fuel. On the date of the accident, decedents entered the vault, and in accordance with their usual practice, descended without testing the oxygen levels in the vault or using protective gear. Each of the decedents collapsed at the bottom of the ladder and died from asphyxiation. It was undisputed that the three men died from insufficient oxygen in the vault, though the parties disagreed about how the condition arose.

Wyatt, Inc., the wholesale fuel distributor, supplied roughly twenty-five percent of the oil stored in Mitchell Fuel's seven tanks—five percent of the number two fuel oil and one hundred percent of the kerosene and diesel fuel. Wyatt obtained its products from the six oil supplier defendants. Although defendants' commodities commingled with the petroleum products of other suppliers, these other companies were not joined as defendants in the action. The claims against Mitchell Fuel were dismissed as barred by the Worker's Compensation Act and the two year statute of limitations for wrongful death claims. Wyatt and the oil suppliers moved for summary judgment, in part, on the ground that the plaintiffs could not prove

that their products caused the decedents' deaths.

The trial court granted summary judgment in favor of the remaining defendants based on their percentage of Mitchell Fuel's inventory and the commingling of petroleum products in the tanks.[116] The court reasoned that "[m]athematical probabilities ... suggest that some of the oil, although a small percentage, originally came from Wyatt, but six other wholesale suppliers sold the remaining 95 percent of the [number two] fuel oil to Mitchell." [117] Moreover, the "co-mingling of the oil in the tanks, and uncertainty as to the supplier of material that leaked from the tanks, makes it impossible to determine that Wyatt's oil was in the vault on the date in question." [118] The court rejected the plaintiffs' reliance on alternative liability because the plaintiffs had failed to join all, or substantially all, of the product manufacturers.[119] If they had, "the plaintiffs could at least claim that they had sued a defendant which caused the deaths, even if they could not pinpoint the responsible defendant or defendants." [120]

The appellate court reversed the decision, relying heavily on the Connecticut Supreme Court's analysis in *Champagne v. Raybestos–Manhattan, Inc.*[121] In that case, the decedent died from injuries caused by his exposure to asbestos products during the course of his employment. Over a sixteen-year period, the defendant had supplied the employer with a total of $130,000 worth of asbestos-containing products. However, two other asbestos manufacturers, who were not defendants, had annually provided the employer with

116. *See Sharp v. Wyatt, Inc.,* No. 28 64 15, 1992 WL 91718, at *8 (Conn.Super. Apr.8, 1992), *rev'd,* 31 Conn.App. 824, 627 A.2d 1347 (Conn.App.1993).

117. *Id.* at *6.

118. *Id.* at *8.

119. *See id.*

120. *Id.* at *6.

121. 212 Conn. 509, 562 A.2d 1100 (1989).

$350,000 and $250,000 worth of asbestos products, respectively. After judgment was entered for the plaintiff, the defendant appealed, arguing that there was insufficient evidence that the decedent was exposed to the defendant's products. The Connecticut Supreme Court disagreed and held that "the jury reasonably could have found or inferred that he was exposed to the defendant's products based on the work that he was engaged in, the length of time he was employed, and the fact that coworkers who performed similar work testified that they handled the defendant's products." [122]

The appellate court in *Sharp* found that *Champagne* stands for the proposition "that a defendant may be liable when its defective product contributes to a condition giving rise to an injury or death." [123] Even though the evidence showed that defendants supplied only twenty-five percent of the leaking petroleum products, the court held that it was premature to conclude, as a matter of law, that plaintiffs could not establish proximate cause. [124] Furthermore, it was not fatal that plaintiffs had not sued Mitchell Fuel's other oil suppliers.

> In the present case, the plaintiffs submitted evidence implicating the defendants as the suppliers of petroleum products that leaked into the vault. Although the defendants' products may not have been the sole cause of the deoxygenation, there was evidence indicating that they *significantly contributed* to the dangerous condition. They did so by the proportion of oil that they supplied to Mitchell. [125]

Notwithstanding the mathematical odds, the appellate court concluded that a genuine issue of material fact existed as to the identification of the products that leaked into the vault. The Supreme Court of Connecticut affirmed the judgment, stating that the issues had been "properly resolved in a thoughtful and comprehensive opinion of the Appellate Court." [126]

The court's decisions in *Sharp* and *Champagne* are instructive for three reasons. *First,* they demonstrate that in a products liability case, the proximate cause requirement is not rigid—especially where defendants' products were present and could have been the cause in fact of the injury. It is difficult to imagine how a reasonable jury could find by a preponderance of the evidence that a defendant's product was a substantial factor in the plaintiff's injury where the defendant supplied less than half of the products at issue. Yet the *Champagne* court upheld a jury finding to that effect, and the *Sharp* court found product identification to be an issue of material fact in similar circumstances.

*Second,* the state's highest court was willing to overlook difficulties of proof during the pretrial motion stage where the defendant contributed to a condition that caused harm to the plaintiff—in other words, where the defendant created a risk of harm to a group of people. This is consistent with the "risk contribution" theories of market share liability enunciated by the Wisconsin and Washington Supreme Courts and with the principle of concurrent wrongdoing. [127] Here, plaintiffs

---

122. *Id.* at 530, 562 A.2d 1100.

123. *Sharp,* 627 A.2d at 1357.

124. *See id.* at 1356.

125. *Id.* at 1357 (emphasis added).

126. *Sharp,* 230 Conn. at 16, 644 A.2d 871.

127. *See Martin,* 689 P.2d at 382 ("Each defendant contributed to the *risk* of injury to the public and, consequently, the risk of injury to individual plaintiffs. Thus, each defendant shares in some measure, a degree of culpabili-

allege that all defendants contributed to the increased risk of water contamination by adding MTBE to gasoline and deceiving plaintiffs, the EPA, and the public about the product's adverse effects.[128]

*Third,* despite the low probability that the named defendants caused the injury, the court did not require that all potential tortfeasors be joined as defendants. It is not necessary to join all possible wrongdoers under either concurrent wrongdoing or market share theory, although defendants may implead other potential tortfeasors. Market share liability specifically permits plaintiffs to sue manufacturers representing only a substantial share, instead of the entire market.[129] And, in some variations of market share theory, the plaintiff need only sue one defendant.[130]

■ Based on the foregoing, I predict that the Connecticut Supreme Court would adopt a "commingled product theory" of market share liability. An important consideration in the court's decisions in *Sharp* and *Champagne,* was the fact that the defendants' products were actually present and combined to cause the plaintiffs' injuries. It was therefore unnecessary to prove causation in fact because each of the products was deemed to have caused the harm. Connecticut's highest court would therefore be likely to grant a plaintiff relief if (1) each defendant acted tortiously in manufacturing and distributing the fungi-

ble product in question; (2) defendants' products commingled or combined to form a new product; and (3) the commingled product caused a single, indivisible injury.

With respect to apportionment, the Connecticut Supreme Court would most likely make defendants severally liable in accordance with market share liability, because the state legislature has eliminated joint and several liability in negligence actions through section 52–572h of the Connecticut General Statutes.[131] That statute modified the doctrine of concurrent wrongdoing to ensure that "no defendant [would] pay more than [its] fair share of damages, as measured by the relative degree of [its] fault in bringing them about."[132] To calculate a defendant's share, a court must examine the degree to which each defendant's conduct deviated from reasonable standards of care, rather than the degree to which the conduct causally contributed to the plaintiff's damages.[133] Furthermore, it would be inequitable to hold each defendant liable for plaintiffs' entire damage where there is a large number of defendants, each contributing only slightly to the harm. Here, there are over fifty named defendants in each of the Connecticut cases.

Finally, *Sharp* indicates that a defendant's share of liability would be calculated by its share of the Connecticut market. In *Sharp,* the Connecticut Supreme Court

---

ty in producing or marketing DES.") (emphasis in original); *Collins,* 342 N.W.2d at 49 (same).

**128.** *See* Am. Distilling Compl. ¶¶ 141–157; 165–172.

**129.** *See Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 937.

**130.** *See Martin,* 689 P.2d at 382; *Collins,* 342 N.W.2d at 50.

**131.** Conn. Gen.Stat. § 52–572h(c) ("[I]f the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for his proportionate share of . . . damages. . . .").

**132.** *Duby v. Tunxis Mgmt. Co.,* No. CV020821772S, 2004 WL 1462620, at *4 (Conn.Super. June 9, 2004).

**133.** *See id.* at *3 n. 1 (interpreting Conn. Gen.Stat. § 52–572h).

recognized by implication the fungible nature of petroleum products and the effect that has on liability. Although both the trial and appellate courts in *Sharp* noted that the oil in the tanks had commingled, each court drew a different inference from that fact. The trial court thought summary judgment was warranted because it was impossible to determine if Wyatt's product was in the vault at the time of the accident. By contrast, the appellate court used it as a basis for determining that "the tanks had leaked their respective petroleum products into the vault *in proportion* to an amount attributable to each of Mitchell Fuel's suppliers."[134] Therefore, defendants had supplied twenty-five percent of the products accumulated in the vault. The Connecticut Supreme Court affirmed the latter interpretation, indicating that it was receptive to the notion that a defendant's market share approximates its level of culpability for injuries caused by its products. Accordingly, the Connecticut Plaintiffs may proceed on their claims on the basis of a "commingled product theory" of market share liability.[135]

## B. Connecticut Products Liability Act

 The Connecticut Plaintiffs assert a cause of action under the CPLA, which provides: "A product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product."[136] The Act defines a "product liability claim" as including:

all claims or actions brought for personal injury, death, or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent.[137]

Defendants contend that plaintiffs' public nuisance, private nuisance, trespass, and civil conspiracy claims are barred because the CPLA provides the exclusive remedy for "defective product" claims, and each of these claims is predicated on the allegation that gasoline containing MTBE is a "defective product." Plaintiffs argue that these claims fall outside the scope of the CPLA because the claims do not allege that gasoline containing MTBE is a "defective product": (1) the public and private nuisance claims rely on the allegation that the migration of MTBE has contaminated the groundwater system; (2) the trespass claim alleges that defendants' failure to properly control MTBE-containing gasoline contributed to the contamination of property and water supplies; and (3) the fraud and civil conspiracy claims are predicated on defendants' efforts to suppress information and broadcast misinformation.

The Connecticut Supreme Court has held that despite the use of the term

---

134. *Sharp,* 627 A.2d at 1356 (emphasis added).

135. Additionally, Connecticut may be amenable to traditional market share theory based on a consideration of the Restatement factors. *See supra* Part IV.E.

136. Conn. Gen.Stat. § 52–572n.

137. *Id.* § 52–572m.

"may" in section 52–572n of the CPLA [quoted above], the CPLA is the exclusive cause of action for products liability claims, and any cause of action that falls within the statute's scope must be dismissed as a matter of law.[138] However, the CPLA was not intended to affect other state statutory schemes.[139]

Here, plaintiffs' public nuisance, private nuisance, and trespass claims must be dismissed because they fall within the scope of the CPLA. In their nuisance and trespass claims, plaintiffs allege that defendants unleashed, allowed or failed to prevent the migration of MTBE into plaintiffs' groundwater and water systems. Defendants' conduct allegedly caused injury to plaintiffs in the form of water contamination; interference with the use or benefit of their property; injury to the health, safety, and comfort of other persons; and diminution in property value. Defendants could only have accomplished these alleged wrongs, however, through their roles as manufacturers and distributors of MTBE-containing gasoline. Indeed, plaintiffs allege that defendants "manufactured, distributed, marketed and promoted their product" even though they "knew or in the exercise of reasonable care should have known that the introduction and use of MTBE in gasoline" would endanger groundwater resources.[140] Although plaintiffs argue that these claims can be reasonably construed as outside the CPLA's reach, the complaints reveal that plaintiffs are seeking recovery for property damage resulting from defendants' manufacture, design, and marketing of MTBE-containing gasoline.

■ Plaintiffs' civil conspiracy claims are also dismissed because they are preempted by the CPLA.[141] Plaintiffs allege that defendants acted in concert and colluded for the unlawful purpose of creating a market for MTBE with full knowledge of MTBE's environmental and health hazards.[142] In furtherance of that conspiracy, defendants allegedly chose to use MTBE instead of other oxygenates, failed to warn the public about, and actively concealed, the dangers of MTBE.[143] The damages asserted are substantially similar for the CPLA and civil conspiracy claims.[144] In Connecticut, a civil conspiracy claim is directed at damages,[145] and "extends liabil-

---

**138.** *See Gerrity v. R.J. Reynolds Tobacco Co.,* 263 Conn. 120, 126, 818 A.2d 769 (2003); *Winslow v. Lewis–Shepard, Inc.,* 212 Conn. 462, 463, 562 A.2d 517 (1989).

**139.** *See Gerrity,* 263 Conn. at 128–29, 818 A.2d 769 ("It was not intended to affect other state statutory schemes such as anti-trust acts or the state unfair trade practice act.") (emphasis omitted); *see also Izzarelli v. R.J. Reynolds Tobacco Co.,* 117 F.Supp.2d 167, 173 (D.Conn.2000) ("[I]n enacting the [C]PLA's exclusivity provision, the legislature did not intend to affect CUTPA or other consumer protection laws. Rather, according to the legislative history of the [C]PLA, the exclusivity language was intended to merge the different theories of strict liability, breach of warranty, negligence and breach of contract into one statutory cause of action for injuries caused by defective products.").

**140.** Am. Distilling Compl. ¶¶ 216, 222.

**141.** *See Edwards v. Novartis Consumer Health,* No. X06CV010167425S, 2002 WL 1843057, at *3 (Conn.Super. July 15, 2002) (striking civil conspiracy claims because plaintiffs had restated their CPLA claims as civil conspiracy).

**142.** *See* Am. Distilling Compl. ¶ 239.

**143.** *See id.* ¶ 240.

**144.** *See id.* ¶¶ 213–215, 241–243.

**145.** *See Benoit v. Amalgamated Local 299 United Elec. Radio & Mach. Workers of Am.,* 150 Conn. 266, 276, 188 A.2d 499 (1963) ("[T]here is no such thing as a civil conspiracy but rather an action for damages caused by acts committed pursuant to a formed conspiracy.").

ity to all conspirators for the damage that results 'from any overt act committed by one of them pursuant to the combination.' "[146] In this instance, the civil conspiracy claims are redundant because the CPLA provides a remedy for the actions of which plaintiffs complain.[147]

Finally, defendants only challenge the fraud claim based on failure to plead with particularity, which I discuss below.[148]

## C. Connecticut Unfair Trade Practices Act

█ CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[149] The parties dispute the applicability of the statute to persons who are not consumers of the relevant product. Defendants argue that plaintiffs' CUTPA claims must be dismissed because plaintiffs do not have a consumer or business relationship with defendants, as required by the statute. Plaintiffs respond that they are "other business persons" covered by the statute because they are affected by defendants' deceptive acts through their business of serving water to their customers.

The Connecticut Supreme Court has made clear that a consumer relationship is not required under CUTPA; a competitor or "other business person" can maintain a claim without showing consumer injury.[150] Because CUTPA's underlying goal is to ensure fair competition,[151] it "gives protection to wronged competitors and consumers but not to the world at large or any individual who might be injured by the activities of a business entity no matter what relationship the individual had with that business."[152] The business must have some type of commercial relationship with the alleged wrongdoer such that the latter's unfair and deceptive acts could adversely affect fair competition in that *particular* market.[153]

As such, the CUTPA claims must be dismissed because plaintiffs and defendants do not operate within the same marketplace. Plaintiffs are neither consumers of defendants' petroleum products nor defendants' competitors. Therefore, they must be "other business persons" within the meaning of CUTPA to maintain a claim. Plaintiffs provide potable water to customers, whereas defendants refine and market petroleum products. Although defendants' alleged unfair and deceptive acts might affect fair competition in the petroleum market, plaintiffs would not be affect-

146. *Edwards*, 2002 WL 1843057, at *3 (quoting *Governors Grove Condominium Ass'n, Inc. v. Hill Dev. Corp.*, 36 Conn.Supp. 144, 151–52, 414 A.2d 1177 (1980)).

147. *See id.*

148. In addition, defendants make no arguments in support of their motion to dismiss the CEPA claims, except for their contention that Connecticut would not recognize collective liability theories.

149. Conn. Gen.Stat. § 42–110b.

150. *See Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 497, 656 A.2d 1009 (1995).

151. *See Connecticut Water Co. v. Town of Thomaston*, No. CV940535590S, 1997 WL 255101, at *8 (Conn.Super. Apr.18, 1997) (the "original purposes of these acts" were "the preservation of fair competitive markets and the direct protection of consumers"); *Skelton v. Chemical Leaman Tank Lines, Inc.*, No. CV94–0359236S, 1996 WL 278343, at *6 (Conn.Super. May 13, 1996) (CUTPA "aimed at regulating and sanitizing commerce and practices in commercial markets") (emphasis omitted).

152. *Skelton*, 1996 WL 278343, at *6.

153. *See Connecticut Water*, 1997 WL 255101, at *8.

ed in their capacity as public water providers. Thus, the Connecticut Plaintiffs are not the intended beneficiaries of the Act and cannot maintain a CUTPA claim.

### D. Fraud

■ Defendants argue that plaintiffs' fraud claims must be dismissed because plaintiffs fail to plead fraud with particularity in accordance with Rule 9(b). Plaintiffs counter that they have pleaded specific details about defendants who were intimately involved in the alleged fraud, and that in any case, the heightened pleading standard is relaxed where the material facts are peculiarly within the defendants' knowledge.

Having closely examined the pleadings, I conclude that the Connecticut Plaintiffs' fraud claims survive with respect to (1) Atlantic Richfield Co.;[154] (2) BP Corp. (Amoco);[155] (3) ChevronTexaco (Chevron and Texaco);[156] (4) Citgo;[157] (5) ExxonMobil (Exxon and Mobil);[158] (6) Shell;[159] (7) Sunoco;[160] (8) members of the API; (9) members of the MTBE Committee; and (10) members of the OFA, because the complaints sufficiently apprise these defen-

dants of the time, place, speaker, and content of the statements claimed to be false or misleading.

The gist of the fraud claim is that defendants misled plaintiffs, the EPA, and the public about the properties of MTBE and its potential for groundwater contamination. The Connecticut Plaintiffs' specific allegations do not amount to group pleading. Representative examples of the allegations include:

- On or about February 27, 1987, the MTBE Committee submitted combined comments to the EPA, stating that "sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data."[161] The MTBE Committee included BP Corp. (Amoco), Arco, ChevronTexaco (Chevron and Texaco), Citgo, ExxonMobil (Exxon), Shell, and Sunoco.[162]
- On or about December 12, 1986, Atlantic Richfield Co. responded to a federal notice relating to MTBE's health and

**154.** Atlantic Richfield Co., individually and doing business as Arco Products Co., f/k/a Arco Petroleum Co. and a/k/a Arco.

**155.** BP Amoco Chemical Co., individually and f/k/a Amoco Chemical Co.; BP Products North America, Inc., individually and as successor-by-merger to Amoco Oil Co. and BP Exploration and Oil, Inc., successor-by-merger to BP North America, Inc.

**156.** Chevron USA, Inc., individually and f/k/a Gulf Oil Corp. d/b/a Chevron Products Co. d/b/a Chevron Chemical Co.; ChevronTexaco Corp., individually and as successor-in-interest to Chevron Corp. and as successor-in-interest to Texaco, Inc.

**157.** Citgo Petroleum Corp.; Citgo Refining and Chemical Co., LP.

**158.** ExxonMobil Chemical Co., Inc., individually and f/k/a Mobil Chemical Co. Inc.; Exx-

onMobil Corp., f/k/a Exxon Corp. and d/b/a ExxonMobil Refining and Supply Co., Exxon Chemical U.S.A., and ExxonMobil Chemical Corp.; ExxonMobil Oil Corp.; ExxonMobil Pipe Line Co.; Mobil Corp.

**159.** Shell Oil Co.; Shell Oil Products Co.; Shell Oil Products Co., LLC; Shell Petroleum, Inc.; Shell Trading (US) Co., individually f/k/a Equiva Trading Co., and a/k/a Stusco.

**160.** Sunoco, Inc., individually and f/k/a Sun Oil Co., and f/k/a Sun Company, Inc.; Sunoco, Inc. (R & M), individually and f/k/a Sun Refining and Marketing Co. f/k/a Sun Company Inc. (R & M).

**161.** Am. Distilling Compl. ¶ 151.

**162.** *See id.* ¶ 146.

environmental risks by stating, *inter alia*, that "some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated"; that "MTBE is only slightly soluble in water"; that the available information does not support the conclusion of high potential environmental exposure; and that MTBE losses from leaking underground storage tanks would be small. Five days later, Arco and Exxon made a presentation to the EPA that additional medical testing of the effects of MTBE was unnecessary.[163]

- On or about January 21, 1988, BP Corp. (Amoco), ExxonMobil (Exxon) and Sunoco signed a Testing Consent Order with the EPA but later convinced the agency that additional chemical fate testing was not needed.[164]

- In 1994, the API wrote to rebut an article that raised questions about MTBE, representing that there was "no basis to question the continued use of MTBE."[165]

- In 1996, the OFA published and distributed a pamphlet, which said: "On *rare* occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks."[166] The pamphlet also suggested that MTBE in groundwater was beneficial because it served as an early indicator of gasoline

contamination of groundwater, thereby triggering cleanup and remediation.[167]

Furthermore, plaintiffs do more than aver scienter generally. Plaintiff's contend that at all times relevant to this litigation defendants had actual knowledge of MTBE's propensity to contaminate groundwater and of the need for testing. For example, plaintiffs allege that in or around 1980, the API formed a Toxicology Committee to study MTBE's hazards and to share information.[168] The Toxicology Committee included Exxon, Mobil, Shell, Arco, Tosco, and Chevron Texaco.[169] In addition, defendants are alleged to have had early knowledge of specific instances of MTBE groundwater contamination in Rockaway, N.J., Jacksonville, Md., East Patchogue, N.Y., and Liberty, N.Y. during the 1980s and 1990s.[170] Defendants were aware of the 1986 Garrett Report, which recommended banning MTBE as a gasoline additive, and they joined forces to lobby the authors to revise the report's conclusion. Arco, Shell, and Exxon are identified as having participated in the joint effort.[171] Additionally, the Connecticut Plaintiffs have included in their complaints examples of internal documents written at Arco Chemical, Mobil, Chevron-Texaco (Chevron), and Shell, such as the "MTBE White Paper," which suggest that these defendants knew of MTBE's adverse effects.[172] Taken as a whole, these allegations are sufficient to support an inference of fraudulent intent. Plaintiffs may proceed on their fraud claims because their complaints inform each of the aforemen-

163. *Id.* ¶ 144.

164. *See id.* ¶ 155.

165. *Id.* ¶ 167.

166. *Id.* ¶ 168 (emphasis added).

167. *See id.* ¶ 169.

168. *See id.* ¶¶ 112–113.

169. *See id.* ¶ 111.

170. *See id.* ¶¶ 116–122.

171. *See id.* ¶¶ 124–130.

172. *See id.* ¶¶ 132–140.

tioned defendants of the nature of its alleged participation in the fraud.

In short, defendants' motion to dismiss the Connecticut complaints is granted in part and denied in part. The Connecticut Plaintiffs may proceed on their claims under the CPLA, CEPA, fraud (as to some but not all defendants). Their claims for public nuisance, private nuisance, civil trespass, civil conspiracy, and CUTPA are dismissed. Their fraud claims are dismissed to the extent indicated above.

## VI. FLORIDA

Escambia County Utilities Authority ("Escambia") asserts claims sounding in (1) strict liability for design defect and/or defective product; (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; and (7) civil conspiracy.[173]

### A. Collective Liability

■ As I noted in *MTBE I*, the Florida Supreme Court adopted a modified theory of market share liability in *Conley v. Boyle Drug Co.*,[174] a DES case. Under Florida law, the theory only applies: (1) in negligence actions;[175] (2) where the plaintiff is unable to identify the tortfeasor;[176] (3) after making a genuine and diligent

attempt to do so;[177] and (4) defendants' products each posed an equivalent risk of harm to the plaintiff.[178] However, "[f]ailure to equate perfectly with DES ... does not absolutely preclude the use of the market share alternate theory of liability."[179]

■ Based on the prevailing case law, Escambia's negligence claim may proceed under the market share liability theory. Escambia alleges that defendants breached their duties of care to plaintiff, downstream handlers, and the public by, *inter alia*, failing to adequately test and remediate contaminated wells; forming joint committees and task forces to promote and defend MTBE while concealing its threat to groundwater; and marketing MTBE-containing gasoline without disclosing its environmental and health hazards.[180] Escambia's complaint gives defendants sufficient notice of the negligence claim to enable them to prepare their defense.

Defendants maintain that the negligence claim is still defective because Escambia has not alleged a reasonable attempt to identify the manufacturers responsible for their injuries. As indicated earlier, however, Escambia is not required *to plead* a good faith attempt to identify specific defendants.[181] Although due diligence is re-

---

173. *See* Escambia County Utilities Authority's Fifth Amended Complaint ("Escambia Compl.") ¶¶ 188–240.

174. 570 So.2d 275, 286 (Fla.1990).

175. *See id.* at 286.

176. *See King v. Cutter Labs.*, 714 So.2d 351, 354 (Fla.1998) ("The doctrine is designed to provide plaintiffs access to the courts in the limited class of cases where the injured party cannot identify, after diligent inquiry, which product manufacturer in fact caused a specific injury."); *Celotex Corp. v. Copeland*, 471 So.2d 533, 537 (Fla.1985) (holding that market share was not applicable where the asbestos worker was able to identify the majority of

the manufacturers who supplied the asbestos products).

177. *See Conley*, 570 So.2d at 286.

178. *See King*, 714 So.2d at 354.

179. *Id. Accord Ray v. Cutter Labs.*, 754 F.Supp. 193, 196 (M.D.Fla.1991) (holding that market share theory of liability applied to case involving contamination of blood factor product with HIV).

180. *See* Escambia Compl. ¶ 212.

181. *See Continental Baking Co. v. Vincent*, 634 So.2d 242, 244 (Fla.Ct.App.1994) ("The pleading standard in federal court and the

quired to invoke market share liability, that is a showing to be made at summary judgment or trial.[182]

Escambia's causes of action for design defect, failure to warn, public and private nuisance, and trespass also survive based on the concert of action theory. In *MTBE I*, this Court held that the Florida plaintiffs could proceed on a concert of action theory in conjunction with allegations of civil conspiracy. While the Florida Supreme Court affirmed the lower court's rejection of concert of action liability in *Conley*, it did so because the complaint only charged defendants with " 'parallel or imitative conduct in that they relied upon each others' testing and promotional methods.' "[183] The lower court reasoned that "[a]pplication of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant."[184] Although the Florida Supreme Court agreed with the lower court, it did not call into question the viability of concert of action liability as a general matter.[185] I therefore conclude, as I did in *MTBE I*, that it would be inappropriate to exclude

the theory as a possible basis of liability without further discovery.[186] Defendants have not given me sufficient reason to depart from my prior ruling, and I decline to do so now.

## B. Trespass

Defendants argue that the facts alleged do not give rise to any reasonable inference of plaintiffs' intention to enter upon Esambia's property and that trespass can only be sustained where the invasion of land was a direct result of defendants' conduct. Escambia counters that its allegations as a whole are sufficient to support a claim for willful trespass, and in any event, Florida law does not require such a showing of intent.

"Trespass to real property has been defined as 'an unauthorized entry onto another's property.' "[187] Although trespass is considered an intentional tort, negligent acts will support a trespass claim:

> Historically, the roots of trespass were criminal and punitive, rather than compensatory. As the law developed in time this became a sort of intentional tort—but intentional does not have its usual meaning here, as the intentional element can be implied. Thus, in reality, negligent acts of a defendant will

---

pleading standard in [Florida] courts differ radically.... The quality of pleading that is acceptable in federal court and which will routinely survive a motion to dismiss for failure to state a claim upon which relief may be granted will commonly not approach the minimum pleading threshold requirements in our state courts.").

**182.** *See Conley,* 570 So.2d at 287 (complaint survived motion to dismiss based on allegation that the plaintiff was unable to identify the manufacturer of the DES ingested by her mother).

**183.** *Conley,* 477 So.2d at 603 (quoting *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 933), *rev'd on other grounds,* 570 So.2d 275 (Fla.1990).

**184.** *Id.*

**185.** *Conley,* 570 So.2d at 280 (stating, without further discussion, that it agreed with lower court's analysis and rejection of concert of action liability).

**186.** *See MTBE I,* 175 F.Supp.2d at 633.

**187.** *Coddington v. Staab,* 716 So.2d 850, 851 (Fla.Ct.App.1998) (quoting *Pearson v. Ford Motor Co.,* 694 So.2d 61, 69 (Fla.Ct.App. 1997)).

support trespass, but the word, negligence, is not used.[188]

■■■ In this instance, Escambia has asserted that defendants' failure to properly control MTBE-containing gasoline "directly and proximately caused and continue to cause MTBE to contaminate Plaintiff's water system."[189] The complaint contains extensive factual allegations regarding the properties of MTBE, defendants' motive to use it, defendants' knowledge of inevitable groundwater contamination, and defendants' actions to conceal MTBE's hazards from plaintiff and the public.[190] Taken as true, these allegations are sufficient to support a claim for trespass.[191]

### C. Civil Conspiracy

Defendants contend that Escambia has failed to state a claim for civil conspiracy because Florida law requires specific intent to injure the plaintiff. Escambia responds that defendants have misstated the law.

■■■■ Under Florida law, civil conspiracy is generally a derivative claim of an underlying substantive tort.[192] A cause of action for civil conspiracy "does not require a finding of specific intent, but requires only the additional element that the accused conspired to commit the underlying offense."[193] Escambia alleges that defendants formed joint task forces and committees to conspire to create a market for MTBE with full knowledge of its hazards and to conceal the nature of MTBE's impact on plaintiff and the environment.[194] It asserts that defendants' actions directly and proximately caused its injuries.[195] These allegations suffice for Escambia to proceed on its civil conspiracy claim.

■■■■ In addition, Escambia's cause of action survives because Florida also recognizes an independent tort of civil conspiracy:

[I]n certain circumstances mere force of numbers acting in unison may comprise an actionable wrong.... [I]f the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess, then conspiracy itself becomes an independent tort. The essential elements of this tort are a malicious motive and coercion through numbers or economic influence.[196]

---

**188.** *Leonard v. Nat Harrison Assocs., Inc.*, 122 So.2d 432, 433 (Fla.Ct.App.1960).

**189.** Escambia Compl. ¶ 233.

**190.** *See id.* ¶¶ 72–78, 83–88, 91–125, 150–159.

**191.** *See Leonard*, 122 So.2d at 433 (where complaint alleged that plaintiff's injury was direct and proximate result of trespass, the "truth of the allegation involves a factual determination, and depends upon the testimony").

**192.** *See Liappas v. Augoustis*, 47 So.2d 582, 582 (Fla.1950) ("The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff."); *Buchanan v. Miami Herald Publ'g Co.*, 206 So.2d 465, 469 (Fla.Ct.App.

1968) (same); *see also Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So.2d 277, 279 (Fla.Ct. App.1994) (charge of civil conspiracy could only be maintained if the underlying offense of civil theft was actionable).

**193.** *Clemons v. State Risk Mgmt. Trust Fund*, 870 So.2d 881, 883 (Fla.Ct.App.2004).

**194.** *See* Escambia Compl. ¶ 237.

**195.** *See id.* ¶ 239.

**196.** *Churruca v. Miami Jai–Alai, Inc.*, 353 So.2d 547, 550 (Fla.1977) (citations omitted). *Accord Lane v. Hemophilia of the Sunshine State, Inc.*, 793 So.2d 992, 995 (Fla.Ct.App. 2001); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.*, 667 So.2d 876,

This tort most commonly applies where there is "combined action of groups of employers or employees."[197]

Consequently, defendants' motion to dismiss the Florida complaint is denied. Escambia may pursue its claims for design defect, failure to warn, negligence, public nuisance, private nuisance, trespass, and civil conspiracy.

## VII. ILLINOIS

The Village of Island Lake ("Island Lake") asserts the following causes of action: (1) strict liability for design defect and/or defective product; (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; (7) civil conspiracy; and (8) violation of the Illinois Water Pollutant Discharge Act[198] ("Discharge Act").[199]

### A. Collective Liability

 In accordance with my reasoning in *MTBE I*, Island Lake may support its claims based on allegations of concert of action and civil conspiracy.[200] Island Lake must rely on concert of action and civil conspiracy because it alleges that it is impossible to identify who manufactured any particular batch of MTBE-containing gasoline, and Illinois has rejected the market share, alternative, and enterprise liability theories.[201] Defendants have asked the Court to revisit its interpretation of Illinois law in *MTBE I*. Although I see no reason to depart from my prior ruling, I take this opportunity to elaborate on my previous findings.

In *Smith v. Eli Lilly & Co.*,[202] Illinois's intermediate appellate court addressed concert of action and civil conspiracy liability on a motion for summary judgment. In that case, plaintiffs alleged that the defendants had worked together to obtain FDA approval for DES and made misrepresentations regarding the safety and efficacy of using DES during pregnancy. The court rejected concert of action and civil conspiracy theories of liability, finding that plaintiffs had failed to produce any evidence of a tacit understanding or common plan among defendants to commit a tortious act; the evidence only demonstrated parallel activity.[203] Furthermore, the

879 (Fla.Ct.App.1996); *Martin v. Marlin,* 529 So.2d 1174, 1179 (Fla.Ct.App.1988).

**197.** *Snipes v. West Flagler Kennel Club, Inc.,* 105 So.2d 164, 166 (Fla.1958).

**198.** 415 Ill. Comp. Stat. § 25/1 *et seq.*

**199.** Village of Island Lake Fourth Amended Complaint ("Island Lake Compl.") ¶¶ 184–246.

**200.** *See MTBE I,* 175 F.Supp.2d at 633 (holding that Illinois plaintiffs could rely on theory of concert of action liability and civil conspiracy).

**201.** *See Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 344–45 (1990) (rejecting market share liability, in part, because of the difficulty of establishing any defendant's share of the market and the burden on courts in applying the theory); *Lewis v. Lead Indus. Ass'n, Inc.,* 342 Ill.

App.3d 95, 276 Ill.Dec. 110, 793 N.E.2d 869, 875 (2003) (acceptance of enterprise liability where there are numerous producers in an industry "would make the manufacturers insurers of their industry, a concept soundly rejected in *Smith*, and would result in an abandonment of the principle that, to be held liable, a causative link must be established between a specific defendant's tortious acts and the plaintiff's injury"); *Smith v. Eli Lilly & Co.,* 173 Ill.App.3d 1, 122 Ill.Dec. 835, 527 N.E.2d 333, 351 (1988) (rejecting alternative and enterprise liability), *rev'd on other grounds,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324 (1990).

**202.** 173 Ill.App.3d 1, 122 Ill.Dec. 835, 527 N.E.2d 333.

**203.** *See id.* at 852, 527 N.E.2d at 350, *rev'd on other grounds,* 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324 (1990).

court noted that these theories were "rarely ... utilized to help plaintiffs overcome the identification burden in products liability cases." [204] Illinois's highest court did not review these rulings on civil conspiracy and concert of action because plaintiffs waived their appeal on those issues.

The Supreme Court of Illinois eventually addressed civil conspiracy liability in *McClure v. Owens Corning Fiberglas Corp.*[205] In *McClure*, plaintiffs brought suit against two asbestos manufacturers for injuries allegedly resulting from their husbands' exposure to asbestos while employed by the Union Asbestos and Rubber Company. Plaintiffs introduced evidence that defendants shared information with other asbestos manufacturers, held meetings in which they considered how to manage asbestos litigation, and participated in drafting a pamphlet regarding safety and handling instructions for asbestos-containing products. In deciding the issue of liability, the court defined civil conspiracy as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." [206] The court viewed conspiracy as the functional equivalent of concert of action, except that conspiracy involves an express, rather than tacit, understanding. The court focused on the agreement requirement, holding that parallel activity alone was insufficient, but that "parallel conduct [could] serve as circumstantial evidence of a civil conspiracy among manufacturers of the same or similar product" if there was

additional evidence that negated the possibility that defendants were acting independently.[207] However, the court held that plaintiffs' evidence was insufficient to create an inference of agreement and therefore reversed plaintiffs' judgment and entered judgment for the manufacturers. Thus, Illinois precedent accepts both concert of action and civil conspiracy as possible theories of recovery, depending on the facts that can be proved.[208]

In *Lewis v. Lead Industries Association, Inc.*,[209] which was decided after *MTBE I*, parents of minor children who required medical monitoring, screening, and assessment for lead poisoning, brought suit against paint manufacturers and their trade association. Although plaintiffs relied on enterprise liability to satisfy the causation element, the trial court dismissed each of plaintiffs' claims for failure to state a cause of action. The appellate court affirmed the dismissal of most of the claims because plaintiffs had failed to identify the defendants that supplied the lead pigment to which their children were exposed. Therefore, "the plaintiffs failed to plead facts in support of the causation element of the claims asserted." [210] Nonetheless, the court reinstated plaintiffs' civil conspiracy claim because plaintiffs had identified the defendants as the sole producers and promoters of lead paint pigment and further alleged that each defendant was a party to the conspiracy. The court found that plaintiffs' inability to identify which of the defendants

---

204. *Id.*

205. 188 Ill.2d 102, 241 Ill.Dec. 787, 720 N.E.2d 242 (1999).

206. *Id.* at 803, 720 N.E.2d at 258.

207. *Id.* at 804, 720 N.E.2d at 259.

208. Evidence that would permit the court to draw an inference of agreement includes:

"(1) actions contrary to the defendants' economic interests, and (2) a motivation to enter into such an agreement." *Id.*

209. 342 Ill.App.3d 95, 276 Ill.Dec. 110, 793 N.E.2d 869 (2003).

210. *Id.* at 120, 793 N.E.2d at 879.

was the active tortfeasor was not fatal. If plaintiffs could establish, as they alleged, that the sale and distribution of lead paint was tortious, defendants were the sole suppliers and promoters of lead pigment, and each defendant was a party to the conspiratorial agreement, "each defendant would be liable regardless of which one was the active tortfeasor."[211] Therefore, plaintiffs were only required to name the members of the conspiracy, rather than identify the actual tortfeasor, to extend liability to all conspirators.

These cases support my holding in *MTBE I* that Illinois plaintiffs may rely on a concert of action theory in conjunction with allegations of civil conspiracy. Although the *Smith* and *McClure* courts refused to apply concert of action or civil conspiracy, their rejection was based on the evidence and did not foreclose either concept as an actionable theory of recovery. Furthermore, the *Lewis* court determined that a plaintiff need not identify either the product or the defendant that is alleged to have proximately caused its losses because if plaintiffs can prove an agreement and tortious conduct in furtherance of that agreement, each member of the conspiracy would be liable. The fact that the *Lewis* plaintiffs' other claims were dismissed does not control in this instance because Illinois is a fact pleading jurisdiction,[212] and the claims were dismissed for failure to meet the state's pleading standard. Stated otherwise, plaintiffs' claims were dismissed because plaintiffs did not plead facts sufficient to support the causation element—not because Illinois would

never relax the requirement that a causal nexus be shown between a specific defendant's tortious acts and the plaintiffs' injuries. Indeed, the appellate court did relax the causation requirement when it reinstated the civil conspiracy claim.

Here, the Illinois Plaintiffs have alleged that *all* the named defendants "engaged in a common plan and concerted action to commit, assist and/or encourage a tortious act among Defendants"[213] and that "[o]ne or more of the defendants committed overt acts in furtherance of the conspiracy."[214] Among other things, defendants allegedly created joint task forces and committees to promote the use of MTBE while concealing its dangers.[215] If plaintiffs' prove these allegations, all defendants would be liable regardless of which one proximately caused plaintiffs' injuries. Accordingly, and consistent with my ruling in *MTBE I*, plaintiffs may proceed on a theory of concert of action and civil conspiracy.

## B. Illinois Water Pollutant Discharge Act

 Defendants argue that Island Lake cannot maintain a cause of action under the Discharge Act because the statute only applies to owners or operators of particular facilities, not to refiners in their refining capacity.

The Discharge Act prohibits the discharge of oil or other pollutants into the waters of Illinois,[216] and permits actions for recovery of clean up costs. In particular, section 5 of the statute reads:

211. *Id.*

212. *Levin*, 208 Ill.Dec. 186, 648 N.E.2d at 1113.

213. Island Lake Compl. ¶ 236.

214. *Id.* ¶ 237.

215. *Id.* ¶¶ 124–155, 238.

216. *See* 415 Ill. Comp. Stat. § 25/3 ("The discharge of oil in quantities which exceed the standards adopted by the Pollution Control Board, or the discharge of other pollutants directly or indirectly into the waters is prohibited.").

The *owner or operator* of such facility from which oil or other pollutants are discharged in violation of Section 3 of this act, shall be liable to such governmental body for the actual costs incurred for the removal of such oil or other pollutants. Such governmental body may, if necessary, bring an action in the circuit court for the recovery of the actual costs of removal, plus reasonable attorney's fees, court costs and other expenses of litigation.[217]

It is plain that the Act only applies to owners and operators of facilities discharging pollutants.

Island Lake's statutory claim must be dismissed because defendants are not owners or operators of polluting facilities. Defendants are alleged to "do business in Illinois as manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and/or marketers of MTBE and/or gasoline containing MTBE."[218] Therefore, Island Lake's claims seek recovery from defendants in their aforementioned capacities, and not as owners and operators. If Island Lake later discovers that a specific defendant was an owner or operator of a polluting facility, leave will be granted for plaintiff to amend its complaint. In the meantime, plaintiff's claim under the Discharge Act is dismissed.

In sum, defendants' motion to dismiss the Illinois complaint is granted in part and denied in part. Island Lake may continue to litigate its claims for design defect, failure to warn, negligence, public nuisance, private nuisance, trespass, and civil conspiracy. Its cause of action under the Discharge Act is dismissed without prejudice.

## VIII. INDIANA

The Indiana Plaintiffs[219] bring causes of action for: (1) violations of the Indiana Products Liability Act ("IPLA");[220] (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; (7) damages resulting from civil conspiracy; and (8) the recovery of costs under the Indiana Environmental Legal Actions statute[221] ("IELA").[222]

### A. Collective Liability

▆ To date, Indiana has not relaxed the identification requirement in products liability cases through the adoption of any theory of collective liability. In fact, in *City of Gary v. Smith & Wesson Corp.,*[223] the Indiana Supreme Court rejected application of market share liability to handgun manufacturers, in part, because many gun injuries are not attributable to the sale of the weapon but to the wrongful conduct of third parties.

*City of Gary* is not determinative of whether Indiana would apply collective liability theories here, however, as there are distinct differences between handguns and MTBE. Most importantly, handguns are not fungible products. Collective liability theories arose due to the inability of some plaintiffs, through no fault of their own, to identify which defendants actually caused their harm. In the case of handguns, plaintiffs are able to determine who manu-

---

**217.** *Id.* § 25/5.

**218.** Island Lake Compl. ¶ 4.

**219.** City of Mishawaka, City of Rockport, City of South Bend, North Newton School Corp., and Town of Campbellsburg.

**220.** Ind.Code § 34–20–2–1 *et seq.*

**221.** *Id.* § 13–30–9–2.

**222.** *See* Town of Campbellsburg Second Amended Complaint ("Campbellsburg Compl.") ¶¶ 188–247.

**223.** 801 N.E.2d 1222, 1245 (Ind.2003).

factured the injury-causing weapon through several means, such as the serial number on the gun. In addition, the focus of the City of Gary's action was the distribution practices of gun manufacturers, which allowed guns to get into the hands of unlawful purchasers and contributed to crime in the city. The city suffered from a remoteness problem because "in the absence of other facts, it [was] not a natural and probable consequence of the lawful sale of a handgun that the weapon [would] be used in a crime." [224]

By contrast, the Indiana Plaintiffs have alleged that defendants were aware of the health and environmental hazards of MTBE and of the longstanding prevalence of unintended discharges of gasoline. In this case, it was foreseeable that defendants' actions would cause the Indiana Plaintiffs' harm. Indiana law is thus silent regarding the use of collective liability theories in fungible product cases. As a result, this Court must predict whether the state would permit the use of these theories in such a case.

The Indiana Court of Appeals's decision in *E.Z. Gas, Inc. v. Hydrocarbon Transportation, Inc.,*[225] is instructive. In *E.Z. Gas,* a homeowners' estate sought damages from Petrolane Gas Service ("Petrolane") for decedents' wrongful deaths because Petrolane had supplied decedents' home with liquid propane gas ("LP-gas") containing insufficient odorant to warn of its presence. When one of the decedents tried to light the pilot on their water heater, it caused an explosion of gas, which had escaped and accumulated in the heater. Petrolane filed a third-party complaint for indemnification, claiming that the gas suppliers were responsible for any problems with the odorant. The trial court granted summary judgment in favor of the suppliers, and Petrolane appealed.[226]

The suppliers argued, among other things, that they were entitled to judgment because Petrolane could not establish which supplier's gas proximately caused the explosion. They based their arguments on the fact that Petrolane pumped the gas it received from the suppliers into common storage tanks. Petrolane's district manager had testified that it would be impossible to tell which supplier's fuel ended up in the decedents' tank since all the gas had been commingled in Petrolane's storage tank. However, the court was not persuaded that the manager's opinion foreclosed the possibility of identification evidence at trial. The court found it conceivable that Petrolane could establish which supplier's gas ended up in the decedents' home based on the records of supplier deliveries to Petrolane and Petrolane's deliveries to customers.

Furthermore, the court felt "constrained to make two additional points." [227]

First, in spite of Petrolane's possible difficulty in establishing exactly whose gas was in the storage tanks, the Suppliers produced no evidence that their gas was *not* in the storage tank and therefore not in the shipment delivered to the [decedents].... The second point ... regarding proximate cause is that, in spite of the Suppliers' emphasis on Petroleum's alleged inability to establish liability in any one Supplier, the rule is that where the separate and independent acts of two or more parties are the direct causes of a single injury, and it is not possible to determine in what proportion each contributed, any or all may

224. *Id.* at 1244.

225. 471 N.E.2d 316 (Ind.Ct.App.1984).

226. *See id.* at 317.

227. *Id.* at 321.

be held responsible for the injury. In view of the evidence that odorants may break down in some circumstances, it may not be necessary for Petrolane to establish fault on the part of any particular Supplier. If all Suppliers were following the same standard regarding the addition of odorant and the odorant or the standard is found inadequate, then all Suppliers may be liable to indemnify Petrolane for damages caused by their concurring acts.[228]

Though *E.Z. Gas* is not completely analogous, I am convinced that Indiana would relax the defendant-identification requirement in cases involving fungible products. *First*, in the face of evidence that LP-gas is fungible and that it would be "almost impossible" to determine whose product caused the injury, the Indiana court found that Petrolane might be able to establish proximate cause by tracing the LP-gas delivery records. The court was reluctant to deny relief even though the plaintiff's own evidence did not create a genuine issue of material fact. It is therefore doubtful that Indiana courts would dismiss these complaints, especially since the information necessary to trace MTBE to particular defendants would be in the possession or control of defendants.

*Second*, the opinion suggests an openness to applying burden-shifting collective liability theories (*i.e.*, alternative and market share liability) to fungible product cases. The Court of Appeals specifically noted, in dicta, that the suppliers had not shown that it was *not* their LP-gas that had caused the injury. Hence, even though Indiana has refused to apply collective liability theories to handgun and as-

bestos cases, it may still do so given these circumstances of MTBE contamination.

*Third*, the Indiana court expressed the view that the plaintiffs may not need to establish individual fault if all suppliers followed the same standard in formulating their products.[229] The 1990 Clean Air Act Amendments ("CAAA") required use of reformulated gasoline containing at least two percent oxygen by weight in those areas of the country with the worst air pollution problems. The EPA approved the use of seven oxygenates, including MTBE, to achieve this requirement. Defendants have previously argued that they added MTBE to gasoline at the direction of the EPA in order to comply with the CAAA. Indiana courts could conceivably relax proof of individual causation if they view the federal oxygenate requirements as faulty standards followed by all defendants.

I predict that Indiana would relax the proximate cause requirement by applying a "commingled product theory" of market share liability.[230] In *E.Z. Gas*, it was undisputed that the defendants' products had been in the retailer's storage tanks. It was impossible to identify which supplier's L.P.-gas proximately caused the explosion in decedents' house due to the commingling of products. The court reasoned, however, that plaintiffs did not necessarily have to establish the liability of a particular defendant because all of defendants' products had combined and contributed to an indivisible injury.[231] Although the court did not actually apply the principle of concurrent wrongdoing, it clearly had it in mind as a possible avenue of recovery for the plaintiffs. It is thus unlikely that

228. *Id.* (citations omitted).

229. *Id.*

230. *See supra* Part IV.F (discussing combined theory of concurrent wrongdoing and market share liability).

231. *See E.Z. Gas,* 471 N.E.2d at 321.

Indiana would require these plaintiffs to identify which defendants' MTBE-containing gasoline proximately caused their injuries in order to withstand dismissal of their complaints. At this stage, it is presumed that defendants' MTBE-containing gasoline was present in Indiana at the time of the alleged contamination of plaintiffs' water supply.

In addition, under the "commingled products theory," Indiana's highest court would limit liability to each defendant's percentage of fault. Indiana eliminated joint and several liability through its Comparative Fault Act, in part, to address the harsh consequence of a defendant being held liable for the entire amount of damages when its negligence contributed only slightly to a plaintiff's loss.[232] It is doubtful that the Indiana Supreme Court would depart from legislative intent by exposing the MTBE defendants to joint liability. Furthermore, it would be reasonable to measure fault on a market share basis because it would approximate the degree of risk imposed on plaintiffs by the defendants.[233] Thus, plaintiffs' claims will not be dismissed for failure to identify the offending product.[234]

### B. Indiana Environmental Legal Action

■ Indiana Code section 13–30–9–2 states:

A person may bring an environmental legal action against a person who caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment to recover reasonable costs of a removal or remedial action involving the hazardous substance or petroleum.

However, Indiana courts have not provided guidance on what "contributed to the release" means. Defendants argue that this claim must be dismissed because plaintiffs do not, and cannot, allege that defendants contributed to the actual release of MTBE gasoline. Plaintiffs assert that defendants contributed to the release by selling MTBE gasoline in the first place. Because I must draw all reasonable inferences in plaintiffs' favor, I conclude that the state courts would interpret the term "contributing to" broadly to include the sale of a polluting product.[235] Accordingly, the Indiana Plaintiffs may proceed on this statutory claim.

### C. Downstream Handlers

■ One defendant, 7–Eleven, has made the additional argument that the City of Mishawaka's ("Mishawaka") claims cannot be maintained against it as a "downstream handler" because the complaint is internally illogical.[236] That is,

**232.** *See Control Techniques, Inc. v. Johnson,* 762 N.E.2d 104, 109 (Ind.2002).

**233.** Although I have predicted Indiana's acceptance of a narrowed version of market share liability, it may still find ordinary market share to be viable in these MTBE cases based on the Restatement factors. *See supra* Part IV.E.

**234.** Defendants' argument to dismiss the claim for damages resulting from civil conspiracy is without merit because Indiana recognizes such a cause of action. *See Hunting-*

ton Mortgage Co. v. DeBrota, 703 N.E.2d 160, 168 (Ind.Ct.App.1998); *Winkler v. V.G. Reed & Sons, Inc.,* 619 N.E.2d 597, 600 (Ind.Ct. App.1993); *Boyle v. Anderson Fire Fighters Ass'n Local 1262,* 497 N.E.2d 1073, 1079 (Ind.Ct.App.1986).

**235.** Defendants have cited no case construing the term "contributed to" either broadly or narrowly.

**236.** 7–Eleven's joinder to defendants' motion to dismiss relates only to *City of Mishawaka v. Amerada Hess Corp., et al.,* No. 04 Civ.2055.

Mishawaka has defined "defendants" as including sellers of MTBE-containing gasoline, and "downstream handlers" as persons engaged in the retail sale of MTBE-containing gasoline.[237] Because the definitions overlap, plaintiff's complaint alleges that sellers of gasoline products, such as 7–Eleven, are both the victims of misleading conduct related to the hazards of MTBE and the parties responsible for such misleading conduct.[238]

Plaintiffs' claims are dismissed as against downstream handlers because its complaint is inherently contradictory. Although 7–Eleven's joinder to defendants' motion relates only to the Mishawaka case, all the Indiana complaints share the same definition problem. Plaintiffs cannot maintain their actions against parties as both the perpetrators and victims of the same tortious conduct. However, because this may be the result of a drafting error, the Indiana Plaintiffs may amend their complaints to cure this deficiency.[239] If plaintiffs choose to amend their complaints, they should clarify whether "defendants" and "downstream handlers" are mutually exclusive categories.

As a result, defendants' motion to dismiss the Indiana complaints is granted in part and denied in part. The Indiana Plaintiffs have stated cognizable claims for violations of the IPLA, failure to warn, negligence, public nuisance, private nuisance, trespass, and damages for civil conspiracy. However, plaintiffs' claims against downstream handlers are dismissed without prejudice.

## IX. IOWA

The Iowa Plaintiffs [240] allege nine causes of action: (1) strict liability for design defect and/or defective product; (2) failure to warn; (3) negligence; (4) common law and statutory public nuisance; (5) private nuisance; (6) trespass; (7) civil conspiracy; (8) breach of warranty; and (9) fraud.[241]

### A. Collective Liability

■ The Iowa Supreme Court has addressed the issue of collective liability in *Mulcahy v. Eli Lilly & Co.*,[242] in which the court responded to the following certified question:

> In a DES product liability case when a product has been ingested by a user and when, after exhaustive discovery, and through no fault of any party, the manufacturer or seller of the ingested product cannot be positively identified, will Iowa law recognize any of the following theories of liability: (1) Market share liability; (2) Alternative liability; and [sic] (3) Enterprise liability? [243]

---

**237.** City of Mishawaka Fifth Amended Complaint ¶¶ 4, 155.

**238.** The Court need not consider additional arguments made by 7–Eleven because they were first raised in its reply brief, and plaintiffs did not have the opportunity to respond. *See Cantor Fitzgerald Inc. v. Lutnick,* 313 F.3d 704, 711 n. 3 (2d Cir.2002).

**239.** *See Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (it is "entirely contrary to the spirit of the Federal Rules ... for decisions on the merits to be avoided on the basis of such mere technicalities" and leave to amend should be freely

granted); *Conley,* 355 U.S. at 48, 78 S.Ct. 99, 2 L.Ed.2d 80 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome....").

**240.** City of Galva, City of Sioux City, and City of Ida Grove.

**241.** *See* City of Galva Fifth Amended Complaint ("Galva Compl.") ¶¶ 187–252.

**242.** 386 N.W.2d 67 (Iowa 1986).

**243.** *Id.* at 70.

The court considered the theories in reverse order and found that enterprise and alternative liability would not apply to DES cases because the facts did not fit the parameters of either theory. Enterprise liability was inappropriate due to the large number of defendants (twenty-five), and because members of the DES industry had not delegated control or responsibility for safety functions to a trade association.[244] Nor did "pure" alternative liability present a viable theory for DES cases because the plaintiffs were required to join all actors who may have caused the injury. Even though the *Mulcahy* plaintiffs were able to limit the field to three defendants, the court found that it was not sufficient to apply alternative liability because the plaintiffs could not exclude the possibility that other manufacturers may have supplied DES to the relevant market.[245]

In addition, the Iowa Supreme Court "reject[ed] the market share liability theory on a broad policy basis."[246] Although the DES plaintiffs presented appealing claims for relief, the court was unwilling to require manufacturers to pay or contribute to payment for injuries that their product may not have caused. It stated:

[A]warding damages to an admitted innocent party by means of a court-constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriately within the legislative domain. . . .

Our General Assembly has not entered this field, and we in the judicial branch adhere to our established principles of legal cause. . . . The imposition of liability upon a manufacturer for harm that it may not have caused is the very legal legerdemain, at least by our long held traditional standards, that we believe the courts should avoid unless prior warnings remain unheeded. It is an act more closely identified as a function assigned to the legislature under its power to enact laws.[247]

Accordingly, the court answered the certified question in the negative.[248]

For the reasons articulated by the *Mulcahy* court, the Iowa Plaintiffs would not be able to recover under theories of alternative, enterprise, or market share liability. *First*, plaintiffs have joined both too many and too few defendants. The Iowa Plaintiffs have asserted claims against over fifty parties—a number substantially more than the twenty-five defendants the court found unwieldy for enterprise liability in *Mulcahy*. *Second*, like the DES manufacturers, defendants here did not delegate control or responsibility for safety functions to a trade association. *Third*, the named defendants only "control a substantial share of the market for gasoline containing MTBE in Iowa."[249] The Iowa Supreme Court would not apply alternative liability here unless all possible tortfeasors were before it.[250] *Finally*, the court would not adopt market share liability in MTBE cases because of policy concerns. It has determined that the issue of whether manufacturers can be held liable for harm not proved to be caused by their products belongs in the legislative domain. In the

244. *See id.* at 71–72.

245. *See id.* at 73–74.

246. *Id.* at 75.

247. *Id.* at 76.

248. *See id.*

249. Galva Compl. ¶ 182.

250. *See Mulcahy*, 386 N.W.2d at 73–74; *see also Doe v. Baxter Healthcare Corp.*, 178 F.Supp.2d 1003, 1014 (S.D.Iowa 2001) (alternative liability inapplicable under Iowa law because plaintiffs failed to name all possible tortfeasors as defendants).

meantime, Iowa courts will continue to follow traditional principles of proximate cause.[251]

Nonetheless, I conclude that the Iowa Supreme Court would apply concert of action liability to these defendants if plaintiffs were to prove a genuine common plan or understanding by defendants to create, sell, and distribute MTBE-containing gasoline. In Iowa, concert of action liability is premised upon defendants acting pursuant to a common plan or tacit understanding.[252] Even though the court rejected other collective liability theories in *Mulcahy*, it specifically "reserve[d] for later consideration the case which involves *actual* concert of action by the defendants...."[253] The court recognized that there would be situations where it might be appropriate to assign liability to all parties who engaged in tortious conduct against a plaintiff. Furthermore, the concert of action theory does not arouse the same concerns the court expressed in *Mulcahy*. In that DES case, the court rejected enterprise, alternative, and market share liability, in large part, because it was unjust to require manufacturers to pay for injuries they did not cause.[254] If the MTBE defendants acted in concert, however, the court's concern would be inapplicable because they would be true joint tortfeasors—*each* defendant would be responsible for the harm caused to the Iowa Plaintiffs.

Although some would argue that Iowa's highest court would follow the decisions in other states rejecting concert of action liability in DES cases, the court would not necessarily find those decisions determinative, or even persuasive. Courts that refused to apply the theory did so because the plaintiffs' allegations did not support the application of concert of action liability.[255] Thus, plaintiffs may pursue their claims on a concert of action theory.

## B. Trespass

■ Despite defendants' argument to the contrary, plaintiffs' trespass claim may

251. *See Mulcahy*, 386 N.W.2d at 75; *see also Perrin v. AC & S*, 68 F.3d 1122, 1124 (8th Cir.1995) (because Iowa has not adopted market share or alternative liability, the mere possibility of the use of defendant's product and decedent's exposure does not satisfy plaintiff's burden of establishing probable exposure to defendants' asbestos).

252. *See Moore v. Fryman*, 154 Iowa 534, 134 N.W. 534, 536 (1912) ("[T]he rule is well settled that joint liability does exist where the wrong is done by concert of action and common intent and purpose, and that there may be such concurrent action and co-operation as will create joint liability without proof of conspiracy."); *Bowman v. Humphrey*, 124 Iowa 744, 100 N.W. 854, 855 (1904) (to sustain recovery under a concert of action theory, "it must be shown in all cases that the tortfeasors acted in confederation with each other, or pursuant to an agreement between themselves to do the wrong").

253. *Mulcahy*, 386 N.W.2d at 76 (emphasis added).

254. *See id.* at 71 ("The overall number of DES manufacturers mitigates against group conduct requiring imposition of liability on all for the acts of the unidentified wrongdoer"); *id.* at 73 (rejecting alternative liability because one element, "the conduct of one of the parties caused the injury, is absent in the facts given to us"); *id.* at 76 (describing market share liability as a "court-constructed insurance plan").

255. *See, e.g., Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 933 (allegations of parallel conduct insufficient to establish concert of action liability); *Hymowitz*, 73 N.Y.2d at 506, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (same); *Martin*, 689 P.2d at 379 (same). *But see Abel*, 343 N.W.2d at 176 (allegations that defendants acted together in negligently manufacturing and promoting drugs which were ineffective and dangerous, were inadequately tested, and were distributed without sufficient warnings, were sufficient to withstand summary judgment based on concert of action liability).

proceed because plaintiffs are not required to prove (or allege) that defendants intended to invade their particular piece of property. "The gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property." [256] Under Iowa law, "[o]ne is subject to liability to another for trespass ... if he intentionally [ ] enters land in the possession of the other, or *causes a thing* or a third person to do so...." [257] Plaintiffs' trespass claim is based on defendants' activities of refining and distributing MTBE-containing gasoline when they knew or should have known that gasoline discharges were inevitable. [258] The alleged conduct could give rise to liability because defendants' practices could be viewed as *causing a thing* to enter plaintiffs' property. Moreover, in certain situations, Iowa also recognizes negligent trespass. [259] Defendants' motion to dismiss the trespass claims is therefore denied.

## C. Fraud

 Defendants argue that the fraud count fails to state a claim because plaintiffs have not identified specific statements allegedly made by each defendant. Defendants are correct that fraud must be alleged with particularity for each defendant joined in the Iowa action. To the extent that plaintiffs have failed to do so for certain defendants, their fraud claim is dismissed as to those defendants. However, the Iowa Plaintiffs have stated a fraud claim against (1) Atlantic Richfield Co. (Arco); (2) BP Corp. (Amoco); (3) ChevronTexaco (Chevron and Texaco); (4) Citgo; (5) ExxonMobil (Exxon and Mobil); (6) Shell; (7) Sunoco; (8) members of the API; (9) members of the MTBE Committee; and (10) members of the OFA. [260]

The Iowa complaint informs each of these defendants of the nature of its alleged participation in the fraud. The complaint is replete with specific dates and misrepresentations allegedly made by defendants. For instance, plaintiffs allege that on or about February 27, 1987, the MTBE Committee submitted comments to the EPA, stating that "sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment." [261] The MTBE Committee included BP Corp. (Amoco), Arco, ChevronTexaco (Chevron and Texaco), Citgo, ExxonMobil (Exxon), Shell, and Sunoco. [262] Because the remaining fraud allegations are the same as those asserted by the Connecticut Plaintiffs, the parties are referred to Part IV.D for further examples. [263]

 Defendants also argue, based on

---

**256.** *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 301 (Iowa 1994), *abrogated on other grounds, Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004).

**257.** *Id.* (emphasis added).

**258.** *See* Galva Compl. ¶¶ 87–92, 158–161.

**259.** *See Wenndt v. Latare*, 200 N.W.2d 862, 869 (Iowa 1972) ("In Iowa ... liability based on negligence may also arise in certain trespass situations.").

**260.** See *supra* notes 154–160 for a partial list of defendants (with the exception of Exxon-Mobil Pipe Line Co.) against which fraud

claims remain. ExxonMobil Pipe Line Co. is not named as a defendant in the Iowa complaints. The fraud claims also survive against members of the API, OFA, and MTBE Committee.

**261.** Galva Compl. ¶ 135.

**262.** *See id.* ¶ 130.

**263.** *See id.* ¶¶ 127, 130, 135, 139, 151–153 (alleged misrepresentations made by defendants); *see id.* ¶¶ 94–95, 99–106, 109–122 (allegations of scienter).

*Wright v. Brooke Group Ltd.,*[264] that the fraud claim must be dismissed because the Iowa Plaintiffs did not transact business with defendants (*i.e.*, were not customers of defendants), and manufacturers do not have a general duty to warn the general public under Iowa law. In *Wright,* the Iowa Supreme Court considered whether a manufacturer's alleged failure to warn or disclose material information can give rise to a fraud claim when the relationship between a plaintiff and defendant is solely that of a customer and manufacturer.[265] Because the case focused on that relationship, the court analyzed section 551 of the Restatement (Second) of Torts, which governs liability for non-disclosure in business transactions. It held that a manufacturer's failure to warn or disclose material information will support a fraud claim by a customer only when disclosure would be necessary to prevent a prior representation from being misleading.[266] However, the court specifically declined to extend the duty of disclosure to a general duty to warn the public.[267]

The fact that the Iowa Plaintiffs were not customers of the defendants does not bar their claim for fraud because *Wright* must be limited to its facts. As noted, the court examined the narrow issue of the duty manufacturers owe to customers. It did not depart from the general principle that concealment of or failure to disclose a material fact can constitute fraud.[268] "To be actionable, the concealment must be by a party under a duty to communicate the concealed fact."[269] Here, plaintiffs have asserted a breach of warranty claim, in addition to their claim for fraud. Construing the complaint in the light most favorable to the plaintiffs, defendants have a duty of disclosure sufficient to support a fraud claim because plaintiffs are third-party beneficiaries of defendants' warranties. The Iowa Code provides that "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by the breach of the warranty."[270] The accompanying note explains that the second alternative (consume) is designed "for those that desire to expand the class of beneficiaries," and that the third alternative (affected by) "follow[s] the trend of modern decisions . . . in extending the rule beyond injuries to the person."[271] Nothing in the Iowa case law prohibits plaintiffs' well-pleaded fraud claims.

In conclusion, defendants' motion to dismiss the Iowa complaints is granted in part and denied in part. The Iowa Plaintiffs have stated causes of action for design defect, failure to warn, negligence, public nuisance, private nuisance, trespass, civil conspiracy, breach of warranty, and fraud (as to some, but not all, defendants). Their fraud claims are dismissed to the extent noted above.

## X. KANSAS

The Kansas Plaintiffs[272] assert the following causes of action: (1) strict liability

264. 652 N.W.2d 159 (Iowa 2002).

265. *See id.* at 163.

266. *See id.* at 176.

267. *See id.*

268. *See id.* at 174 (citing *Cornell v. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987)).

269. *Cornell,* 408 N.W.2d at 374.

270. Iowa Code § 554.2318 (2004).

271. *Id.* cmt. 3.

272. Chisholm Creek Utility Authority, City of Bel Aire, County of Sedgwick Water Authority, City of Dodge City, and City of Park City.

for design defect and/or sale of a dangerously defective product; (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; (7) civil conspiracy; and (8) breach of warranty.[273]

## A. Collective Liability

■ The Kansas courts have not spoken on whether, and under what circumstances, they would relax the causation requirement by applying theories of collective liability. The parties have cited no authority, and the Court has found none, in which the Kansas courts addressed market share, alternative, enterprise, or concert of action theories of liability. Additionally, the cases cited by defendants are not controlling because they simply reiterate the proximate cause requirement without addressing whether the requirement could ever be relaxed in a products liability case where plaintiffs are unable to identify the specific tortfeasor.[274]

Plaintiffs may recover damages jointly and severally under four theories: alternative liability, enterprise liability, concert of action, and concurrent wrongdoing.[275] Defendants rely on the fact that the Kansas comparative fault statute abolishes joint and several liability to support their argument that Kansas would not adopt any theory of collective liability.[276] This argument is unpersuasive, however, because the comparative fault statute "concerns itself with the 'all or nothing' philosophy which previously attended tort negligence actions when the contributory negligence of the plaintiff, however slight, foreclosed all defendant's responsibility for plaintiff's injuries."[277] It did not alter common law duties,[278] and did not change the common law rule of joint and several liability for torts other than negligence.[279] Moreover, the comparative fault statute still leaves open the possibility of market share liability, which apportions damages severally among defendants. Because Kansas has not spoken on the issue of collective liabili-

273. *See* Chisholm Creek Utility Authority Fourth Amended Complaint ("Chisholm Compl.") ¶¶ 188–244.

274. *See Lyons v. Garlock, Inc.*, 12 F.Supp.2d 1226, 1228 (D.Kan.1998) ("[P]laintiffs acknowledge their obligation to show that they were in fact exposed to the products of a particular defendant in order to recover from that defendant."); *Smith v. Fibreboard Corp.*, No. 92–1035–MLB, slip op. at 6 (D.Kan. Mar. 24, 1998), Ex. A to Memorandum of Law in Support of Defendants' Motion to Dismiss ("Causation is an essential element of a products liability case under Kansas law."); *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 661 P.2d 348, 357–58 (1983) ("[Plaintiff] must prove, first of all, not only that he has been injured, but that he has been injured by the product.").

275. *See supra* Part IV.A–D.

276. *See Brown v. Keill*, 224 Kan. 195, 580 P.2d 867, 874 (1978) ("[U]nder the provisions of K.S.A. 60–258a the concept of joint and

several liability between joint tortfeasors previously existing in [Kansas] no longer applies in comparative negligence actions.").

277. *Bridges v. Bentley*, 244 Kan. 434, 437, 769 P.2d 635 (1989) (citation omitted). *Accord Luther v. Danner*, 268 Kan. 343, 346, 995 P.2d 865 (2000).

278. *See id.* ("[T]his court has unequivocally stated 'no change' in common law duties occurred as a result of the enactment of our comparative negligence statute.").

279. *See Sieben v. Sieben*, 231 Kan. 372, 646 P.2d 1036, 1041 (1982) (comparative fault statute does not affect joint and several liability in battery cases); *Boyle v. Harries*, 22 Kan. App.2d 686, 923 P.2d 504, 511 (1996) (in action alleging breach of fiduciary duty, restraint of trade, and unjust enrichment, defendants may be held jointly and severally liable where they are similarly situated, benefit equally from the alleged torts and produced a single, indivisible injury).

ty, I must predict what the state's highest court would do.

The Kansas Supreme Court's decision in *McAlister v. Atlantic Richfield Co.*,[280] provides some guidance on whether Kansas would relax the causation requirement in MTBE cases. In *McAlister*, a landowner sought damages for the pollution of his water well by eight oil companies because they allegedly allowed salt water brine to escape during their oil drilling operations in violation of the Kansas Oil Well Pollution Act. Evidence was introduced which suggested that when the landowner purchased the property it had a fresh water well. However, several years later, the landowner detected a high concentration of salt and chloride in his well, which rendered the water unusable. The lower court granted summary judgment in favor of the oil companies because the plaintiff had been unable to establish which defendant was responsible for the contamination of his well.

The Kansas Supreme Court reversed the judgment on appeal, finding that "[t]he plaintiff in this case need not show negligence, nor need he pinpoint what a particular defendant did or did not do to cause his pollution; this is not an issue. All he need prove is a violation of [the Oil Well Pollution Act]."[281] In reaching its conclusion, the court was persuaded that the evidence disclosed a community of wrongdoing. The court noted that there was eyewitness and aerial photographic evidence that brine escaped the control of each defendant, and that there was evidence that the salt water polluted the plaintiff's well. Where the landowner had pled and offered substantive proof of a statutory violation by all the defendants,

an issue of material fact remained as to whether defendants' actions had caused the seepage of the salt water brine into the landowner's well.

Based on *McAlister*, I conclude that Kansas would relax its causation requirement in environmental contamination cases involving multiple tortfeasors where the plaintiffs allege concurrent wrongdoing. In *McAlister*, the Kansas Supreme Court effectively relieved the plaintiff of the burden of connecting the salt and chloride in his well to any particular defendant. All he needed to show was that the defendants had all committed statutory violations. Collective liability theories may be applicable where all the defendants acted tortiously toward the plaintiff. The *McAlister* court's analysis would have been the same in the absence of the statute because its decision turned on the converging wrongful acts of the defendants. On a prior occasion, the Kansas Supreme Court explained that the Oil Well Pollution Act is "not needed ... to make [ ] oil companies liable for damages caused by the escape of salt water from the premises of the company."[282] Instead, recovery for well pollution is predicated on the common law notion that oil companies should be liable for storing hazardous substances on their land and permitting those substances to damage the plaintiff's property. The statute was only necessary to the extent that it allowed liability to be assessed against companies for allowing salt water to escape even in the absence of damage to property. Moreover, as a matter of public policy, the Kansas Supreme Court has said that "the water supply of the people is of greater importance than the operation of a

---

**280.** 233 Kan. 252, 662 P.2d 1203 (1983).

**281.** *Id.* at 1209.

**282.** *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P.2d 953, 957 (1934).

business at a reduced cost."[283]

I therefore predict that Kansas would relax the causation requirement by applying the "commingled product theory" of market share liability. Like the Connecticut and Indiana courts, the Kansas Supreme Court has demonstrated a willingness to apply principles of concurrent wrongdoing where defendants' products were present in the zone of injury. However, Kansas would probably limit defendants' exposure to its apportioned share of the damages. As recognized earlier, where there are a large number of defendants, each of whom may have contributed only slightly to the harm, it would be unfair to expose each of them to liability for the total amount of plaintiffs' damages.[284]

The Kansas Plaintiffs allege that *all* defendants have breached duties owed to plaintiffs (whether statutory or common law), by conspiring to—and in fact—refining, manufacturing, and distributing MTBE-containing gasoline, knowing that MTBE contamination of groundwater was inevitable, and failing to warn plaintiffs of MTBE's environmental and health hazards.[285] Because defendants' MTBE-containing gasoline is presumed to be in Kansas at this early stage, plaintiffs have alleged concurrent wrongdoing sufficient to relax the requirement of product identification. If plaintiffs eventually prove

their allegations, defendants would be severally liable.[286]

In short, defendants' motion to dismiss the Kansas complaints is denied. The Kansas Plaintiffs have stated cognizable claims for design defect, failure to warn, negligence, public nuisance, private nuisance, trespass, civil conspiracy, and breach of warranty.

## XI. LOUISIANA

The Louisiana Plaintiffs[287] assert causes of action for (1) unreasonably dangerous design in violation of the Louisiana Products Liability Act ("LPLA");[288] (2) inadequate warning in violation of the LPLA;[289] (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; and (7) civil conspiracy.[290]

### A. Collective Liability

██ Louisiana courts have been silent regarding collective liability theories. The parties have not cited—nor has the Court found—a single case in which a Louisiana court has expressed its view on relieving plaintiffs of the burden of identifying a defendant's product in a products liability action. Nonetheless, defendants argue that federal courts applying Louisiana law have consistently refused to recognize any theory of collective liability.

Defendants' reliance on federal case law is misplaced because those courts did not

---

**283.** *Id.* at 958.

**284.** *See* Restatement (Second) of Torts § 433B(2) cmt. e.

**285.** *See* Chisholm Compl. ¶¶ 77–79, 92–96.

**286.** Furthermore, in considering market share liability for the first time, the Kansas Supreme Court may find that the broader theory should apply, consistent with the Restatement factors, because of the fungible nature of MTBE-containing gasoline, plaintiffs'

inability to identify the active tortfeasor(s) through no fault of their own, and the causal connection between the product and plaintiffs' injuries. *See supra* Part IV.E.

**287.** City of Marksville and Town of Rayville.

**288.** La.Rev.Stat. § 9:2800.56.

**289.** *Id.* § 9:2800.57.

**290.** *See* City of Marksville Fourth Amended Complaint ("Marksville Compl.") ¶¶ 185–248.

predict how the Louisiana Supreme Court would rule when confronted with these theories of liability. In *Thompson v. Johns–Manville Sales Corp.*,[291] the Fifth Circuit Court of Appeals declined to adopt enterprise or market share liability in the asbestos context because Louisiana courts had not considered the issue. The court saw "little purpose in discussing in detail the potential applicability of these theories to [the plaintiff's] case,"[292] and stated:

> [W]riting in diversity, we write on the wind. Louisiana will or will not adopt either or both at some future time. In no reported case has it done so at present.... All that [the plaintiff] can advance in support of his claim ... is a supposed general tendency or trend on the part of Louisiana courts to expand the liability of manufacturers. That is not enough to support our adoption for Louisiana of a particular and radical mode of its expansion. Such departures are for the Louisiana courts, not for us.[293]

In that diversity case, the court was reasonably guided by notions of comity. Other courts examining collective liability in Louisiana have also failed to determine what the state's highest court would do.[294] This Court cannot reject these theories based solely on the absence of state case law—especially if the Louisiana Supreme Court has not yet addressed the issue.[295]

The Louisiana case most analogous to these MTBE actions is *Gould v. Housing Authority of New Orleans.*[296] In *Gould*, tenants sued the Housing Authority of New Orleans ("HANO"), alleging that their minor children had suffered lead poisoning from the paint in the apartments owned by the city housing authority and rented to the plaintiffs. HANO, in turn, sued the paint producers. It conceded that it could not identify whose pigment injured a particular child, but sought application of the market share theory of liability. The district court sustained the manufacturers' defense that HANO had failed to identify which manufacturer's paint had injured each child, holding that market share liability was not an actionable theory of recovery. However, the court permitted HANO to amend its claims.

**291.** 714 F.2d 581 (5th Cir.1983).

**292.** *Id.* at 583.

**293.** *Id.*

**294.** *See Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1252–53 (5th Cir.1997) (dismissal of claims against lead paint manufacturers was proper based on *Thompson* and *Bateman* ); *Bateman v. Johns–Manville Sales Corp.*, 781 F.2d 1132, 1133 (5th Cir.1986) (finding that "[t]he disposition of the market share liability issue in *Thompson* ... governs Bateman's case"); *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, No. 94–0382, 2000 WL 282787, at *10, 2000 U.S. Dist. LEXIS 3328, at *32 (E.D.La. Mar. 14, 2000) (rejecting alternative liability because plaintiffs had "produced no case in which a Louisiana state court, or federal court sitting in diversity, has applied this theory of recovery"); *Hannon v. Waterman S.S. Corp.*, 567 F.Supp. 90, 92 (E.D.La.1983) (independently rejecting market share, alternative, enterprise, and concert of action liability because "asbestos is not like DES").

Although some of the cases from the Fifth Circuit acknowledge a duty to apply state substantive law, they do not predict what the state's highest court would do where the state law is uncertain—an explicit requirement under Second Circuit law. *See Phansalkar,* 344 F.3d at 199. The Court need not defer to the views of the Fifth Circuit if there is a basis in Louisiana law for predicting that the Louisiana courts, when confronted with a case like this, would conclude that the Fifth Circuit's ruling was incorrect. *See Factors Etc.,* 652 F.2d at 283.

**295.** Issues of collective liability frequently arise in DES cases, and it does not appear that any DES cases have been litigated in Louisiana courts.

**296.** 595 So.2d 1238 (La.Ct.App.1992).

HANO filed a supplemental demand, which alleged that the paint producers acted in concert with their trade association and were therefore liable. The court sustained the objection again for HANO's failure to identify the specific tortfeasor, but again allowed HANO to amend its demand. HANO then asserted that each of the producers supplied paint that was ultimately applied in each of the eleven apartments where the injured children resided. This time, the district court dismissed the claims.[297]

The Louisiana Court of Appeals reversed and remanded. It construed HANO's petition "liberally" and "interpret[ed] it as 'pleading in the alternative' pursuant to art. 892" of the Louisiana Code of Civil Procedure ("C.C.P.").[298] "In effect HANO alleged that the paint in each apartment contained the pigment produced by either one or more of the producers."[299] Although the manufacturers argued that HANO would never be able to prove whose product was in each apartment, the court concluded that had no bearing on whether the demand stated a cause of action. It explained:

> Discovery has to do with the evidence and plays a prominent part in the summary judgment procedure, but discovery and evidence have no part in the evaluation of the petition for the purpose of considering an exception of no cause of action. In this instance, the inquiry is

limited to the four corners of the petition and in this case HANO has stated a cause of action. *The trial court's insistence that HANO identify exactly which producer's product was in each apartment as a condition of stating a cause of action was an erroneous assumption which led to an erroneous judgment.* Because of the conclusion we have reached we need not consider the pigment producers' arguments relative to market share or collective liability.[300]

I predict that the Louisiana Supreme Court would similarly allow the Louisiana Plaintiffs to plead in the alternative in accordance with article 892 of the C.C.P.[301] In this case, plaintiffs have alleged that *all* defendants have caused their injuries because defendants collectively put a defective, fungible product on the market in a fully commingled condition.[302] Defendants' MTBE was allegedly released into plaintiffs' water supply through inevitable discharges, such as leaks and overfills in the chain of distribution.[303] It is not material that the Louisiana Plaintiffs use the term "all" instead of "each" because they essentially allege that their groundwater contains the MTBE created by one or more of the defendants. Stated otherwise, if plaintiffs' water supply was not contaminated by *x*-defendant, it was contaminated by *y*-defendant. Plaintiffs' ability to prove these allegations is a matter properly left for summary judgment or trial of the merits.[304] Alternatively, Louisiana would be

---

297. *See id.* at 1240.

298. *Id.* at 1242. Article 892 of the C.C.P. provides: "[A] petition may set forth two or more causes of action in the alternative, even though the legal or factual bases thereof may be inconsistent or mutually exclusive."

299. *Gould,* 595 So.2d at 1242.

300. *Id.* (emphasis added).

301. *See Barnco Int'l, Inc. v. Arkla, Inc.,* 628 So.2d 162, 166 (La.Ct.App.1994) ("Article 892

specifically allows the pleading of inconsistent or mutually exclusive causes of action in one pleading as long as they are pled in the alternative.").

302. *See* Marksville Compl. ¶¶ 7, 183, 185–248.

303. *See id.* ¶¶ 1–3, 91–92.

304. *See Economy Carpets Mfrs. and Distribs., Inc. v. Better Bus. Bureau of Baton Rouge, Inc.,* 333 So.2d 765, 768 (La.Ct.App.1976) (when considering an exception of no cause

likely to find market share liability applicable to these MTBE cases if it considers the factors outlined in the Restatement (Third) of Torts—namely, fungibility, inability to identify, and causal nexus.[305] Therefore, plaintiffs' inability to identify specific tortfeasors at this juncture does not prevent them from pursuing their claims.

## B. Louisiana Products Liability Act

■ Defendants argue that plaintiffs' negligence, public nuisance, private nuisance, trespass, and civil conspiracy claims must be dismissed because the LPLA provides the exclusive basis for recovery against a product manufacturer. Plaintiffs try to avoid the LPLA's preemptive effect by arguing that their non-LPLA claims fall outside the statute because they allege actionable activities by defendants other than those that would give rise to a products liability claim; for example, the nuisance and trespass claims are based on defendants' interference with plaintiffs' property rights.

The Louisiana Plaintiffs' non-LPLA causes of action must be dismissed because they are precluded by statute. The LPLA provides that "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."[306] The LPLA "establishes the *exclusive* theories of liability for manufacturers for *damage caused by their products*. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in [the statute]."[307] Under the LPLA, a claimant may prove that a product was unreasonably dangerous in one of four ways: (1) construction or composition; (2) design; (3) inadequate warning; or (4) non-conformance with an express warranty.[308] Because plaintiffs' claims for public and private nuisance, trespass, negligence, and civil conspiracy are premised on defendants' manufacture of MTBE-containing gasoline, relief may only be granted on the four statutory bases. Plaintiffs' argument that the claims fall outside the statute's scope ignores the fact that the damage of which plaintiffs complain was allegedly caused by the product at issue—MTBE-containing gasoline. Accordingly, all causes of action except the LPLA claims are dismissed.[309]

of action, the court should "not be concerned with whether the plaintiff can prove the allegations of the complaint, or whether he can win his case").

**305.** *See supra* Part IV.E.

**306.** La.Rev.Stat. § 9:2800.54(A).

**307.** La.Rev.Stat. § 9:2800.52 (emphasis added).

**308.** *See id.* § 9:2800.54(B).

**309.** *See Jefferson,* 106 F.3d at 1251 (dismissing claims of negligence, fraud by misrepresentation, breach of implied warranty, and civil conspiracy against lead paint manufac-

turers because they were preempted by the LPLA); *Ingram v. Bayer Corp.,* No. 02–0352, 2002 WL 1163613, at *2, 2002 U.S. Dist. LEXIS 10402, at *6 (E.D.La. May 29, 2002) (dismissing claims sounding in negligence, gross negligence, strict liability, fraud, misrepresentation, concealment, conspiracy, suppression, and willful, wanton, and reckless conduct against pharmaceutical company because they were really products liability claims); *Lacey v. Bayer Corp.,* No. 02–1007, 2002 WL 1058890, at *2, 2002 U.S. Dist. LEXIS 9647, at *6 (E.D.La. May 23, 2002) (dismissing negligence, fraud, misrepresentation, negligent and reckless misrepresentation, conspiracy, and strict liability claims because the LPLA did not allow the plaintiff to recover under those theories).

In sum, defendants' motion to dismiss the Louisiana complaints is granted in part and denied in part. The Louisiana Plaintiffs may proceed on their claims for violations of the LPLA, while their claims for negligence, public nuisance, private nuisance, trespass, and civil conspiracy are dismissed.

## XII. MASSACHUSETTS

The Massachusetts Plaintiffs[310] bring causes of action for: (1) public nuisance; (2) breach of warranty for design defect and/or defective product; (3) breach of warranty for failure to warn; (4) negligence; (5) private nuisance; (6) trespass; (7) civil conspiracy; and (8) violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act[311] ("Oil Act").[312]

### A. Collective Liability

■ Although the Massachusetts Supreme Judicial Court has not addressed enterprise or concert of action liability, it has demonstrated a willingness to relax the identification requirement under a market share theory in cases involving un-reasonably dangerous products. Moreover, the lower courts have applied both alternative and market share liability in actions analogous to these MTBE cases.

In *Payton v. Abbott Laboratories*,[313] plaintiffs brought an action against six DES manufacturers for damages they suffered as a result of their mothers' ingestion of DES. Defendants moved to dismiss the complaint on the basis that plaintiffs could not identify which manufacturer had caused their injuries. The federal district court certified four questions to the Supreme Judicial Court of Massachusetts, including, whether manufacturers "who probably supplied some of the DES ingested by the mothers of the plaintiff class, be held liable to members of the plaintiff class when neither the plaintiffs nor defendants [could] identify which manufacturer's DES was ingested by which mothers?"[314]

While the court was unwilling to give a definitive answer to this question in the form stated, it clearly expressed its reservations regarding market share liability. *First*, the court was troubled by the plain-

---

**310.** Town of Duxbury, Brimfield Housing Authority, Town of Charlton, Chelmsford Water District, Cotuit Fire District Water Department, Town of Dudley, East Chelmsford Water District, Town of Edgartown, Town of Halifax, Town of Hanover, Hillcrest Water District, Town of Hudson, Leicester Water Supply District, Town of Marion, Town of Maynard, Town of Monson, North Chelmsford Water District, Town of North Reading, City of Peabody, Town of Pembroke, South Sagamore Water District, Town of Spencer, Town of Tewksbury, Town of Tyngsborough, United Methodist Church (Wellfleet, Massachusetts), Town of Ware, Town of Wayland, Town of West Brookfield, Westview Farm, Inc., Town of Avon, Town of Bedford, Town of Bellingham, City of Brockton, Centerville–Osterville–Marstons Mills Water Department, Town of Danvers, Dedham Westwood Water District, Town of Dover, Town of East Bridgewater, Town of East Brookfield, Town of Ea-ston, Town of Hanson, Town of Holliston, Massasoit Hills Trailer Park, Inc., Town of Merrimac, City of Methuen, Town of Millis, Town of Natick, Town of Norfolk, Town of North Attleborough, North Raynham Water District, Town of Norwell, Town of Reading, Sandwich Water District, Town of Stoughton, Sudbury Water District, Town of West Bridgewater, Westport Federal Credit Union, Town of Weymouth, Town of Wilmington, Town of Yarmouth, Town of Salisbury, and Water Supply District of Acton.

**311.** Mass. Gen. Laws ch. 21E, § 5 (2005).

**312.** *See* Duxbury Fifth Amended Complaint ("Duxbury Compl.") ¶¶ 249–308.

**313.** 386 Mass. 540, 437 N.E.2d 171 (1982).

**314.** *Id.* at 188.

tiffs' insistence that the defendants be prohibited from providing exculpatory evidence. Such a version of market share liability "would practically ensure that defendants innocent of wrongdoing to a particular plaintiff would be held liable to her." [315] *Second,* the court was hesitant to forego the primary benefits of the identification requirement: protecting defendants from liability beyond their share of responsibility, and separating tortfeasors from innocent actors. *Third,* the court reasoned that imposing liability would not further the public policy of developing and marketing more efficacious drugs. Despite these concerns, the court carefully articulated that on an adequate record, it would "recognize some relaxation of the traditional identification requirement ... to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant period of time." [316] Accordingly, the court held that it "might permit recovery from those defendants" based on their share of the DES market. [317]

Following the *Payton* court's opinion, the class was decertified, and the plaintiff Shelley McCormack proceeded to prosecute the action individually in the district court. [318] The federal court noted that all the substantive rulings in *Payton* were still binding on this particular plaintiff. Accordingly, when defendants filed a motion to dismiss, the court considered, based on *Payton,* whether it should apply a market share liability theory. In answering

this question in the affirmative, the court addressed each of the concerns expressed by the Massachusetts Supreme Judicial Court. *First,* the district court made clear that defendants would have the opportunity to exculpate themselves by introducing evidence regarding if, where, and how they manufactured or distributed DES. *Second,* the court stated that "where each defendant carries its burden of proof with respect to actual market share, no defendant will be held liable in negligence for more harm than it statistically could have caused in the relevant market." [319] Moreover, because a plaintiff is required to "prove that a defendant acted tortiously before any liability may be imposed ... a defendant who erroneously is held liable to a particular plaintiff cannot be considered wholly innocent." [320] *Third,* the court reasoned that imposing liability would benefit the public by encouraging manufacturers to create safer products that are easily identifiable. [321] As a result, the court applied the market share theory of liability and denied defendants' motion to dismiss. [322]

Following these two decisions, Massachusetts courts have embraced the imposition of liability based on each defendants' share of the relevant market. In *Russo v. Material Handling Specialities Co.,* [323] the court denied defendants' summary judgment motion where the plaintiff was injured by an unsecured beverage cart, allegedly manufactured by one of the three defendants. In reaching its conclusion, the court held that market share liability was appropriate because the carts' generic

---

**315.** *Id.* at 189.

**316.** *Id.* at 190.

**317.** *Id.*

**318.** *See McCormack v. Abbott Labs.,* 617 F.Supp. 1521, 1523 (D.Mass.1985).

**319.** *Id.* at 1527.

**320.** *Id.*

**321.** *See id.* at 1528.

**322.** *See id.* at 1529.

**323.** No. 9101209, 1995 WL 1146853, at *1–2 (Mass.Super.Ct. Aug. 29, 1995).

design, combined with the fact that several manufacturers supplied carts to the airline rendered identification virtually impossible.[324] In addition, the court permitted plaintiffs to proceed on a theory of alternative liability.[325] Similarly, in *Mahar v. Hanover House Industries*,[326] the court denied defendants' motion for summary judgment and adopted a market share approach where the plaintiff was injured by a rowing machine but was unable to ascertain which supplier had provided the defective product.

In view of the courts' analyses in *Payton* and *McCormack*, as well as the lower courts acceptance of these theories, I am convinced that the Massachusetts Supreme Judicial Court would approve of market share liability in the MTBE context. The *Payton* court was uncomfortable with the notion of allowing plaintiffs to utilize a theory of market share liability which would, in effect, hold defendants liable without regard to fault. However, the *McCormack* court pointed out that the theory advanced by the *Payton* plaintiffs was fundamentally at odds with the concept of market share liability, which specifically permits defendants to exculpate themselves by proving that they did not produce DES during the relevant time frame or in the relevant market.

Because plaintiffs are also unable to identify the specific wrongdoer due to the fungible nature of MTBE, this case is similar to *McCormack*. Plaintiffs have sought, but have been unable to obtain, information regarding causation and the identity of the alleged tortfeasor.[327] Plaintiffs will be required to prove that defendants acted tortiously in manufacturing and/or distributing MTBE-containing gasoline and that gasoline containing MTBE caused their injuries. A defendant will then be able to exonerate itself by producing evidence that it did not manufacture or distribute MTBE-containing gasoline in the geographic area in question, or the relevant time frame.

The *Payton* court's concern regarding disproportionate liability does not present a problem. If defendants are held liable, apportionment based on each defendant's share of the market will reduce the "disproportion between potential liability and actual responsibility." [328] In addition, a defendant's ability to exculpate itself and provide evidence regarding its share of the market will decrease the likelihood of holding a defendant liable for more harm than it caused. Finally, exposure to liability here could have the effect of encouraging manufacturers of MTBE-containing gasoline to research safer alternatives and to develop a product that possesses distinguishing characteristics.

Thus, the Massachusetts Plaintiffs may pursue their claims on the basis of market share liability.

### B. Trespass

Defendants also contend that under Massachusetts law, trespass requires intentional entry onto plaintiffs' property and failure to plead this element is fatal to plaintiffs' claim. Defendants' argument is

324. *Id.* at *5.

325. *See id.* at *7–8.

326. No. CA 880156, 1995 WL 1146188, at *1–2 (Mass.Super.Ct. Dec. 12, 1995).

327. *See, e.g.,* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 8 ("Plaintiffs thus asked for preliminary discovery of such matters, to investigate further the very causation question that defendants now claim are insufficiently pled. Defendants objected to plaintiffs' request.").

328. *McCormack*, 617 F.Supp. at 1527.

without merit because plaintiffs are not required to plead intent under Rule 8.

More importantly, however, plaintiffs need not prove that defendants intended to invade their property. Under Massachusetts law, "trespass requires an affirmative voluntary act upon the part of a wrongdoer." [329] That voluntary act may simply consist of "intentionally set[ting] in motion a force which in the usual course of events will damage the land of another." [330] Indeed, plaintiffs' trespass claim is based on the fact that "Defendants so negligently, recklessly and/or *intentionally* released, spilled, and/or failed to properly control ... gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to contaminate Plaintiffs' water systems and the groundwater systems...." [331] Thus, plaintiffs sufficiently allege that defendants intended to manufacture and distribute MTBE-containing gasoline in such a way that contamination of plaintiffs' property was foreseeable. Defendants' motion to dismiss plaintiffs' trespass claim is denied.

### C. Massachusetts Oil and Hazardous Material Release Prevention and Response Act

█ The Oil Act imposes liability for the release, or threatened release, of oil or hazardous materials if plaintiffs can prove that defendants are "persons liable" under any of five subsections of the statute. Defendants assert that plaintiffs have not alleged that they are "persons liable" within the meaning of the Oil Act, and that subsections 5(a)(2), 5(a)(3) and 5(a)(4) of the Act are inapplicable because they do not pertain to the release of oil, only hazardous materials. Plaintiffs contend that defendants' analysis of the Oil Act is inapposite because they have not cited to the relevant subsections of the statute.

The Oil Act distinguishes between oil and hazardous materials. Three subsections relate only to the release or threatened release of hazardous material, while subsections 5(a)(1) and 5(a)(5) of Chapter 21E concern the release of oil. Thus, the plain language of the statute only permits recovery if plaintiffs can establish that defendants are "persons liable" under subsections 5(a)(1) and 5(a)(5). Subsection 5(a)(1) holds liable "the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material." [332] Similarly, subsection 5(a)(5) provides that "any person who otherwise caused or is *legally responsible* for a release or threat of release of oil or hazardous material from a vessel or site ... [is] liable, without regard to fault." [333]

Plaintiffs' claim under the Oil Act may proceed. Plaintiffs do not allege that defendants *own or operate* any sites or vessels. Instead, plaintiffs' claim is predicated on the fact that defendants are legally responsible for oil discharges because they manufacture and distribute MTBE-containing gasoline.[334] Accordingly, only subsection 5(a)(5) governs this claim. To date, the Massachusetts Supreme Judicial Court has only considered the notion of legal responsibility where the parties

---

**329.** *United Elec. Light Co. v. Deliso Constr. Co.*, 315 Mass. 313, 52 N.E.2d 553, 556 (1943).

**330.** *Id.* at 557.

**331.** Duxbury Compl. ¶ 293 (emphasis added).

**332.** Mass. Gen. Laws ch. 21E, § 5(a)(1).

**333.** *Id.* § 5(a)(5) (emphasis added).

**334.** *See* Duxbury Compl. ¶ 305.

maintained a contractual or special relationship.[335] However, the court has been willing to impose liability under subsection 5(a)(5) when a "plaintiff establish[es] ... that the defendant caused the release and that the release caused the contamination." [336] Although the language of the statute is broad, Massachusetts's highest court has maintained a high evidentiary standard.[337] In fact, the court has held that "[e]vidence that the property was contaminated by oil which the defendant brought to the premises and which had been stored there by the prior owner is insufficient, by itself, to hold the defendant liable under § 5(a)(5)." [338] Nonetheless, plaintiffs may proceed on this statutory claim because during the course of transport, defendants may have caused the release, spill or leak of gasoline. As such, discovery, rather than dismissal is the appropriate vehicle by which to determine if such events did in fact occur.[339]

In short, defendants' motion to dismiss the Massachusetts complaint is denied. The Massachusetts Plaintiffs have stated claims for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, civil conspiracy, and violation of the Oil Act.

## XIII. NEW HAMPSHIRE

The New Hampshire Plaintiffs [340] assert causes of action for: (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) failure to warn; (4) negligence; (5) private nuisance; (6) trespass; (7) civil conspiracy; (8) strict liability under Revised Statute § 146–A:10, the oil discharge statute; and (9) unfair or deceptive business acts in violation of Revised Statute § 358–A:2, the New Hampshire Consumer Protection Act ("NHCPA").[341]

### A. Collective Liability

■ The New Hampshire Supreme Court has not yet spoken on whether—and under what circumstances—it would relieve a plaintiff of the burden of product identification through the use of collective liability theories.[342] Nonetheless, the court

---

**335.** *See, e.g., Griffith v. New England Tel. & Tel. Co.*, 420 Mass. 365, 649 N.E.2d 766, 769 (1995) (holding that defendant not legally responsible for contamination where nothing in the lease agreement required defendant to maintain tanks or underground facilities); *Marenghi v. Mobil Oil Corp.*, 420 Mass. 371, 649 N.E.2d 764, 766 (1995) (holding that defendant not legally responsible for contamination where there was "nothing in the equipment loan agreement to suggest that the defendants had any duty of preventive maintenance nor was there any evidence that the defendant did not fulfill its duties under the equipment loan agreement").

**336.** *Marenghi*, 649 N.E.2d at 766.

**337.** *See id.* ("[T]o establish that the defendant caused the leak under § 5(a)(5), there must be more than what would establish liability" under the other provisions of the Oil Act).

**338.** *Id.*

**339.** *See Pelman*, 396 F.3d at 512 (in an action by obese children against fast food company, court held that information such as what plaintiffs ate and how much they exercised was "information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a)") (citing *Swierkiewicz*, 534 U.S. at 512–13, 122 S.Ct. 992).

**340.** City of Dover and City of Portsmouth.

**341.** *See City of Dover Third Amended Complaint* ("Dover Compl.") ¶¶ 182–247.

**342.** However, one federal court interpreting New Hampshire law has held that market share, alternative, enterprise, and concert of action theory does not apply to asbestos cases due to the non-fungible nature of asbestos products. *See University Sys. of N.H. v. U.S. Gypsum Co.*, 756 F.Supp. 640, 653–57 (D.N.H.1991).

has provided some guidance through its development of the state's strict products liability law—namely, its reasoning for adopting the theory and for limiting its reach.

In New Hampshire, the expansion of products liability law turns on the presence of an insurmountable barrier to a plaintiff's recovery on an otherwise meritorious claim. When the New Hampshire Supreme Court adopted strict liability for design defect claims in *Buttrick v. Arthur Lessard & Sons, Inc.*,[343] the court explained that requiring the plaintiff to prove negligence would impose "an impossible burden" on the plaintiff due to the difficulty of proving breach of a duty by a distant manufacturer using mass production techniques: "How the defect in manufacture occurred is generally beyond the knowledge of either the injured person or the marketer or manufacturer."[344] The court later clarified that "[w]hat was crucial in this court's policy analysis [in *Buttrick*] was the recognition that the need to establish traditional legal fault in certain products liability cases had proven to be, and would continue to be, a practically impossible burden. This was the compelling reason of policy without which *Buttrick* would have gone the other way."[345]

Based on this rationale, the court has also placed the burden of disproving joint liability on defendants in crashworthiness cases involving indivisible injuries. Under the doctrine of crashworthiness, manufacturer liability is extended to situations in which the design of the car causes separate or enhanced injuries in the course of the initial collision brought about by an independent cause.[346] In *Trull v. Volkswagen of America, Inc.*,[347] the court held that plaintiffs were required to prove that a design defect was a substantial factor in producing damages over and above those caused by the original impact to their car; once they had made that showing, the burden would shift to the defendants to show which injuries were attributable to the initial collision and which to the design defect. The court chose to place the burden on defendants rather than plaintiffs because the plaintiffs otherwise would have been " 'relegated to an almost hopeless state of never being able to succeed against a defective designer.' "[348] The court was persuaded by "policy reasons" not to place a "practically impossible burden" on injured plaintiffs.[349]

Conversely, the court has been unwilling to expand products liability law where plaintiffs have not faced inherent difficulties of proof,[350] or where defendants could

---

343. 110 N.H. 36, 260 A.2d 111 (1969).

344. *Id.* at 39, 260 A.2d 111.

345. *Bagley v. Controlled Env't Corp.*, 127 N.H. 556, 560, 503 A.2d 823 (1986) (citation omitted).

346. *See* Restatement (Third) of Torts: Products Liability § 16 cmt. a (discussing liability for increased harm due to defective products).

347. 145 N.H. 259, 761 A.2d 477 (2000).

348. *Id.* at 265, 761 A.2d 477 (quoting *Mitchell v. Volkswagenwerk, AG*, 669 F.2d 1199, 1204 (8th Cir.1982)).

349. *Id.*

350. *See Royer v. Catholic Med. Ctr.*, 144 N.H. 330, 335, 741 A.2d 74 (1999) (strict liability rationale did not apply to action against hospital for selling defective prosthetic knee to plaintiff because plaintiff was not faced with the "inherent difficulty" of proving negligence as happens in many products liability cases); *Bruzga v. PMR Architects, P.C.*, 141 N.H. 756, 761–62, 693 A.2d 401 (1997) (strict liability inapplicable to architect and contractor because, *inter alia*, the owner or user of a building does not face "extraordinary difficulties in proving liability"); *Bagley*, 127 N.H. at 560, 503 A.2d 823 (in action by landowner against adjoining landowner for damages resulting

not have been at fault. In *Simoneau v. South Bend Lathe, Inc.*, the state's highest court rejected the product line theory of successor liability, reasoning that "liability without negligence is not liability without fault." [351] Under the product line theory, a party that acquires a manufacturing business and continues the output of its line of products assumes strict liability for defects in units of the same product line manufactured and sold by the predecessor company. The *Simoneau* court refused to "impose what amounts to absolute liability on a manufacturer," and found that the product line theory was incompatible with the state's approach to strict liability in tort.[352] The court reaffirmed " '[t]he common-law principle that *fault and responsibility* are elements of our legal system applicable to corporations and individuals alike [and that principle would] not be undermined or abolished by [the] 'spreading' of risk and cost in this State.' " [353]

Based on *Simoneau* and cases rejecting a "risk-spreading" approach to liability,[354]

defendants argue that the New Hampshire Supreme Court would not embrace collective liability theories. Defendants' argument is flawed, however, because it misinterprets the case law. Although the state's highest court has expressed disapproval of risk-spreading among manufacturers,[355] it has done so only when the redistribution of risks and costs would occur *without fault or responsibility* so as to impose *absolute* liability on manufacturers.[356]

In a products liability action, a plaintiff must prove that the product was unreasonably dangerous in order to obtain relief. In other words, she must demonstrate that the product could have been made safer by a better design or through a proper warning (through a risk/utility balancing test).[357] Liability is not absolute because the manufacturer must have breached a duty to make the product safe, even though the plaintiff need not prove the manufacturer's negligence.[358] In *Simo-*

from soil and groundwater contamination, the court declined to impose strict liability because "[w]ith respect to the dumping of the waste products and the leakage of gasoline in this case, there [was] no apparent impossibility of proving negligence"); *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19 (1984) (refusing to extend strict liability to owner and operator of amusement park ride because "there [was] no indication that the plaintiffs suffer[ed] an unfair burden from the doctrine of strict liability not being applied in this case"); *Wood v. Public Serv. Co. of N.H.*, 114 N.H. 182, 189, 317 A.2d 576 (1974) (refusing to apply strict liability to electric companies in wrongful death action because "[n]o compelling reason of policy or logic [had] been advanced").

351. 130 N.H. 466, 469, 543 A.2d 407 (1988).

352. *Id.* at 470, 543 A.2d 407.

353. *Id.* at 469, 543 A.2d 407 (quoting *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 806, 395 A.2d 843 (1978)) (emphasis in original).

354. *See, e.g., Thibault*, 118 N.H. 802, 395 A.2d 843.

355. *See id.* at 806, 395 A.2d 843 ("[S]trict liability is not a no-fault system of compensation.").

356. In *Thibault*, the New Hampshire Supreme Court disagreed with the proposition that products liability law should abandon the requirements of causation and product defect because some connection had to be maintained between fault and liability. *See id. See also Simoneau*, 130 N.H. at 470, 543 A.2d 407 (reaffirming principle against "risk-spreading" without a finding of fault and responsibility).

357. *See* Restatement (Third) of Torts: Products Liability § 1 cmt. a (1998).

358. *See id.* (explaining that courts prefer to use the term "strict liability" even though product defect claims "rely on a reasonableness test traditionally used in determining whether an actor has been negligent"). *See*

*neau,* adoption of the product line theory would have exposed blameless successor corporations to liability because the injury-causing product was manufactured by the predecessor, *i.e.,* the successor breached no duty to the consumer.

On the other hand, collective liability theories presume that all defendants breached a duty to the plaintiffs. If all the manufacturers in an industry created and marketed the same product with the same defect, then they would not be without fault or responsibility because they would have created a risk of harm to the general public. Therefore, the limitations on strict liability do not eviscerate the general tendency of New Hampshire courts to construct judicial remedies for plaintiffs who would be left without recourse due to impossible burdens of proof.

Given its previous pronouncements, I am persuaded that the New Hampshire Supreme Court would apply theories of collective liability because plaintiffs cannot identify which defendant's fungible product caused the contamination of their water supply.[359] As noted earlier, plaintiffs allege that identification of the wrongdoers is impossible because MTBE lacks a chemical signature, and gasoline is frequently commingled during the distribution process.[360] If the allegations are true, strict

adherence to the identification requirement would render plaintiffs unable to ever succeed against manufacturers of defective petroleum products. Although I conclude that New Hampshire would be receptive to collective liability theories generally, I predict that the state would be most inclined to apply market share liability based on an assessment of the Restatement factors.[361]

Defendants would likely counter that judicial remedies are still available because plaintiffs can pursue those parties responsible for actual discharges, *e.g.,* owners of leaking underground storage tanks. However, this argument ignores the possibility that releases can occur in less obvious (and less traceable) ways, such as through tank overfills by individual consumers, or through the evaporation of MTBE and subsequent rainfall.[362] These are examples of circumstances where the New Hampshire Supreme Court would bend traditional rules of proximate cause through collective liability. Accordingly, collective liability provides actionable theories of recovery to the New Hampshire Plaintiffs.[363]

## B. Nuisance

Defendants posit that plaintiffs' nuisance claims are fatally defective because under

---

*also Price v. BIC Corp.,* 142 N.H. 386, 390, 702 A.2d 330 (1997) ("In undertaking this analysis [of manufacturer liability], we caution that the term 'unreasonably dangerous' should not be interpreted so broadly as to impose absolute liability on manufacturers or make them insurers of their products.").

359. Notwithstanding defendants' assertions to the contrary, this Court need not predict the form of market share liability that New Hampshire would adopt. In all variations of the theory, plaintiffs are relieved of having to identify the specific tortfeasor, and defendants bear the burden of either disproving their liability or establishing their share of the market. *See supra* Part IV.E.

360. *See* Dover Compl. ¶¶ 184–188.

361. *See supra* Part IV.E.

362. *See id.* ¶¶ 97, 100.

363. Defendants also argue that plaintiffs' civil conspiracy claims are deficient because pleadings alleging conspiracy to defraud must be pled with particularity, and the New Hampshire Plaintiffs make only conclusory allegations about some, but not all, of the defendants. However, plaintiffs' civil conspiracy claims are not necessarily derivative of their fraud claims but may be based on their other surviving claims.

New Hampshire law, nuisance arises from the use of real property and cannot stem from the manufacture and distribution of a product. Plaintiffs counter that all that must be proved to establish a nuisance claim is an unreasonable interference with the use of another's property.

■ Under New Hampshire law, a private nuisance is "an activity which results in an unreasonable interference with the use and enjoyment of another's property,"[364] while a public nuisance is "behavior which unreasonably interferes with the health, safety, peace, comfort or convenience of the general community."[365] Conduct may constitute both a public and private nuisance, and both actions involve an analysis of similar considerations.[366] "A nuisance arises from the use of property, either actively or passively, in an unreasonable manner."[367] "[L]iability for common law nuisance may be established if the landowner knew or had reason to know that a public nuisance existed."[368]

■ Plaintiffs' nuisance claims must be dismissed because plaintiffs seek to recover from defendants in their capacity as manufacturers, and not as property owners or users.[369] Plaintiffs rely on *United States v. Ottati & Goss, Inc.*,[370] for the proposition that nuisance liability may attach to a defendant who does not own or control adjacent property. However, the *Ottati* court sustained the "common law nuisance" claim against non-property owning water generators by relying on a specific public nuisance statute that provided for a cause of action against them. Because the New Hampshire Plaintiffs do not assert a statutory nuisance claim, their nuisance claims must be dismissed.

### C. Trespass

Defendants contend that the most that plaintiffs' allegations could establish is "constructive intent" to enter upon plaintiffs' land, and constructive intent has been rejected by the New Hampshire Supreme Court. With respect to their trespass claims, plaintiffs respond that they need only allege that defendants knew their conduct was substantially certain to result in injury.

■ "[U]nder the established law of [New Hampshire] a trespass must be an intentional invasion of the property of another."[371] New Hampshire courts do not consider involuntary or accidental entries upon another's land as trespass,[372] nor do they recognize "constructive intent."[373] The intent required for a trespass claim is an intent "to bring about a result which will invade the interests of another in a way that the law forbids. Such intent is not limited to consequences that are de-

**364.** *Robie v. Lillis*, 112 N.H. 492, 495, 299 A.2d 155 (1972).

**365.** *Id.*

**366.** *See id.*

**367.** *Shea v. City of Portsmouth*, 98 N.H. 22, 27, 94 A.2d 902 (1953).

**368.** *State of New Hampshire v. Charpentier*, 126 N.H. 56, 62, 489 A.2d 594 (1985) (emphasis omitted).

**369.** *See Town of Hooksett Sch. Dist. v. W.R. Grace & Co.*, 617 F.Supp. 126, 133 (D.N.H. 1984) (dismissing private nuisance claim because plaintiff sought to recover from defendant not in its capacity as a landowner, but in its capacity as a manufacturer of asbestos products).

**370.** 630 F.Supp. 1361 (D.N.H.1985).

**371.** *Moulton v. Groveton Papers Co.*, 112 N.H. 50, 54, 289 A.2d 68 (1972).

**372.** *See White v. Suncook Mills*, 91 N.H. 92, 98, 13 A.2d 729 (1940).

**373.** *See Moulton*, 112 N.H. at 54, 289 A.2d 68.

sired."[374] "If an actor knows that an injury is substantially certain to result from [its] act and [it] nevertheless completes the act, [it] is treated by the law as if [it] in fact desired to produce the injury."[375]

 Plaintiffs allege that defendants intended to manufacture and distribute MTBE-containing gasoline and that defendants knew with substantial certainty that their acts would result in the contamination of plaintiffs' groundwater.[376] Because that is sufficient to state a claim for trespass under New Hampshire law, the motion to dismiss these claims is denied.

### D. Oil Discharge Statute

 The New Hampshire Plaintiffs have asserted a cause of action for "strict liability under R.S.A. 146–A:10."[377] Section 146–A:10 of the Revised Statute provides: "Any person who negligently or intentionally discharges or spills oil ... into the groundwater of the state which causes damage to the property of another shall be liable in tort to the person whose property is so damaged in the amount of 1–½ times the damages sustained by that person."[378] "Discharge" and "spillage" is defined as "the release or addition of any oil to land, groundwater or surface water."[379]

Defendants argue that plaintiffs' claim under the oil discharge statute fails as a matter of law because the terms "discharge" and "spillage" are explicitly defined in the statute and do not encompass refining and marketing gasoline. Plaintiffs maintain that they have adequately pled a claim under this statute because defendants "directly or indirectly caused or suffered the discharge of oil in the form of MTBE into the groundwater" in the state.[380] Plaintiff State of New Hampshire, as *amicus curiae*, requests that the Court refrain from addressing manufacturer/refiner liability under the strict liability provisions of the oil discharge statute, asserting that the State is the only party permitted to recover in strict liability for violations of the statute.[381]

It is implicit in the statute's terminology that only direct "releases or additions" of oil are covered by the statute. If the legislature had meant to include conduct contributing to, or resulting in, the discharge of petroleum, it could have said so. Therefore, plaintiffs' discharge act claims can only survive if defendants directly caused releases or additions of MTBE-containing gasoline into plaintiffs' water supply. In these cases, the possibility that defendants spilled or leaked gasoline from trucks or tankers when they transported it to New Hampshire precludes dismissal of plaintiffs' claims under section 146–A:10 of the Revised Statute. If defendants wish to learn where and under what circumstances any releases or additions occurred, they should move for a more definite statement under Rule 12(e).

**374.** *Thompson v. Forest*, 136 N.H. 215, 219, 614 A.2d 1064 (1992).

**375.** *Id.* at 219–20, 614 A.2d 1064.

**376.** *See* Dover Compl. ¶¶ 84–86, 99–102, 169–171.

**377.** *Id.* (Eighth Cause of Action).

**378.** N.H.Rev.Stat. § 146–A:10.

**379.** *Id.* § 146–A:3–a.

**380.** Dover Compl. ¶ 241.

**381.** This Court is currently divested of jurisdiction over the State of New Hampshire's case pending its appeal of my October 19, 2004 opinion and order. Although I permitted the State to participate in these motions as *amicus curiae*, this opinion and order is without prejudice to the State rearguing points I have considered here.

Furthermore, although the New Hampshire Plaintiffs have titled their cause of action as "strict liability under R.S.A. 146–A:10," that section [as quoted above] does not provide for such liability. It specifically targets negligent or intentional conduct, while section 146–A:3–a permits strict liability. Plaintiff State of New Hampshire is correct that it is the only party that may invoke that strict liability provision, and the Court therefore refrains from making any determination on strict liability.[382] Although plaintiffs appear to have made a drafting error, it does not affect the viability of their cause of action because plaintiffs' reference to section 146–A:10 puts all defendants on notice of the alleged legal violation. Therefore, plaintiffs may pursue their claims for violations of section 146–A:10 of the Revised Statute.

### E. New Hampshire Consumer Protection Act

Defendants assert that plaintiffs fail to state a claim under the NHCPA because the statute only applies to the types of acts enumerated therein and to offending conduct that took place within New Hampshire. Plaintiffs refute defendants' contention that the NHCPA does not apply, by alleging that defendants have offered for sale, sold, or distributed MTBE-containing gasoline in New Hampshire, and that this trade has affected the people of the state.

 The NHCPA "is a comprehensive statute whose language indicates that it should be given broad sweep."[383] Pursuant to the Act,

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or any unfair or deceptive act or practice shall include, but is not limited to the following:
>
> . . . .
>
> V. Representing that goods or services have sponsorship, approval, *characteristics,* ingredients, uses, benefits, or quantities that they do not have . . . .;
>
> . . . .
>
> VII. Representing that goods or services are of a particular *standard, quality, or grade,* or that goods are of a particular style or model, if they are of another; . . . .[384]

Although the NHCPA provides a non-exclusive list of prohibited conduct, the statute precludes only those *"types* of [acts] therein particularized."[385] In other words, a plaintiff's claim must fall within the thirteen enumerated categories in order to be actionable.[386]

 Plaintiffs' NHCPA claims are based on defendants' alleged misrepresentations that MTBE and/or gasoline containing MTBE were environmentally sound products that did not require special handling, storage, or other procedures to mitigate or prevent the special dangers posed by MTBE.[387] Plaintiffs assert that

---

382. *See Mesiti v. Microdot, Inc.,* 739 F.Supp. 57, 63 (D.N.H.1990) (holding that, based on plain language of statute, strict liability provisions of New Hampshire environmental cleanup legislation applied only to actions by the state).

383. *Roberts v. General Motors Corp.,* 138 N.H. 532, 538, 643 A.2d 956 (1994).

384. N.H.Rev.Stat. § 358–A:2 (emphasis added).

385. *Roberts,* 138 N.H. at 538, 643 A.2d 956 (emphasis and alteration in the original).

386. *See id.* (dismissing plaintiff's NHCPA claim because alleged refusal-to-deal was not prohibited by the statute).

387. *See* Dover Compl. ¶ 245.

MTBE was not safe because of its propensity to contaminate groundwater and potential to cause adverse health effects.[388] Taking a broad view of the statute, defendants' alleged activities fall within the type of conduct described in subsections V and VII of Section 358-A:2. Moreover, though not alleged, plaintiffs may eventually prove that the misrepresentations of which they complain occurred within the state.[389] Therefore, the New Hampshire Plaintiffs have stated a claim for violations of the NHCPA.

In conclusion, defendants' motion to dismiss the New Hampshire complaints is granted in part and denied in part. Plaintiffs' claims for public and private nuisance are dismissed. Plaintiffs' claims for design defect, failure to warn, negligence, trespass, civil conspiracy, and violation of the oil discharge statute and the NHCPA survive.

**388.** *See id.* ¶¶ 91–95.

**389.** Even if dismissal were required due to failure to plead location, I would grant the New Hampshire Plaintiffs leave to amend their complaints.

**390.** New Jersey American Water Company, Inc., The Elizabethtown Water Company, The Mount Holly Water Company, Penns Grove Water Supply Company, Inc., City of Bridgeton, City of Camden, Borough of Penns Grove, Mount Laurel Municipal Utilities Authority, City of Gloucester City, United Water New Jersey, Inc., United Water Toms River, Inc., United Water Arlington Hills, Inc., United Water Hampton, Inc., United Water Vernon Hills, Inc., The Township of Montclair, The Township of Winslow, Little Egg Harbor Municipal Utilities Authority, Point Pleasant Borough, and The Southeast Morris County Municipal Utilities Authority.

**391.** N.J. Stat. § 58:10–23.11.

**392.** *See New Jersey American Water Company, Inc. Seventh Amended Complaint* ("NJ Am. Water Compl.") ¶¶ 198–259.

**393.** *See Lyons v. Premo Pharm. Labs, Inc.,* 170 N.J.Super. 183, 406 A.2d 185, 190–92 (1998)

## XIV. NEW JERSEY

The New Jersey Plaintiffs [390] assert the following claims: (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) strict liability for failure to warn; (4) negligence; (5) private nuisance; (6) trespass; (7) civil conspiracy; and (8) violation of the New Jersey Spill Compensation and Control Act [391] ("Spill Act").[392]

### A. Collective Liability

To date, New Jersey courts have not relaxed the causation requirement and have rejected market share, enterprise, alternative, and concert of action liability in the context of products liability actions.[393] In *Shackil v. Lederle Laboratories,*[394] the leading case on market share liability in New Jersey,[395] an infant child and her parents brought suit against five manufac-

(DES); *McLaughlin v. Acme Pallet Co.,* 281 N.J.Super. 565, 658 A.2d 1314, 1316–17 (1995) (defective industrial pallets); *Sholtis v. American Cyanamid Co.,* 238 N.J.Super. 8, 568 A.2d 1196, 1203–04 (1989) (asbestos).

**394.** 116 N.J. 155, 561 A.2d 511 (1989).

**395.** Although *Lyons v. Premo Pharmaceutical Labs, Inc.,* 170 N.J.Super. 183, 406 A.2d 185, 189–91 (1998), is a DES case, it is not the leading opinion on market share liability because the facts made it inappropriate to apply *any* theory of collective liability. In *Lyons,* the plaintiff was able to identify the specific DES manufacturer that caused her injuries. Nonetheless, she wanted to bring an action against eleven additional manufacturers, using collective liability theories. The court affirmed the grant of summary judgment in favor of defendants, holding that, neither alternative liability nor enterprise liability were applicable because they contemplate lack of knowledge regarding the tortfeasor and causal agent, respectively, and concert of action was inapplicable because placing the drug on the market was not tortious in and of itself.

turers of the diphtheria-pertussis-tetanus ("DPT") vaccine for allegedly causing chronic encephalopathy and severe retardation of the infant. Due to the lapse in time from the infant's inoculation to the discovery of the connection between DPT and brain damage, plaintiffs were unable to identify which manufacturer had produced the vaccine that caused the infant's injury. As a result, plaintiffs sought to use a market share theory of liability.

The New Jersey Supreme Court rejected market share liability based on the public policy of the state and the availability of other remedies. It stated that "the central consideration on which [its] decision [was] essentially premised [was] whether as a matter of sound public policy [the] Court should modify traditional tort theory to allow plaintiffs' design-defect claims to proceed." [396] It answered that question in the negative, reasoning that the imposition of market share liability would be detrimental to public health by reducing the number of vaccine manufacturers and decreasing the likelihood of developing safer vaccines. The court noted that there were now only two companies willing to produce the DPT vaccine because of the " 'extreme liability exposure, [the] cost of litigation and the difficulty of continuing to obtain adequate insurance.' " [397] In addition, the court was influenced by the existence of the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), a "no-fault compensation scheme ... 'under which awards can be made to vaccine-injured persons quickly, easily, and with *certainty* and generosity.' " [398] The court was satisfied that the Vaccine Act enjoyed sufficient funding and that vaccine-injured persons could easily receive compensation through the legislative scheme. Given these conditions, the court was unwilling to expand the scope of traditional tort liability. The New Jersey Supreme Court emphasized:

> The foregoing discussion should make clear that our opinion is confined solely to the context of vaccines. It should not be read as forecasting an inhospitable response to the theory of market-share liability in an appropriate context, perhaps one in which its application would be consistent with public policy and where no other remedy would be available. This case, the Court's first exposure to market-share liability, may therefore come to represent the exception rather than the rule.[399]

Given the court's guidance in *Shackil*, I predict that New Jersey would apply market share liability to these MTBE cases based on public policy considerations and plaintiffs' lack of alternative remedies. "[I]t is the public 'policy of [New Jersey] to eliminate the introduction of ... toxic chemicals into the groundwater of this State,' " [400] and courts have consistently encouraged "parties [to] engage in responsible conduct that will increase, not decrease, available [environmental] resources." [401] In accordance with this view,

---

**396.** *Shackil*, 561 A.2d at 521.

**397.** *Id.* at 523 (quoting Vaccine Injury Compensation: Hearing Before Subcomm. on Health and the Env't of the House Comm. on Energy and Commerce, 98th Cong., 2d Sess. 295 (Sept. 10, 1984)).

**398.** *Shackil*, 561 A.2d at 524 (emphasis added) (quoting H. Rep. No. 908, 99th Cong., 2d Sess. 3 (1986), U.S.Code Cong. & Admin.News 1986, p. 6344, 6344).

**399.** *Id.* at 529.

**400.** *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 276 N.J.Super. 52, 647 A.2d 182, 186 (1994) (quoting N.J. Stat. § 58:10A–15).

**401.** *Owens–Illinois v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974, 992 (1994).

New Jersey has promoted the expedient removal of environmental contaminants.[402] In *Shackil*, public policy dictated that the manufacturing of vaccines should be encouraged even at the expense of injured plaintiffs. However, in these MTBE cases, if defendants engaged in conduct resulting in groundwater contamination, liability would likely encourage better preservation of environmental resources—for example, through minimizing contamination of water resources, increasing cleanup efforts, and providing redress to innocent victims. The interest in public health and safety would be best served by shifting the burden of identification to defendants.

Furthermore, the *Shackil* court was concerned about the effect that imposing liability on vaccine manufacturers would have on the production and development of vaccines. In contrast to vaccines, gasoline is not required to protect lives. In the instant case, it is unlikely that exposure to liability would cause a gasoline shortage in the same way that liability against vaccine manufacturers could have caused a public health crisis. In *Shackil*, only two companies were still willing to make the DPT vaccine. Here, there are over fifty named defendants that are participants in the petroleum industry. Liability exposure would encourage research and efforts to pursue safer alternatives (assuming, *ar-*

*guendo*, that MTBE-containing gasoline is unsafe).

The *Shackil* court also relied on plaintiffs' certain recovery under the Vaccine Act. While the Spill Act provides an alternative to court-authorized recovery, redress is not nearly as certain as it is under the Vaccine Act.[403] Accordingly, I conclude that New Jersey would relax the causation requirement by applying market share liability in these MTBE cases.

## B. Private Nuisance

■ "[T]he concept of a private nuisance has been traditionally confined to instances either of one person's property use interfering with another's use of property, or of property use injuring third parties."[404] Defendants ask the court to adopt a more restrictive interpretation of private nuisance, requiring an unlawful or unreasonable use by defendants of property adjoining or neighboring plaintiffs' property based on *Mayor and Council of the Borough of Rockaway v. Klockner & Klockner*.[405] Plaintiffs respond that New Jersey has consistently permitted plaintiffs to recover under a theory of private nuisance where defendants' offending use occurred in the same area or general vicinity as the polluted property. Because I find that plaintiffs' claims survive under either interpretation of New Jersey private nui-

**402.** *See Buonviaggio v. Hillsborough Township Comm.*, 122 N.J. 5, 583 A.2d 739, 745 (1991) (reversing dismissal of plaintiffs' claim under the Spill Act because both the public policy and legislative goals of New Jersey dictated that environmental damage should be remedied).

**403.** *See, e.g., Bahrle v. Exxon Corp.*, 279 N.J.Super. 5, 652 A.2d 178, 188–89 (1995), *aff'd*, 145 N.J. 144, 678 A.2d 225, 231 (1996) (affirming judgment in favor of oil company where plaintiff did not prove that the oil company controlled the service station owner and was therefore responsible for the groundwa-

ter contamination); *United States v. Manzo*, 182 F.Supp.2d 385, 412 (D.N.J.2001) ("However remote a party's responsibility under the Spill Act may be, the statute nevertheless requires some degree of particularity; one cannot be 'responsible' for a hazardous substance without having some connection to the site on which that substance was deposited.").

**404.** *Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F.Supp. 784, 807 (D.N.J.1989) (citing Restatement (Second) of Torts § 822).

**405.** 811 F.Supp. 1039 (D.N.J.1993).

sance law, I need not decide which approach the court would adopt.

In *Rockaway*, the mayor and the Borough of Rockaway sought damages for the contamination of groundwater and wells by a corporation and landowner. Because the landowner purchased the polluted property from the corporation, it asserted a cross claim against the corporation for private nuisance. The court dismissed the landowner's private nuisance claim, and he appealed. In reaching its conclusion that the claim should be dismissed, the federal court held that under New Jersey law, private nuisance "applies only to interference with use of *adjoining* land."[406] Therefore, a successor landowner was precluded from asserting a private nuisance claim against its predecessor.

Despite the federal court's narrow interpretation of New Jersey private nuisance law, the state courts' characterization has not been so restrictive. In fact, the New Jersey Supreme Court has "recognized that the pollution of a watercourse may constitute an actionable nuisance" even where the polluted property does not neighbor or adjoin plaintiffs' property.[407] Additionally, the lower courts consistently allow private nuisance actions to proceed where the pollution is in the same "area" or "vicinity" as the plaintiffs' property.[408]

Plaintiffs allege that defendants polluted "[t]he groundwater system, including the zone of influence in the groundwater that supplies Plaintiffs' wells, and that Plaintiffs' wells themselves, have been contaminated by MTBE."[409] As such, plaintiffs adequately pled that defendants polluted property in the general vicinity or area of their property and are thus entitled to proceed on their private nuisance claims.

Even if the New Jersey Supreme Court were to adhere to the more limited view of private nuisance adopted by the federal court, it is conceivable that defendants utilized land adjoining or neighboring plaintiffs' property. For example, some defendants might own, control or distribute gasoline to gas stations that are located adjacent to plaintiffs' property. Because of that possibility, discovery, rather than dismissal is the appropriate course of action.[410]

## C. New Jersey Spill Compensation and Control Act

 The Spill Act provides, in pertinent part: "Any person who has discharged a hazardous substance, or is any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by

---

**406.** *Id.* at 1057 (emphasis in original).

**407.** *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 449 A.2d 472, 477 (1982) (allowing non-adjoining and non-neighboring downstream owners to recover in nuisance for injury to their property caused by the discharge of municipal sewerage).

**408.** *See Bahrle*, 652 A.2d at 194 ("[O]ne is subject to liability for private nuisance if he negligently invades another's interest in the private use and enjoyment of his land. We agree with plaintiffs that as *area* residents, they comprised a foreseeable class potentially

harmed by any negligent discharge from the gas station . . . .") (emphasis added); *Kenney v. Scientific Inc.*, 204 N.J.Super. 228, 497 A.2d 1310, 1313 (1985) (failing to address the adjoining or neighboring requirement despite the fact that the ninety-five plaintiffs in question only "reside[d] in the *vicinity* of landfills") (emphasis added).

**409.** NJ Am. Water Compl. ¶ 240.

**410.** *See Pelman*, 396 F.3d at 512 (information such as what obese minor plaintiffs ate and how much they exercised was information that is appropriately the subject of discovery).

whom *incurred.*[411] In order to facilitate recovery, the Spill Act permits contribution claims against the actual tortfeasor.[412] However, "a cause of action under section 23.11f(a)(2) can accrue only when a plaintiff has engaged in cleanup and removal of a discharge of a hazardous substance."[413] Thus, in order to recover, plaintiffs must bring an action after incurring cleanup and removal costs. Plaintiffs do not allege that they have incurred such costs. Therefore, their claims under the Spill Act are not ripe and must be dismissed. If and when the New Jersey Plaintiffs incur such costs, they may amend their complaint to assert this claim.

In sum, defendants' motion to dismiss the New Jersey complaint is granted in part and denied in part. The New Jersey Plaintiffs' cause of action under the Spill Act is dismissed without prejudice. Plaintiffs may continue to prosecute their claims for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, and civil conspiracy.

## XV. NEW YORK

There are four sets of New York plaintiffs that have asserted claims against defendants (collectively, the "New York Plaintiffs").[414] All of them have brought claims for: (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) failure to warn; (4) negligence; (5) private nuisance; (6) violation of General Business Law § 349; (7) violation of the Navigation Law (New York Oil Spill Prevention, Control, and Compensation Act);[415] and (8) trespass.[416] Three groups of plaintiffs have added one or more of the following, as additional causes of action: (1) civil conspiracy;[417] (2) negli-

**411.** N.J. Stat. § 58:10–23.11g(c)(1).

**412.** *See id.* § 58:10–23.11f(a)(2).

**413.** *Kemp Indus., Inc. v. Safety Light Corp.*, Civ. A. No. 92–95(AJL), 1994 WL 532130, at *32 (D.N.J. Jan.25, 1994). *Accord Hatco Corp. v. W.R. Grace & Co.-Conn.*, 836 F.Supp. 1049, 1093 (D.N.J.1993).

**414.** There are four "sets" of complaints filed in the challenged New York actions. (1) The firms of Weitz & Luxenberg and Baron & Budd together have filed similar complaints on behalf of plaintiffs in *County of Nassau*, No. 03 Civ. 9543, *Franklin Square*, No. 04 Civ. 5423, *Great Neck North*, No. 04 Civ. 1727, *Hicksville*, No. 04 Civ. 5421, *Long Island Water*, No. 04 Civ.2068, *Port Washington*, No. 04 Civ. 3415, *County of Suffolk*, No. 04 Civ. 5424, *United Water New York*, No. 04 Civ. 2389, *Pawling*, No. 04 Civ. 2390, *Roslyn*, No. 04 Civ. 5422, *Sands Point*, No. 04 Civ. 3416, *Wappinger*, No. 04 Civ. 2388, and *Western Nassau*, No. 03 Civ. 9544.(2) The law firm of Napoli, Kaiser & Bern has filed similar complaints in *East Hampton*, No. 03 Civ. 10056, *Carle Place*, No. 03 Civ. 10053, *Hempstead*, No. 03 Civ. 10055, *Mineola*, No. 03 Civ.

10051, *Southampton*, No. 03 Civ. 10054, *Westbury*, No. 03 Civ. 10057, and *West Hempstead*, No. 03 Civ. 10052.(3) The City of New York has filed a complaint on its own behalf in this action, No. 04 Civ. 3417.(4) Finally, Miller, Axline & Sawyer, the Sarcone Law Firm, and the Law Office of Peter D. Hoffman have filed similar complaints in *Tonneson*, No. 03 Civ. 8248, and *Basso*, No. 03 Civ. 9050. Because complaints within the same group contain virtually identical allegations, I shall cite to representative cases from each of the sets: *Long Island Water, East Hampton, City of New York*, and *Tonneson*.

**415.** N.Y. Nav. Law § 181.

**416.** *See* Long Island Water Corp. Fourth Amended Complaint ("Long Island Water Compl.") ¶¶ 232–287; City of New York Second Amended Complaint ("NYC Compl.") ¶¶ 124–141, 151–185; Town of East Hampton Second Amended Complaint ("East Hampton Compl.") ¶¶ 233–279, 288–294; Tonneson Second Amended Complaint ("Tonneson Compl.") ¶¶ 56–84, 96–102, 109–133.

**417.** *See* NYC Compl. ¶¶ 142–150 (civil conspiracy); East Hampton Compl. ¶¶ 257–262.

gence per se;[418] (3) outrageous conduct causing the infliction of emotional distress;[419] (4) declaratory relief;[420] and/or (5) intentional interference with the right to appropriate water from the ground or from other water resources.[421]

## A. Collective Liability

 As this Court recognized in *MTBE I*, New York has unequivocally adopted the market share theory of liability where the product in question is fungible, and as a result, the plaintiff cannot identify which defendant proximately caused her harm.[422] Therefore, plaintiffs' claims cannot be dismissed based on an inability to prove proximate cause. Although the New York Plaintiffs are not required to plead a theory of causation, I note that they have alleged that their property is contaminated with MTBE; MTBE is a fungible product; the manufacturers of the offending product cannot be identified; and defendants are manufacturers that together control a substantial share of the market for MTBE-containing gasoline.[423] These allegations are suffi-

cient to support the application of market share liability under New York law.[424]

In *MTBE I*, this Court also held that without further discovery, it would be inappropriate to exclude the concert of action theory as a possible basis of liability where the plaintiffs had alleged conspiracy.[425] Plaintiffs contend that defendants acted together to create a market for MTBE, to conceal the nature of MTBE, and to maximize profits in a way defendants knew would result in contamination of plaintiffs' groundwater.[426] They allege that defendants' conspiratorial acts included failing to provide sufficient warnings, fighting underground storage tank legislation, and collectively deciding to use MTBE rather than other, safer oxygenates to satisfy the requirements of the Reformulated Gasoline Program.[427] Thus, the New York Plaintiffs may, consistent with the Court's previous ruling, rely on either market share or concert of action liability at this stage of the proceedings. Even if—as defendants argue—plaintiffs cannot rely on alternative or enterprise liability, the Court has already held that other collective liability theories (*i.e.*, market share

418. *See* East Hampton Compl. ¶¶ 280–287 (negligence per se).

419. *See* Tonneson Compl. ¶¶ 104–108 (outrageous conduct causing the infliction of emotional distress).

420. *See id.* ¶¶ 85–90.

421. *See id.* ¶¶ 91–94. Because defendants have not argued for dismissing the claims for declaratory relief and intentional interference with the right to appropriate water, I do not address them in this opinion.

422. *See MTBE I*, 175 F.Supp.2d at 620–22 (citing *Hymowitz*, 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069).

423. *See* Long Island Water Compl. ¶¶ 1, 218–224; NYC Compl. ¶¶ 2, 58–60, 120; East Hampton Compl. ¶¶ 218–225. The *Tonneson* and *Basso* plaintiffs are only suing Sunoco

and Exxon Mobil and do not rely on collective liability theories to prove proximate cause. As a result, this discussion does not apply to those plaintiffs.

424. *See Hymowitz*, 73 N.Y.2d at 507, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (acknowledging, in a similar context, that DES plaintiffs needed a "realistic avenue of relief"); *see also MTBE I*, 175 F.Supp.2d at 621, 622 n. 42 (finding that market share liability applied to similar allegations).

425. *See MTBE I*, 175 F.Supp.2d at 633.

426. *See* Long Island Water Compl. ¶ 229; East Hampton Compl. ¶ 230; NYC Compl. ¶¶ 144–146.

427. *See* Long Island Water Compl. ¶ 230; East Hampton Compl. ¶ 229–232; NYC Compl. ¶ 147.

and concert of action) apply. Accordingly, none of plaintiffs' claims will be dismissed for failure to identify the party that caused plaintiffs' injuries.

## B. Trespass

Defendants contend that the trespass claims must be dismissed, even under the liberal pleading standard, because plaintiffs have not alleged any fact which, if proven, would show that defendants had the requisite willful intent to intrude upon plaintiffs' property. Plaintiffs argue that defendants have misstated the law on the willful intent element because the trespasser must only intend the act which amounts to or produces the unlawful invasion; the trespasser need not intend the unlawful invasion itself.

■ To prevail on a claim for trespass in New York, the trespasser

> need not intend or expect the damaging consequence of his intrusion, [but] he must intend *the act which amounts to or produces the unlawful invasion,* and the intrusion must at least be the immediate or *inevitable* consequence of what he willfully does, or which he does so negligently as to amount to willfulness. To constitute such a trespass, the act done must be such as 'will to a *substantial*

*certainty* result in the entry of foreign matter.' [428]

The New York Plaintiffs assert that defendants intentionally created MTBE, intentionally added it to gasoline, and intentionally transported MTBE-containing gasoline through a distribution system they knew was susceptible to leaks and spills. Defendants allegedly acted, knowing that MTBE had a higher propensity to contaminate groundwater than other gasoline additives, and that unintentional releases of gasoline frequently occurred. For example, defendants supposedly knew of "a national crisis involving gasoline leaking from multiple sources, such as [underground storage tanks]" [429] and that "thousands of gallons of gasoline enter the soil annually from gasoline-dispensing stations due to consumer and jobber overfills and from leaks . . . ." [430]

■ As oft-stated, plaintiffs need not allege facts supporting every element of a claim. Nonetheless, based on the allegations, it could be reasonably inferred that defendants willfully intruded upon plaintiffs' land. *First,* defendants' intentional creation and distribution of MTBE-containing gasoline could be construed as the act which amounted to or produced the unlawful invasion of plaintiffs' property.[431]

---

428. *Phillips v. Sun Oil Co.,* 307 N.Y. 328, 331, 121 N.E.2d 249 (1954) (quoting Restatement (Second) of Torts § 158 cmt. h) (emphasis added). *Accord Scribner v. Summers,* 84 F.3d 554, 558 (2d Cir.1996) ("[T]he appropriate standard is whether [defendant]: (I) intended the *act* which amounts to or produces the unlawful invasion, and (ii) had good reason *to know or expect* that subterranean and other conditions were such that there would be passage of the contaminated water from defendant's to plaintiff's land.") (quotations marks, alterations, and citations omitted) (emphasis in original).

429. East Hampton Compl. ¶ 133. *See also* Long Island Water Compl. ¶ 129; NYC Compl. ¶¶ 77–78; Tonneson Compl. ¶¶ 33–34.

430. East Hampton Compl. ¶ 134. *See also* Long Island Water Compl. ¶ 130; NYC Compl. ¶¶ 77–78.

431. *See Valley Stream Union Free Sch. Dist. # 30 v. Exxon Mobil Corp.,* No. 5093/02, slip op. at 10 (N.Y. Sup.Ct. Nassau Co. Jan. 23, 2003), Ex. B to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (denying motion to dismiss trespass claim because "[t]he plaintiff school district has alleged that defendants intended the acts which produced the invasion and had good reason to know that there would be and in fact was an invasion of MTBE gas on the plaintiff school district's land").

*Second,* given defendants' alleged awareness of the vulnerabilities in the gasoline distribution and storage system, a reasonable inference is that it was substantially certain that MTBE would enter plaintiffs' property.[432] Defendants' motion to dismiss the trespass claims is therefore denied.

### C. New York Oil Spill Prevention, Control, and Compensation Act

■■ Defendants argue that the Navigation Law claims must fail because plaintiffs' allegation that defendants are "dischargers" within the meaning of the statute are so conclusory that it fails to give any notice of the events and circumstances of which plaintiffs complain. Plaintiffs, in turn, emphasize that the statute should be broadly construed, as it is meant to apply to any intentional or unintentional action or omission resulting in the release of petroleum into the waters of the state. They have pled that defendants created MTBE knowing it had a unique ability to enter and contaminate

groundwater, and distributed it through a system they knew was prone to leaks and spills.[433]

"Article 12 of the Navigation Law, commonly known as the Oil Spill Act, was enacted to ensure swift, effective cleanup of petroleum spills that threaten the environment." [434] The Navigation Law provides, in relevant part, that "any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and direct and indirect damages, no matter by whom sustained." [435] "Discharge" means "any intentional or unintentional action or omission resulting in the releas[e] . . . of petroleum into the waters of the state . . . ," [436] and the term "discharger" includes "a party who is in a position to halt [a] discharge, to effect an immediate cleanup or to prevent the discharge in the first place." [437]

Although the statute was meant to be construed broadly,[438] it was not meant to impose liability merely for supplying the market with gasoline.[439] For example, in

**432.** *See Scribner,* 84 F.3d at 558 (metal treatment business liable in trespass for barium contamination of adjacent property, based on intentional washing and demolition of barium-tainted furnaces after barium had been listed as a hazardous waste, and business had good reason to know or expect that barium particles would pass from waste water to adjacent property); *cf. Hilltop Nyack Corp. v. TRMI Holdings,* 264 A.D.2d 503, 505, 694 N.Y.S.2d 717 (2d Dep't 1999) (trial court improperly granted summary judgment for defendant on trespass claim because there were factual issues as to whether defendants had "good reason to know or expect" that the contaminants would pass from the gasoline service station to the plaintiff's property).

**433.** *See* Long Island Water Compl. ¶¶ 114–116, 129–133; NYC Compl. ¶¶ 70–78; East Hampton Compl. ¶¶ 98–100, 111–116; Tonneson Compl. ¶¶ 29–31, 34–36.

**434.** *State of New York v. Green,* 96 N.Y.2d 403, 406, 729 N.Y.S.2d 420, 754 N.E.2d 179 (2001).

**435.** N.Y. Nav. Law § 181(1).

**436.** *Id.* § 172(8).

**437.** *State of New York v. Avery–Hall Corp.,* 279 A.D.2d 199, 201, 719 N.Y.S.2d 735 (3d Dep't 2001).

**438.** *See* N.Y. Nav. Law § 195 ("This article, being necessary for the general health, safety, and welfare of the people of this state, shall be liberally construed to effect its purposes.").

**439.** *See Coppola v. Amerada Hess Corp.,* No.2001/3995, slip op. at 13 (N.Y. Sup.Ct. Dutchess Co. July 31, 2002), Ex. A to Memorandum of Law in Support of Defendants' Motion to Dismiss the New York Complaints ("The refining and marketing of gasoline or the use of MTBE as an additive are not activities which fall within the definition of 'discharge.' Even as suppliers of petroleum products, defendants are not subject to Navigation Law liability absent evidence that they did something to cause the discharge."); *Mol-*

*State v. Cronin,* the court granted partial summary judgment to the fuel supplier because the act of delivery alone had not led to the plaintiff's injury.[440] Rather, New York courts have required a more direct nexus between the defendant and the discharge—for instance, a landowner who could have prevented the contamination,[441] or a seller who set in motion the events which resulted in the discharge.[442]

Nonetheless, the Navigation Law claims survive because defendants conceivably could have set in motion events that resulted in the release of petroleum into plaintiffs' water supply. Defendants may have supplied or controlled *particular* gas stations at which discharges occurred, or, spills may have occurred during the process of gasoline delivery, *e.g.*, through

leaks from defendants' trucks. During the course of this litigation, the parties have indicated that these types of events do occur. Whether they occurred in these cases is a question more appropriately answered through discovery, rather than dismissal.[443]

Furthermore, the *Tonneson* and *Basso* plaintiffs make exactly those types of allegations. They assert that "MTBE was discharged from UST systems located at gasoline stations at 805 Route 9W in the Town (Sunoco station), ... and at 1086 Route 9W in the Town (Exxon Mobil station).... These stations were *owned* and/or *operated* and/or *controlled* and/or *supplied* with MTBE laden gasoline by the defendants in wanton, reckless and negligent disregard for the health and safety of

---

*loy v. Amerada Hess Corp.,* No.2001/3996, slip op. at 13 (N.Y. Sup.Ct. Dutchess Co. Aug. 1, 2002), Ex. B to Memorandum of Law in Support of Defendants' Motion to Dismiss the New York Complaints (same).

440. *See* 186 Misc.2d 809, 812–13, 717 N.Y.S.2d 828 (2000) ("In the court's view, it would be unduly burdensome to extend liability for petroleum discharges to petroleum suppliers in the absence of some evidence that the supplier either caused or contributed to the discharge or that it possessed the ability to anticipate and/or prevent the discharge. The court finds that the mere delivery of gasoline to an underground storage tank, of itself—absent other factors—is not sufficient to render a gasoline supplier a discharger.").

441. *See, e.g., Green,* 96 N.Y.2d at 407, 729 N.Y.S.2d 420, 754 N.E.2d 179 (holding that defendant was discharger within the meaning of Navigation Law § 181 because "[a]s the owner and lessor of the trailer park, Lakeside had the ability to control potential sources of contamination on its property, including [the] maintenance of a 275–gallon kerosene tank"); *Henning v. Rando Mach. Corp.,* 207 A.D.2d 106, 111, 620 N.Y.S.2d 867 (4th Dep't 1994) (reinstating Navigation Law claim against landowner, lessee, and trustee of land).

442. *See, e.g., Avery–Hall Corp.,* 279 A.D.2d at 201, 719 N.Y.S.2d 735 ("[W]here a party con-

tracts to deliver petroleum products and thereby has responsibility for the manner and means of delivery, and the discharge occurs during the delivery, that party will not be insulated from liability as a discharger by arranging to have the delivery made by a third party."); *State of New York v. Montayne,* 199 A.D.2d 674, 675, 604 N.Y.S.2d 978 (3d Dep't 1993) (fuel broker could be liable under Navigation Law because it was "in a position to prevent the discharge or to effect a cleanup as it was contractually obligated to furnish the oil to [the plaintiff] and thus had the responsibility for selecting the manner and means of delivery"); *Domermuth Petroleum Equip. and Maint. Corp. v. Herzog & Hopkins, Inc.,* 111 A.D.2d 957, 959, 490 N.Y.S.2d 54 (3d Dep't 1985) (defendant that delivered fuel was required to clean up the oil spill because "it set in motion the events which resulted in the discharge"); *cf. Lowenthal v. Perkins,* 164 Misc.2d 922, 626 N.Y.S.2d 358, 361 (1995) (genuine issue of material fact as to whether supplier set in motion events resulting in discharge of fuel by delivering oil to fuel tank with or without notice of defect in tank precluded summary judgment as to whether supplier was discharger within meaning of Navigation Law).

443. *See id.* at 362.

the plaintiffs."[444] These allegations imply that the named defendants in those cases, Sunoco and Exxon Mobil, actively contributed to the discharge of petroleum on plaintiffs' property.

Defendants argue that the complaints fail to give them notice of the basis of plaintiffs' claims. However, plaintiffs allege, *inter alia,* that defendants alone had control of the oxygenate selected and added to gasoline; defendants used MTBE, knowing that it had a unique ability to contaminate groundwater; and defendants sent it into a distribution system that they knew would inevitably leak and spill.[445] Some of the complaints also identify particular spill locations.[446] These allegations are sufficient to inform defendants of their alleged acts or omissions that form the basis of plaintiffs' claims. Consequently, defendants' motion to dismiss plaintiffs' Navigation Law claims is denied.

### D. Negligence Per Se

■ Defendants argue that one group of plaintiffs' negligence per se claims must be dismissed because plaintiffs do not allege a viable statutory violation to support their cause of action. "As a rule, violation of a State statute that imposes a specific duty constitutes negligence per se, or may even create absolute liability."[447] Every New York complaint asserting negligence per se alleges violations of the Navigation Law and section 349 of the General Business Law. The Navigation Law imposes a duty not to release petroleum into the waters of the state, while the General Business Law imposes an obligation on those doing business in New York to avoid using "deceptive acts or practices in the conduct of any business, trade or commerce...."[448] The Court has been pointed to no authority and has discovered none, precluding violation of either statute as a predicate for negligence per se. Plaintiffs have therefore stated a claim for negligence per se.

### E. Infliction of Emotional Distress

Defendants move to dismiss the *Tonneson* and *Basso* plaintiffs' causes of action for "outrageous conduct causing the infliction of emotional distress." Defendants argue that their only conduct was to refine, manufacture, and distribute gasoline containing MTBE, and that this conduct does not arise to the level of an "extreme and outrageous act" that would support a claim for intentional infliction of emotional distress. In addition, defendants argue that property contamination cannot serve as a basis for an emotional distress claim in New York, and therefore, plaintiffs' claim must be premised on personal exposure to MTBE. Even upon that theory, however, they say that the claim would fail because plaintiffs fail to allege facts sufficient to demonstrate a clinically-demonstrable presence of a toxin in their bodies or some other indication of toxin-induced disease.

Plaintiffs respond that defendants knowingly contaminated drinking water with a chemical suspected to cause cancer, and that behavior is more extreme and outrageous than other conduct courts have found adequate to support emotional dis-

---

444. Tonneson Compl. ¶ 50.

445. *See* Long Island Water Compl. ¶¶ 6–7, 77–82, 149–153, 163, 186; East Hampton Compl. ¶¶ 14–15, 98–100, 133, 142, 202–207; NYC Compl. ¶¶ 69–95; Tonneson Compl. ¶¶ 19, 34–35, 51, 54.

446. *See, e.g.,* East Hampton Compl. ¶ 224.

447. *Elliott v. City of New York,* 95 N.Y.2d 730, 734, 724 N.Y.S.2d 397, 747 N.E.2d 760 (2001).

448. N.Y. Gen. Bus. Law § 349.

tress claims. Plaintiffs also assert that they have alleged a rational basis for their fear of contracting a disease. The complaints include allegations that MTBE has caused a statistically significant increase in the incidence of cancer in scientific animal studies, and MTBE is a probable human carcinogen.[449]

▇▇▇ Under New York law, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."[450] Because damages are not recoverable for anxiety caused by property damage, these plaintiffs may only recover for emotional distress caused by injury or fear of injury to the person.[451] To maintain a cause of action for emotional distress following exposure to a toxic substance, a plaintiff must establish (1) that he or she was in fact exposed to the disease-causing agent, and (2) there is a rational basis for his or her fear of contracting a disease.[452] "A 'rational basis' has been construed to mean the clinically-demonstrable presence of a toxin in the plaintiff's body, or some other indication of a toxin-induced disease."[453] The policy reason for such requirements "has less to do with feigned claims; rather, it is the guarantee of trustworthiness of the claim

449. *See* Tonneson Compl. ¶ 47.

450. *Dana v. Oak Park Marina, Inc.*, 230 A.D.2d 204, 208, 660 N.Y.S.2d 906 (4th Dep't 1997) (alterations omitted). *Accord Butler v. Delaware Otsego Corp.*, 203 A.D.2d 783, 785, 610 N.Y.S.2d 664 (3d Dep't 1994) (intentional infliction of emotional distress requires " 'extreme and outrageous conduct [so transcending] the bounds of decency as to be regarded as atrocious and intolerable in a civilized society' ") (alteration in original) (quoting *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985)).

451. *See Muzio v. Brown*, 302 A.D.2d 505, 506, 755 N.Y.S.2d 278 (2d Dep't 2003) (lawyer properly sanctioned for bringing frivolous emotional distress claim because claim premised on destruction of personal property); *Probst v. Cacoulidis*, 295 A.D.2d 331, 332, 743 N.Y.S.2d 509 (2d Dep't 2002) ("Damages are not recoverable for mental distress caused by malicious or negligent destruction of personal property[.]"); *Magro v. Morgan Holding Corp.*, 292 A.D.2d 154, 155, 738 N.Y.S.2d 194 (1st Dep't 2002) (plaintiffs had no cause of action for emotional injury where observation of damage to personal property was the source of the psychological harm); *General Accident Ins. Co. v. Black & Decker (U.S.), Inc.*, 266 A.D.2d 918, 918, 697 N.Y.S.2d 420 (4th Dep't 1999) ("There is no cause of action for emotional distress caused by the destruction of one's property ... nor for emotional distress caused by the observation of damage to one's property.") (quotation marks and citation omitted); *Jensen v. L.C. Whitford Co., Inc.*, 167 A.D.2d 826, 826, 562 N.Y.S.2d 317 (4th Dep't 1990) ("While physical injury is not a necessary component of a cause of action for negligent infliction of emotional distress, recovery for such injury generally must be premised upon a breach of a duty owed directly to plaintiff which either endangered plaintiff's physical safety or caused plaintiff to fear for his or her own safety.").

452. *See Prato v. Vigliotta*, 253 A.D.2d 746, 748, 677 N.Y.S.2d 386 (2d Dep't 1998); *Abusio v. Consolidated Edison of N.Y., Inc.*, 238 A.D.2d 454, 454, 656 N.Y.S.2d 371 (2d Dep't 1997); *Wolff v. A–One Oil, Inc.*, 216 A.D.2d 291, 291–92, 627 N.Y.S.2d 788 (2d Dep't 1995).

453. *Prato*, 253 A.D.2d at 748, 677 N.Y.S.2d 386. *Accord Abusio*, 238 A.D.2d at 455, 656 N.Y.S.2d 371 ("rational basis" construed to mean the presence of polychlorinated biphenyls (PCBs) in the body, or a physical manifestation of PCB-contamination); *Wolff*, 216 A.D.2d at 292, 627 N.Y.S.2d 788 ("rational basis" interpreted as the presence of asbestos fibers in the plaintiff's body, or some indication of asbestos-induced disease). *See also Tischler v. Dimenna*, 160 Misc.2d 525, 527, 609 N.Y.S.2d 1002 (1994) ("[T]he courts of this State have rejected cancer phobia and cancer like-phobia claims (i.e., asbestosphobia) where there were no chemical manifestations of the disease and no reasonable basis that the disease would develop.").

that is lacking, as recovery for damages for the possibility of obtaining a future disease as a result of a present physical injury requires medical proof of a reasonable certainty that such developments will occur." [454]

■ Plaintiffs allege that "[o]ne or more plumes of defendants' MTBE has contaminated each of the plaintiffs' wells located on their respective real properties." [455] Plaintiffs contend that they rely "for drinking, bathing, cooking, cleaning, and all other ordinary and domestic purposes on water from [their] wells" [456] and that the wells are "plaintiffs' only source of water." [457] While some plaintiffs own the contaminated properties as investment vehicles, most of the plaintiffs actually reside on the land at issue. [458] A reasonable inference to be drawn from these allegations is that plaintiffs ingested water contaminated with MTBE.

Plaintiffs' emotional distress claims survive dismissal because plaintiffs could be granted relief under New York law if they eventually prove that (1) they were exposed to MTBE, and (2) they exhibit a physical manifestation of MTBE contamination in their bodies, or an indication of MTBE-induced disease. At a minimum, plaintiffs' allegations are sufficient to support an inference of exposure to MTBE. Whether they can establish that they have a rational fear of developing disease is an issue of proof that cannot be considered on a motion to dismiss. The New York Court of Appeals has explained that although "[m]ental disturbance is easily simulated," [459] some

> kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof. It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. *The problem is one of adequate proof,* and it is not necessary to deny a remedy in all cases because some claims may be false. [460]

If defendants seek to learn which plaintiffs (if any) have been exposed to MTBE, when and where they were exposed, and whether they have developed any physical manifestation of MTBE contamination, the cure for such deficiencies is a motion for a more definite statement under Rule 12(e). [461]

Nevertheless, I recognize that recovery for fear of future injury is rare under New York law. New York courts "have been loathe to entertain claims for emotional damage flowing from the possibility of coming down with an illness or disease absent infection or clinical evidence of a related condition." [462] For a plaintiff's fear to be rational, New York courts have

---

**454.** *Tischler,* 160 Misc.2d at 528, 609 N.Y.S.2d 1002 (emphasis omitted).

**455.** Tonneson Compl. ¶ 38.

**456.** *Id.* ¶¶ 6–15 (alleged by each plaintiff).

**457.** *Id.* ¶ 39.

**458.** *See id.* ¶¶ 6, 13 (investment); 7–12, 14–15 (residence).

**459.** *Ferrara v. Galluchio,* 5 N.Y.2d 16, 21, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958).

**460.** *Id.* (emphasis added).

**461.** *See Pelman,* 396 F.3d at 512 n. 5 (cure for vague and conclusory allegations is a motion for a more definite statement pursuant to Rule 12(e)).

**462.** *Petri v. Bank of N.Y. Co., Inc.,* 153 Misc.2d 426, 434, 582 N.Y.S.2d 608 (1992).

required that the development of disease be *likely*, rather than just possible.[463] Because many plaintiffs are unable to prove *physical* manifestations of bodily contamination, New York courts routinely grant summary judgment for defendants on emotional distress claims based on plaintiffs' fear of getting cancer,[464] asbestos-related disease,[465] and AIDS.[466] Given

that MTBE is only a "probable," and not a known, human carcinogen, it is likely that plaintiffs will be unable to withstand summary judgment on these emotional distress claims.[467] Nonetheless, it is sufficient at the pleading stage that there exists a set of facts which, if proven, would entitle the *Tonneson* and *Basso* plaintiffs to relief.

**463.** *See Dangler v. Town of Whitestown*, 241 A.D.2d 290, 672 N.Y.S.2d 188, 190 (4th Dep't 1998) (lower court "erred in dismissing [on summary judgment] the cancerphobia causes of action" because "plaintiffs presented the testimony of an expert who testified to a reasonable degree of medical certainty that plaintiffs had a 'likelihood' of contracting cancer as a result of their exposure to contaminants in the landfill"); *Brown v. New York City Health and Hosp. Corp.*, 225 A.D.2d 36, 648 N.Y.S.2d 880, 887 (2d Dep't 1996) ("The fear of contracting AIDS depends not only upon the likelihood that the virus was transmitted during a specific incident but also upon the likelihood that infection will develop."); *Doner v. Ed Adams Contracting, Inc.*, 208 A.D.2d 1072, 1073, 617 N.Y.S.2d 565 (3d Dep't 1994) (finding in favor of defendant on summary judgment motion because "no doctor has indicated that [plaintiff] is likely to develop asbestos-related impairment in the future"); *Conway v. Brooklyn Union Gas Co.*, 189 A.D.2d 851, 852, 592 N.Y.S.2d 782 (2d Dep't 1993) (dismissing claim on summary judgment because it was "far too speculative" since plaintiffs offered no proof "that they had been advised by medical personnel of the likelihood of developing cancer").

**464.** *See Abusio*, 656 N.Y.S.2d at 372 (no rational basis for fear because plaintiffs failed to present any clinical evidence of PCB contamination); *Conway*, 189 A.D.2d at 851, 592 N.Y.S.2d 782 (plaintiffs offered no evidence of asbestos contamination which could develop into cancer).

**465.** *See Wolff*, 216 A.D.2d at 292, 627 N.Y.S.2d 788 (plaintiffs failed to present clinical evidence of asbestos contamination); *Doner*, 208 A.D.2d at 1073, 617 N.Y.S.2d 565 (medical proof demonstrated that plaintiff did not suffer any physical ailment as the result of his exposure to asbestos and tests revealed no objective signs of an increased likelihood of

developing asbestosis); *Rittenhouse v. St. Regis Hotel Joint Venture*, 149 Misc.2d 452, 454, 565 N.Y.S.2d 365 (1990) (although plaintiff submitted various physician's affirmations attesting to her agitated mental state, her lungs showed no clinical evidence of scarring or the presence of asbestos fibers), *rev'd on other grounds*, 180 A.D.2d 523, 579 N.Y.S.2d 100 (1st Dep't 1992).

**466.** *See Schott v. St. Charles Hosp.*, 250 A.D.2d 587, 672 N.Y.S.2d 393, 394 (2d Dep't 1998) (following needle-stick, plaintiff repeatedly tested negative for HIV); *Petri*, 153 Misc.2d at 433–34, 582 N.Y.S.2d 608 (although plaintiff had been exposed to HIV infection, he had not tested positive for either AIDS or HIV); *Hare v. State of New York*, 143 Misc.2d 281, 286, 539 N.Y.S.2d 1018 (1989) (fear of developing AIDS unfounded because no evidence that assailant was suffering from AIDS, immediate precautions were taken to prevent possible infection after the attack, and plaintiffs had tested negative on three occasions).

**467.** *See Atkins v. Exxon Mobil Corp.*, 9 A.D.3d 758, 780 N.Y.S.2d 666, 668 (3d Dep't 2004) (district court properly dismissed emotional distress claim on the merits because plaintiffs had not "demonstrated the presence of MTBE in the body of any of the plaintiffs or other evidence of the presence of a toxin-induced disease causally related to such exposure"); *see also Distefano v. Nabisco, Inc.*, 2 A.D.3d 484, 767 N.Y.S.2d 891, 891 (2d Dep't 2003) (no rational basis for fear because no "clinical evidence of physical manifestation of VOC [volatile organic compounds] contamination"); *Prato*, 253 A.D.2d at 748, 677 N.Y.S.2d 386 (plaintiffs failed to raise fact issue as to the rational basis of their fear because they "failed to present any clinical evidence of some physical manifestation of petroleum contamination").

In conclusion, defendants' motion to dismiss the New York complaints is denied. The New York Plaintiffs have stated actionable claims for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, infliction of emotional distress, negligence per se, civil conspiracy, violation of General Business Law § 349, violation of the Navigation Law, declaratory relief, and intentional interference with the right to appropriate water.

## XVI. PENNSYLVANIA

Northampton, Bucks County Municipal Authority ("Northampton") asserts claims sounding in: (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) failure to warn; (4) negligence; (5) private nuisance; (6) trespass; and (7) civil conspiracy.[468].

### A. Collective Liability

 Under Pennsylvania law, theories of enterprise and concert of action do not provide a basis here for relaxing plaintiffs' obligation to prove causation. In Pennsylvania, enterprise liability is appropriate where (1) the injury-causing product was manufactured by one of a small number of defendants in an industry; (2) defendants had joint knowledge and control of the risks inherent in the product; and (3) defendants delegated their safety responsibilities to a trade association.[469] Northampton has not satisfied two of these requirements: it has sued over fifty defendants, and has not alleged that defendants delegated their safety responsibilities to a trade organization.[470] Therefore, enterprise liability does not apply. In addition, under Pennsylvania law, concert of action liability can only attach if the plaintiff identifies the wrongdoer or the person who acted in concert with the wrongdoer.[471] Thus, Northampton may only proceed on its claims if the Pennsylvania Supreme Court would employ a theory of alternative or market share liability in MTBE cases.[472]

**468.** *See* Northampton, Bucks County Municipal Authority Second Amended Complaint ("Northampton Compl.") ¶¶ 199–251.

**469.** *See Burman v. Golay & Co., Inc.,* 420 Pa.Super. 209, 616 A.2d 657, 659–60 (1992); *Burnside v. Abbott Labs.,* 351 Pa.Super. 264, 505 A.2d 973, 984 (1985); *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 495 A.2d 963, 970 (1985).

**470.** *See Burnside,* 505 A.2d at 985 (rejecting enterprise liability in DES case because plaintiffs could not satisfy the criteria enunciated in *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972)). *See also Hurt v. Philadelphia Hous. Auth.,* 806 F.Supp. 515, 533 (E.D.Pa.1992) (enterprise liability not applicable to lead paint case because defendants did not delegate safety responsibilities to a trade association); *Vigiolto v. Johns–Manville Corp.,* 643 F.Supp. 1454, 1459 (W.D.Pa.1986) (enterprise liability not appropriate in asbestos case because the industry had a large number of manufacturers).

**471.** *See Skipworth v. Lead Indus. Ass'n, Inc.,* 547 Pa. 224, 690 A.2d 169, 175 (1997) (plaintiff in lead paint case could not rely on concert of action because she was unable to identify any one of the lead paint manufacturers as the wrongdoer); *Burnside,* 505 A.2d at 984 ("[T]he law of [the] Commonwealth forecloses the assertion of a cause of action for concerted action where the plaintiff is unable to isolate a particular manufacturer as a causative agent of his injuries."); *Kline v. Ball,* 306 Pa.Super. 284, 452 A.2d 727, 729 (1982) (granting summary judgment on concert of action claim because evidence did not establish who made the dare that led to the dropping of the trash can over the balcony, causing plaintiff's injury).

**472.** Pennsylvania courts have approved of alternative liability outside of the products liability context. *See Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707, 709 (1970) (landowner of construction site permitted to invoke alternative liability and join as defendants the children who threw rocks at the plaintiff and struck her eye); *Sommers v. Hessler,* 227 Pa.Super. 41, 323 A.2d 17, 20 (1974) (applying alternative liability to school bus passen-

The Pennsylvania Supreme Court has addressed collective liability in products litigation on only one occasion. In *Skipworth v. Lead Industries Association, Inc.*,[473] a minor child filed an action through her legal guardians against several manufacturers of lead pigment and their trade association. Plaintiffs alleged that Skipworth had suffered physical and neuropsychological injuries as a result of lead poisoning from the paint in their home. Plaintiffs stipulated that they could not identify which manufacturer's pigment had been ingested by Skipworth and that they could not identify when the pigment had been applied to their residence. They alleged, however, that they had joined substantially all of the manufacturers of lead pigment used in house paint from 1870 to 1977, when production of lead pigment ceased. Although the court realized that "there may arise a situation that would compel [it] to depart from [its] time-tested general rule [of proximate cause], such a situation [was] not presented by the matter *sub judice.*"[474]

The court refused to apply market share liability to the lead paint case due to concerns about the expansive time period alleged and the non-fungible nature of lead paint. The court reasoned that over the one hundred year period at issue, several lead pigment producers had entered and left the market. "Thus, application of the market share theory to this situation would virtually ensure that certain pigment manufacturers would be held liable where they could not possibly have been a potential tortfeasor...."[475] More impor-

tantly, what was "actually fatal" to plaintiffs' argument for applying market share liability was that "lead paint, as opposed to DES, is *not a fungible product.*"[476] The Pennsylvania Supreme Court explained that differing formulae of lead paint resulted in differing levels of "bioavailability" of lead, or the extent to which lead is easily internalized by the body.[477] Thus, differing formulae of lead paint created varying risks of harm. The court reasoned:

Market share liability is grounded on the premise that it ensures that 'each manufacturer's liability would approximate its responsibility for the injuries caused by its own products.' *Sindell,* 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145. Yet, in this case, apportioning liability based upon a manufacturer defendant's share of the market ... would not serve to approximate that defendant's responsibility for injuries caused by its lead paint. For example, a manufacturer whose lead product had a lower bioavailability than average would have caused less damage than its market share would indicate. Thus, application of market share liability to such a manufacturer would impose on it [a] disproportionately high share of the damages awarded.[478]

The court also concluded, in granting summary judgment to defendants, that alternative liability did not apply because plaintiffs produced no evidence that defendants acted simultaneously in producing the lead paint and plaintiffs had failed to join all potential tortfeasors.[479] Although the court spoke in terms of lengthy time frame

gers, one of whom injured minor plaintiff in spit ball fight on bus).

**473.** 547 Pa. 224, 690 A.2d 169.

**474.** *Id.* 690 A.2d at 172.

**475.** *Id.* at 173.

**476.** *Id.* (emphasis added).

**477.** *Id.*

**478.** *Id.*

**479.** *See id.* at 174.

and fungibility, it was clearly concerned about the distortion of liability in two ways: (1) the assignment of liability to those who could not *possibly* have been the cause in fact of the injury; and (2) the apportionment of liability among manufacturers in a way that did not correspond to each defendant's level of culpability in producing an unreasonably dangerous product.[480]

Other Pennsylvania courts have ruled in accordance with the *Skipworth* principles when they have rejected market share and alternative liability. For instance, in *Pennfield Corp. v. Meadow Valley Electric, Inc.*,[481] the state appellate court held that the plaintiff could not maintain an action against two manufacturers of electrical cables because the plaintiff had alleged that he purchased the defective cable *either* from one defendant or the other. By that allegation, the plaintiff had implicitly admitted that one of the manufacturers had committed no wrongdoing whatsoever. The court therefore concluded that neither alternative nor market share liability applied because the predicate for both theories was that the conduct of all defendants be similarly tortious.[482] The court in *Cummins v. Firestone Tire & Rubber*

*Co.*,[483] reached a similar result where the plaintiff was unable to identify the manufacturer of a defective wheel rim because a third party had repaired the tire part and returned it to the stream of commerce after the accident. The court refused to adopt market share liability partly because the plaintiff's inability to identify the manufacturer was not the fault of the producers of the product but of another party, and suing manufacturers that accounted for a "high percentage" of the market left too great a possibility that the actual wrongdoer would escape liability.[484] The court was concerned that application of market share theory in the case before it would ensnare blameless manufacturers without assigning liability to the actual tortfeasor. And, of course, the common thread running through both decisions and *Skipworth* is that none of the products at issue were fungible.

In one DES case, *Burnside v. Abbott Laboratories*,[485] the Pennsylvania Superior Court refused to adopt market share liability. In *Burnside*, the trial court granted complete or partial summary judgment in favor of twenty-six pharmaceutical companies based on undisputed evidence that the

**480.** *See id.* at 172 ("Application of market share liability to lead paint cases such as this one would lead to a distortion of liability which would be so gross as to make determinations of culpability arbitrary and unfair.").

**481.** 413 Pa.Super. 187, 604 A.2d 1082 (1992).

**482.** *See id.* 604 A.2d at 1085 (alternative liability not available because plaintiff did not assert that both manufacturers' conduct was tortious, but rather that one supplier was the source of the defective cable); *id.* at 1087 (market share liability theory not applicable because there was no allegation in the complaint that both manufacturers were similarly careless).

The Superior Court's decision in *Pennfield* might provide another avenue for Northamp-

ton because it suggests that a plaintiff could plead in the alternative. The court in *Pennfield* held that the plaintiff-appellant should be allowed to amend his complaint to allege that the electrical cables distributed by both the first and second defendants were defective. "Appellant should then have the opportunity to utilize discovery to pin-point which company distributed the allegedly defective cable." *Pennfield*, 604 A.2d at 1089–90.

**483.** 344 Pa.Super. 9, 495 A.2d 963.

**484.** *See id.* 495 A.2d at 972 (also rejecting market share liability because plaintiff failed to allege that the product was fungible, and instead alleged that the tire rim assemblies were "generically similar").

**485.** 505 A.2d 973.

companies could not have manufactured the DES that allegedly caused plaintiffs' injuries. Nonetheless, plaintiffs appealed, arguing that there should be industry-wide liability. After rejecting several liability theories "on the facts here shown," [486] the Superior Court found it unnecessary to consider the merits of the market share theory because "[e]ven if such a theory were adopted in Pennsylvania, it would not permit recovery against those defendants who were excused by the trial court in this case." [487] Various defendants had demonstrated that they had never manufactured or marketed DES as a miscarriage preventative, or had not manufactured DES in the relevant time frame or region. [488] It is not surprising that under these circumstances the court refused to extend liability to this group of defendants.

The lone Pennsylvania case applying "alternative liability" in products litigation did not face the same factual shortcomings as *Skipworth, Pennfield, Cummings,* and *Burnside.* In *Erlich v. Abbott Laboratories,* [489] the Court of Common Pleas held that a DES plaintiff who could not identify the particular manufacturer of the DES ingested by her mother could maintain an action against those manufacturers who allegedly produced substantially all of the drug. In reaching its decision, the court was persuaded by four factors. *First,* the plaintiff was unable to identify which defendant manufactured the DES that caused her injury, and her inability was through no fault of her own. [490] *Second,* although contested, the plaintiff had joined manufacturers that represented ninety percent—or "substantially all"—of the market. [491] *Third,* the plaintiff had alleged that all of the defendants "engaged in the same wrongful conduct of placing an allegedly defective product on the market without adequate warning of its dangers." [492] *Fourth,* the plaintiff alleged that the DES produced was identical and all shared the same defective qualities. [493] The court found that the fungible nature of the product "eliminate[d] the fear expressed by some commentators ... that imposing liability upon an entire industry would lessen a manufacturer's incentive to produce a safe product," [494] *i.e.,* the manufacturer would only be liable for injuries caused by products that conformed to its own standards, rather than insuring the products of other manufacturers with lower safety standards. The facts of the DES case were therefore "sufficiently compelling to warrant placing the burden on the Defendant to prove that it did not manufacture the drug which allegedly injured the Plaintiff." [495] Because *Erlich* was a paradigm case for market share liability, the case did not present the concerns expressed by the Pennsylvania Supreme Court in *Skipworth.* In addition, I note that although the court purported to adopt a modified form of alternative liability, its analysis

---

486. *Id.* at 984.

487. *Id.* at 986.

488. *See id.* at 986–87. *See also Karibjanian v. Thomas Jefferson Univ. Hosp.,* No. 89–1891, 1989 WL 80317, at *2 (E.D.Pa. July 11, 1989) (finding that the *Burnside* court had not rejected market share theory altogether, but "simply held that several of the defendants had exonerated themselves from liability even if the market-share theory were adopted").

489. 5 Phila.Co.Rptr. 249 (Pa.Com.Pl.1981).

490. *See id.* at 265.

491. *Id.* at 266.

492. *Id.* at 267.

493. *See id.* at 267–68.

494. *Id.* (citation omitted).

495. *Id.* at 258.

was more akin to that under market share.[496]

Pennsylvania courts have clearly considered the merits of alternative and market share liability in products litigation. To date, only one trial court has embraced a theory of collective liability to permit plaintiffs to supplant the proximate cause requirement. However, other Pennsylvania courts have left open the possibility that the theories might apply under suitable circumstances.[497] The underlying principle in cases rejecting alternative and market share liability is that their application to the facts before the various courts would have distorted liability by holding innocent manufacturers (*i.e.*, those who could not possibly have caused the harm) liable for the plaintiff's injuries and/or assigning a greater proportion of liability to manufacturers than each deserved. As previously discussed, however, plaintiffs' allegations conform to the Restatement factors weighing in favor of market share liability.[498]

Based on the prevailing case law, I find that the Pennsylvania Supreme Court would approve of a market share or alternative theory of liability in Northampton's case.[499] Northampton alleges that "[s]ometime after 1979, Defendants started manufacturing, distributing and/or selling

gasoline with MTBE."[500] Because the relevant time period is twenty-five years, as opposed to the hundred year period in *Skipworth*, this case does not pose the same risk of imputing liability to defendants that could not have caused plaintiff's harm. Furthermore, plaintiff's allegations of concerted action and conspiracy (which are taken as true for purposes of this motion) limit the possibility that manufacturers might be held liable without fault. In addition, Northampton asserts that gasoline containing MTBE is a fungible product.[501] The interchangeable nature of the allegedly defective product ensures that the liability of each manufacturer approximates its responsibility for injuries caused by its product. Finally, theories of alternative and market share liability allow any defendant to be dismissed if it proves that it did not cause the plaintiff's harm.[502] Accordingly, Northampton may rely on market share and alternative liability theories.

### B. Trespass

■ Defendants challenge Northampton's trespass claim because Pennsylvania law requires that a defendant intend to enter upon the particular piece of land in question. They stress that plaintiff has not even alleged trespass upon land but upon groundwater.

---

496. The *Erlich* court interpreted market share liability as encompassing the apportionment of damages only, rather than covering the burden shifting effect of the theory. *See id.* at 268 n. 11. *See also City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 124 n. 11 (3d Cir.1993) (noting that *Erlich* court relied on market share liability even though it professed to endorse an extension of alternative liability) (citing cases).

497. *See supra* notes 473–488 and accompanying text. *See also Vigiolto*, 643 F.Supp. at 1462–63 (finding that although Pennsylvania Supreme Court would adopt market share liability theory, it would not do so in asbestos

cases given the inherent differences between asbestos and DES).

498. *See supra* Part IV.E.

499. *Cf. Karibjanian*, 1989 WL 80317, at *2 (denying motion to dismiss in action against manufacturers of the drug Thorotrast because the manufacturers might have been liable in Pennsylvania under alternative or market share theory).

500. Northampton Compl. ¶ 83.

501. *See* Northampton Compl. ¶ 185.

502. *See Burnside*, 505 A.2d at 978.

To state a cause of action in trespass under Pennsylvania law, "it is not necessary that [the defendant] perform [its] act for the purpose of entering on plaintiff's land. It is sufficient if [it] knows that [its] conduct will result in such an entry inevitably or to a substantial certainty."[503] In this case, Northampton alleges, among other things:

> At all times relevant to this litigation, Defendants were aware that there is a national crisis involving gasoline leaking from multiple sources, such as USTs. Substantial industry reports, congressional testimony, and concerns expressed by the Environmental Protection Agency ("EPA") document Defendants' knowledge that the systems used for shipping, storing, pumping, and using gasoline involve leaks and spillages at all links in the gasoline distribution chain.[504]

Furthermore, plaintiff alleges that defendants "were or should have been aware that MTBE contamination of groundwater was inevitable, as a result of MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use."[505] At this stage, I must accept that defendants knew with substantial certainty that their conduct would result in the invasion of plaintiff's land and was therefore intentional. There is no merit to defendants' contention that dismissal is required because plaintiff has not alleged intent to invade a "particular piece of land." Although Northampton will eventually be required to prove defendants' intent to enter specific property, it need not make such a showing at the pleading stage. If defendants seek to learn which particular property has been invaded, they should move for a more definite statement under Rule 12(e).[506] Defendants' argument that groundwater contamination is insufficient for trespass on a particular piece of land is also unpersuasive because "a trespass may be committed on, beneath, or above the surface of the earth."[507] Northampton has stated a cause of action for trespass.[508]

In conclusion, defendants' motion to dismiss the Pennsylvania complaint is denied. Northampton may proceed on its claims for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, and civil conspiracy.

## XVII. VERMONT, VIRGINIA, AND WEST VIRGINIA

503. *Buckley Motors v. Amp, Inc.,* 23 Pa. D. & C.2d 324, 328 (1960). *Accord Burr v. Adam Eidemiller, Inc.,* 386 Pa. 416, 422, 126 A.2d 403 (1956) (intentional invasion occurs "(a) where the actor acts for the purpose of causing it; or (b) where the actor knows that it is resulting or substantially certain to result from his conduct").

504. Northampton Compl. ¶ 98.

505. *Id.* ¶ 102.

506. *See Pelman,* 396 F.3d at 512 n. 5 (cure for vague and conclusory allegations is a motion for a more definite statement pursuant to Rule 12(e)).

507. Restatement (Second) of Torts § 159(1).

508. *See Curry Coal Co. v. M.C. Arnoni Co.,* 439 Pa. 114, 266 A.2d 678, 682 (1970) (after plaintiff notified defendant that its dumping of sludge was causing seepage into plaintiffs' mine, continued dumping constituted grounds for a cause of action for intentional trespass); *Buckley Motors,* 23 Pa. D. & C.2d at 329 (defendant's emission of particles from smokestack was intentional because defendant had notice that the particles were falling on plaintiff's land and were causing damage to painted vehicles parked there).

The Vermont[509] and West Virginia Plaintiffs[510] bring causes of action for: (1) public nuisance; (2) strict liability for design defect and/or defective product; (3) failure to warn; (4) negligence; (5) private nuisance; (6) trespass; and (7) civil conspiracy.[511] The Virginia Plaintiffs[512] assert the same causes of action, but substitute a claim for breach of warranty in place of strict liability for design defect and/or defective product.[513]

## A. Collective Liability

■ The highest courts of Vermont, Virginia, and West Virginia have not yet passed on the viability of collective liability because the issue has never reached them in a products litigation. Furthermore, extensive research has failed to uncover a basis for inferring whether these courts would accept or reject collective liability in MTBE cases.

Nevertheless, there is a discernable inclination on the part of the highest courts of each of these states to expand the common law to accommodate the changing needs of society. For instance, in *Hay v. Medical Center Hospital of Vermont,*[514] the Vermont Supreme Court rejected the notion that it should defer to the legislature when departing from common law, declaring

> [T]his Court has frequently met new and difficult problems head-on, using common law principles. Many of these cases have produced change which would have a profound effect on social and business relationships.... It is the responsibility of the courts to balance competing interests and to allocate losses arising out of human activities. One of the principal purposes of the law of torts is to compensate people for injuries they sustain as a result of the negligent conduct of others. The common law, which is judge-made and judge-applied, can and will be changed when changed conditions and circumstances establish that it is unjust or has become bad public policy.[515]

The Virginia Supreme Court and West Virginia Supreme Court of Appeals have expressed similar views.[516] And in accordance with this philosophy, each of these state courts have modified or eliminated common law requirements that previously made recovery for certain tort victims practically impossible.[517]

---

**509.** Town of Hartland and Craftsbury Fire District # 2.

**510.** Town of Matoaka.

**511.** *See* Town of Hartland Fourth Amended Complaint ("Hartland Compl.") ¶¶ 202–253; Town of Matoaka Second Amended Complaint ("Matoaka Compl.") ¶¶ 191–251.

**512.** Buchanan County School Board and Patrick County School Board.

**513.** *See* Buchanan County School Board Second Amended Complaint ("Buchanan Compl.") ¶¶ 197–263.

**514.** 145 Vt. 533, 496 A.2d 939 (1985).

**515.** *Id.* at 543–44, 496 A.2d 939 (quotation marks and citations omitted).

**516.** *See Surratt v. Thompson,* 212 Va. 191, 183 S.E.2d 200, 202 (1971) (" 'There is not a rule of common law in force today that has not evolved from some earlier rule of common law ... leaving the common law of today when compared with the common law of centuries ago as different as day is from night.' ") (quoting *State v. Culver,* 23 N.J. 495, 505, 129 A.2d 715 (1957)); *McDavid v. United States,* 213 W.Va. 592, 584 S.E.2d 226, 230 n. 4 (2003) (maintaining that their "courts retain the power to change the common law").

**517.** *See, e.g., R. & E. Builders, Inc. v. Chandler,* 144 Vt. 302, 304, 476 A.2d 540 (1984) (rejecting common law rule that wife's legal existence merged with that of her husband); *Hilder v. St. Peter,* 144 Vt. 150, 159–60, 478 A.2d 202 (1984) (finding an implied warranty of habitability for residential premises); *Mor-*

A review of the Restatement factors leads me to conclude that the highest courts of Vermont, Virginia, and West Virginia would apply market share liability to the MTBE cases at bar.[518] Plaintiffs allege that MTBE-containing gasoline is a defective product which has caused contamination of their groundwater.[519] They contend that due to the fungible nature of MTBE and the way in which it is distributed, they cannot identify the specific refiners and distributors who caused their injuries.[520] MTBE presents precisely the type of situation envisioned by *Sindell*, where "advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer."[521] The proof problems caused by generic products did not exist generations ago, and the courts of these states have been receptive to reducing barriers that would deprive tort victims of *any*

remedy. Accordingly, plaintiffs' claims will not be dismissed for failure to identify the actual tortfeasors.

## B. Trespass

In addition, defendants assert that the Vermont Plaintiffs cannot maintain a trespass claim because they fail to allege intent and that the allegations only contain reference to defendant Irving Oil's negligent entry onto plaintiffs' land. Plaintiffs argue that their trespass claims are cognizable because the complaints allege that defendants knew with substantial certainty that MTBE would reach plaintiffs' property when they manufactured, marketed, and sold MTBE-containing gasoline.

■ The Vermont Supreme Court has held that "[a] person who intentionally enters or remains upon land in the posses-

*ris v. American Motors Corp.*, 142 Vt. 566, 575, 459 A.2d 968 (1982) (holding that assembler-manufacturer of cars can be vicariously liable for negligence of manufacturer of defective component part); *Menard v. Newhall*, 135 Vt. 53, 54–55, 373 A.2d 505 (1977) (creating rebuttable presumption of causation in failure to warn cases); *Zaleskie v. Joyce*, 133 Vt. 150, 155, 333 A.2d 110 (1975) (adopting strict products liability); *Richard v. Richard*, 131 Vt. 98, 106, 300 A.2d 637 (1973) (abrogating rule of interspousal tort immunity); *O'Brien v. Comstock Foods, Inc.*, 125 Vt. 158, 161, 212 A.2d 69 (1965) (rejecting privity as a defense for injuries to consumer); *Foster v. Roman Catholic Diocese*, 116 Vt. 124, 133–34, 70 A.2d 230 (1950) (rejecting rule that charitable institutions are immune from tort liability); *Smith v. Kauffman*, 212 Va. 181, 186, 183 S.E.2d 190 (1971) (abolishing parental immunity in automobile accident cases); *Weishaupt v. Commonwealth*, 227 Va. 389, 405, 315 S.E.2d 847 (1984) (abolishing husband's immunity from prosecution for rape of wife that occurred when husband and wife were separated but not yet divorced); *Midkiff v. Midkiff*, 201 Va. 829, 833, 113 S.E.2d 875 (1960) (abolishing immunity in automobile accident case between two unemancipated brothers); *Worrell v. Worrell*, 174 Va. 11, 12, 4 S.E.2d

343 (1939) (eliminating interspousal tort immunity in personal injury case because "[a] maxim of the common law (and of the ages for that matter) is when the reason for a rule ceases the rule itself ceases"); *Teller v. McCoy*, 162 W.Va. 367, 384, 253 S.E.2d 114 (1978) (affording residential tenant implied warranty of habitability); *Lee v. Comer*, 159 W.Va. 585, 593, 224 S.E.2d 721 (1976) (establishing right of unemancipated minor to maintain action against parents for personal injuries received in automobile accident); *Adkins v. St. Francis Hosp. of Charleston*, 149 W.Va. 705, 718, 143 S.E.2d 154 (1965) (abolishing doctrine of charitable immunity in tort cases against hospitals); *Snyder v. Wheeling Elec. Co.*, 43 W.Va. 661, 661, 28 S.E. 733 (1897) (adopting *res ipsa loquitur* doctrine).

**518.** *See supra* Part IV.E.

**519.** *See* Hartland Compl. ¶¶ 217–225; Buchanan Compl. ¶¶ 201–209; Matoaka Compl. ¶¶ 195–203.

**520.** *See* Hartland Compl. ¶ 195; Buchanan Compl. ¶ 193; Mataoka Compl. ¶ 187.

**521.** *Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 936.

sion of another without a privilege to do so is subject to liability for trespass."[522] In addition, a person may be liable in trespass if she performs an act knowing with substantial certainty that it will result in the entry of foreign matter onto another's land.[523]

▮ Plaintiffs' trespass claims are based on the contention that defendants knew with substantial certainty that MTBE would reach plaintiffs' property when they manufactured and distributed MTBE-containing gasoline. Among other things, plaintiffs allege that defendants knew or should have known that MTBE would pollute plaintiffs' property "[g]iven the properties of MTBE and the long history of gasoline spills, leaks and other losses during distribution, sale and use."[524] Despite this knowledge, defendants refined, sold, and made available MTBE-containing gasoline because it was a way for defendants to profit from a refining waste byproduct.[525] These allegations are sufficient for the Vermont Plaintiffs to state a claim for trespass.

In sum, defendants' motions to dismiss the Vermont, Virginia, and West Virginia complaints are denied. The Vermont and West Virginia Plaintiffs may proceed on their causes of action for public nuisance, design defect, failure to warn, negligence, private nuisance, trespass, and civil conspiracy. The Virginia Plaintiffs may pursue their claims for public nuisance, breach of warranty, failure to warn, negligence, private nuisance, trespass, and civil conspiracy.

## XVIII. CONCLUSION

In conclusion, defendants' motions to dismiss the complaints filed in Florida, Kansas, Massachusetts, New York, Pennsylvania, Vermont, Virginia, and West Virginia are denied in their entirety. Defendants' motions to dismiss the complaints filed in Connecticut, Illinois, Indiana, Iowa, Louisiana, New Hampshire, and New Jersey are granted in part and denied in part. The following claims are dismissed: (1) Connecticut Plaintiffs' claims for public nuisance, private nuisance, civil trespass, civil conspiracy, violation of the Connecticut Unfair Trade Practices Act, and fraud (as to some, but not all, defendants); (2) Illinois Plaintiff's claim for violation of the Illinois Water Pollutant Discharge Act; (3) Indiana Plaintiffs' claims against downstream handlers; (4) Iowa Plaintiffs' claim for fraud (as to some, but not all, defendants); (5) Louisiana Plaintiffs' claims for negligence, public nuisance, private nuisance, trespass, and civil conspiracy; (6) New Hampshire Plaintiffs' claims for public and private nuisance; and (7) New Jersey Plaintiffs' claim for violation of the New Jersey Spill Compensation and Control Act. The Clerk of the Court is directed to close these motions.

SO ORDERED.

▮

---

**522.** *Harris v. Carbonneau,* 165 Vt. 433, 437, 685 A.2d 296 (1996) (citing Restatement (Second) of Torts § 158).

**523.** *See* Restatement (Second) of Torts § 158 cmt. I.

**524.** Hartland Compl. ¶ 102.

**525.** *See id.* ¶¶ 88–90.